**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF CONNECTICUT; NED LAMONT, Governor of Connecticut, in his Official Capacity; WILLIAM TONG, Attorney General of Connecticut, in his Official Capacity; CITY OF NEW HAVEN, CONNECTICUT; JUSTIN ELICKER, Mayor of New Haven, in his Official Capacity,<br><br>    Defendants. | No. 3:26-cv-568<br><br>**COMPLAINT** |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**INTRODUCTION**

1. Within hours of assuming the Presidency, President Donald J. Trump took immediate action to fulfill his campaign promise to the American people and declared that a "national emergency exists at the southern border of the United States" caused by the unprecedented "illegal entry of aliens" into the country. Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the prior Administration's open border policies that incentivized disregard for laws passed by Congress. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law, resulting in "significant threats to national security and public safety," with aliens "committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against*

*Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Further exacerbating this national crisis, so-called sanctuary cities seek to provide some of these criminal aliens with safe harbor from federal law enforcement detection. The consequences of those misguided policies are dire. Sanctuary cities welcome aliens to live and work in American communities whose citizens may become the crime victim. This national crisis underscores the vital importance of the Executive "[e]nforcing our Nation's immigration laws." *Id*.

2.    Despite the known dangers of such sanctuary policies, the State of Connecticut insists on harboring criminal offenders from federal law enforcement. Specifically, the end of the Trust Act, Conn. Gen. Stat. § 54-192h ("Trust Act"), is to intentionally obstruct federal law enforcement and thwart the constitutional obligation of the President of the United States to take care that the immigration laws enacted by Congress are enforced. *See* Exec. Order 14,287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025). Such blatant disregard for federal laws that have been on the books for decades is not merely a political disagreement or passive abstention; it is deliberate, disruptive action that jeopardizes the public safety of all Americans. The Supremacy Clause of the United States Constitution prohibits a state or locality from thus obstructing Congress and the Executive.

3.    Accordingly, the United States brings this declaratory and injunctive action to prohibit the State of Connecticut from enforcing the Trust Act. The Trust Act unlawfully interferes with, regulates, and discriminates against the Federal Government's enforcement of federal immigration law in violation of the Supremacy Clause of the United States Constitution. *See generally* Conn. Gen. Stat. § 54-192h.

4.    The United States has well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution,

2

numerous acts of Congress, and binding U.S. Supreme Court and Second Circuit precedent. Indeed, Congress last year strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[1]

5.      The challenged provisions of Connecticut law reflect an effort to obstruct the operation of federal immigration law and to impede the consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe. The Trust Act serves "to hide criminals from law enforcement."[2] "Sanctuary legislation like Connecticut's Trust Act only endangers the communities it claims to protect. Such laws only force law enforcement professionals to release criminal alien offenders back into the very communities they have already victimized."[3]

6.      Upon information and belief, the conduct of officials in Connecticut obstructing and refusing to comply with federal immigration laws over a period of years has resulted in countless criminals being released into Connecticut who should have been held for immigration removal from the United States. For example, the Connecticut Department of Corrections officials recently refused to honor the detainer of an alien who was convicted of sexually assaulting two

---

[1] Press Release, DHS, *President Trump Signs the Laken Riley Act into Law* (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

[2] Mark Pazniokas, *Expansion of CT Trust Act Passes House*, CT MIRROR (May 21, 2025) (quoting Rep. Doug Dubitsky, R-Chaplin). https://ctmirror.org/2025/05/21/ct-trust-act-expansion-passes-house/

[3] *ICE Arrests 65 Undocumented Immigrants in Four-Day Sweep in* Connecticut, NBC Conn. (Aug. 20, 2025 at 7:42 pm), https://www.nbcconnecticut.com/news/local/ice-arrests-65-undocumented-immigrants-in-four-day-sweep-in-connecticut/3627816/ (last accessed March 2, 2026).

children, and ICE officers had to arrest the alien in the community after his release from state prison.[4] Since 2020, less than 20% of civil immigration detainers have been honored in Connecticut.

7.     The Connecticut Trust Act impedes the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state and local law enforcement[5] officials from assisting with federal civil immigration enforcement. Under these laws, state and local officers are explicitly prohibited from complying with immigration detainers and civil immigration warrants in most instances.[6] They are also generally prohibited from communicating with federal immigration authorities regarding the custody status or release of a targeted illegal alien. And the Connecticut law limits the ability of state and local law enforcement officers to provide federal officers access to such individuals to effect the safe transfer of such individuals to federal immigration custody, even when federal officials present a federal administrative warrant.

8.     Moreover, on March 26, 2026, the Connecticut Office of the Attorney General issued the *Statement of Policy and Guidance Regarding Immigration Matters* addressing the state's Trust Act and the protocols for sharing information with federal authorities. Regarding the

---

[4] Press Release, DHS, ERO Boston arrests twice-convicted sex offender in Connecticut after Department of Corrections ignores immigration detainer (Jan. 14, 2025), https://www.ice.gov/news/releases/ero-boston-arrests-twice-convicted-sex-offender-connecticut-after-department.

[5] "Law enforcement officer" is defined very broadly by the Trust Act, including the Department of Correction, municipal police, State Police, marshals, probation officers, the Division of Criminal Justice (including state's attorneys), and the Board of Pardons and Paroles. *See* Conn. Gen. Stat. § 54-192h(a)(9).

[6] *See* Press Release, DHS, Connecticut is a sanctuary no more, *supra* note 3 (noting that "state and local law enforcement agencies will refuse to honor ICE detainers with a few rare exceptions").

disclosure of an individual's "immigration status," the guidance states that "personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena." Memorandum from William Tong, Conn. Att'y Gen., *Statement of Policy and Guidance Regarding Immigration Matters*, at 12 (March 26, 2026) ("Policy Guidance," attached as Exh. A). The Policy Guidance further directs that "[a]gencies and officials should protect the privacy and legal rights of individuals, and should only share sensitive information as explicitly required by law." *Id.*

9.      The Policy Guidance also states that "ICE detainer requests are just that: requests. They do not carry the weight of a warrant, and they impose no legal obligation for local law enforcement to detain, arrest, or jail someone." *Id.* at 11. In encouraging state officials to flout "administrative subpoenas," the Policy Guidance states that "[s]uch documents generally do not require immediate responses and can be challenged in court. Unlike judicial subpoenas, penalties for failure to comply with an administrative subpoena are not automatic and may only occur if a subpoena enforcement action is brought in federal district court." *Id.*

10.      These provisions intentionally obstruct the sharing of information envisioned by Congress, including sharing basic information such as release dates and custodial status, thereby impairing federal detention of removable aliens, including dangerous criminals, as required by federal law. They further require federal officials to procure judicial warrants in order to take custody of removable aliens, even though Congress has made an explicit policy choice that such removals can be effectuated by *civil* arrest warrants for immigration enforcement and even though courts have upheld the lawfulness of that choice. And they facilitate the release of dangerous criminals into the community by directing local employees to refuse to transfer such aliens to

5

federal officials in a secure environment, thereby resulting in their release onto the streets, where they all too often reoffend and commit serious crimes.

11.     Similarly, the Executive Order issued by City of New Haven Mayor Justin Elicker on July 23, 2020, entitled, "An Executive Order to Affirm New Haven a Welcoming City" ("Executive Order," attached as Exh. B) unlawfully impedes the operation of federal immigration laws. The Executive Order forbids New Haven officers and employees from disclosing "confidential information" without the consent of the alien, defining "confidential information" to include "immigration status." *Id.* at §§ III(6), (7). It prohibits local law enforcement agencies from inquiring about or engaging in activities to ascertain an individual's immigration status. *Id.* §§ III(2)–(4). It forbids city employees from using their resources "to investigate, enforce or assist in the investigation or enforcement of *any federal program* . . ." *Id.* § III(5) (emphasis added). The Executive Order also bars local law enforcement agencies from using their resources to "[d]etain or arrest a person, based on ICE detainer requests or administrative warrants entered by ICE . . . unless required by law." *Id.* § III(8). Finally, the Executive Order subjects "[a]ny employee of the City who is found to have violated this Executive Order" to "discipline in accordance with applicable union contract, civil service rules, or department work rules." *Id.* § III(10).

12.     The New Haven Executive Order is in conflict with and reflects an obstacle to the Federal Government's enforcement of the immigration laws, is expressly preempted by 8 U.S.C. §§ 1373, 1644, unlawfully regulates the Federal Government, and discriminates against federal immigration enforcement. Specifically, in rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, the Executive Order unlawfully regulates the Federal Government. By prohibiting information sharing with federal immigration authorities in most instances, the Executive Order acts to single out federal

immigration authorities for disfavored treatment and frustrates the system of cooperation contemplated by federal law.

13.    The Supremacy Clause prohibits the State of Connecticut and City of New Haven from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution. The Supremacy Clause also provides that federal statutes prevail over conflicting state or local laws. And the Supremacy Clause prohibits states and localities from directly regulating or singling out the Federal Government for adverse treatment— as the challenged laws do—thereby violating the doctrine of intergovernmental immunity twice over.

14.    Accordingly, the provisions challenged here are unlawful and cannot stand.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

16.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this District.

17.    This Court has authority to provide the relief requested under its inherent equitable powers, the Supremacy Clause, as well as the Declaratory Judgment Act, 28 U.S.C. §§ 1651, 2201, 2202.

## PARTIES

18.    Plaintiff is the United States of America. It regulates immigration under its constitutional, statutory, and inherent sovereign authorities. It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security ("DHS"), along with DHS's component agencies, including U.S.

7

Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

19. Defendant State of Connecticut is a State of the United States.

20. Defendant Ned Lamont is the Governor of Connecticut and is being sued in his official capacity, as he bears responsibility for the enforcement of the Trust Act.

21. Defendant William Tong is the Attorney General of Connecticut and is being sued in his official capacity as the State of Connecticut's chief law enforcement official charged with enforcing and defending the Trust Act and implementing the Policy Guidance. *See* Policy Guidance at 1 ("I provide this Memorandum pursuant to my authority as the State's chief legal officer and chief civil law enforcement official, and pursuant to the Constitution of the State of Connecticut and General Statutes § 3-125[.]").

22. Defendant City of New Haven is a city in the State of Connecticut.

23. Defendant Justin Elicker is the Mayor of New Haven and is being sued in his official capacity as he bears responsibility for the administration and enforcement of the New Haven Executive Order. *See* Executive Order at § III(11).

## CONSTITUTIONAL AND STATUTORY BACKGROUND
## POWER OVER IMMIGRATION

24. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. U.S.*, 567 U.S. 387, 394 (2012); *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring). This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394 (citations omitted). Those inherent rights and obligations as an independent Nation include a duty to control the Nation's borders to ensure

the safety and flourishing of its citizens. *See Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893); *Ping v. United States*, 130 U.S. 581, 603–04 (1889); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

25.     The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

### RELEVANT STATUTES

26.     Exercising this authority, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396.

27.     Federal immigration authorities also "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Federal immigration authorities further are authorized to issue subpoenas "concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service," and federal district courts are authorized to issue orders requiring individuals to comply with such subpoenas. *See* 8 U.S.C. § 1225(d)(4).

28.     Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that

removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). Further, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a).

29.     Congress also authorized states and localities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). Additionally, Section 287(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C § 1357(g), authorizes the Secretary of DHS to enter into written agreements with state or local law enforcement permitting designated officers to perform specified federal immigration enforcement functions. Participation is voluntary and designated officers receive training at the federal government's expense. When a State or locality decides to participate, its officers act pursuant to federal authority under federal direction and oversight.

30.     In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

31.     DHS also may request that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d). And in some instances, DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). And in other instances, the INA gives the federal immigration authorities the discretion to detain an alien based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

32.     Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

**SUPREMACY POINTS**

33.     The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), "regulat[es] the United States directly," *United States*

*v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted), or "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). The Supremacy Clause incorporates both intergovernmental immunity and preemption.

34.    The preemption doctrine provides that federal interests edge out state interests when federal and state law "clash." *North Dakota*, 495 U.S. at 435; *Murphy*, 584 U.S. at 477–79. Preemption is typically categorized as express, field, or conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). Express preemption occurs when Congress includes express language within the statute indicating its preemptive intent. *Id.* at 372. State law is also naturally preempted to the extent of any conflict with a federal statute. *Id*. That includes, for example, if it is impossible to comply with both state and federal law, and where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372–73.

35.    "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government

entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b). These provisions both regulate and facilitate the Federal Government's regulation of private parties.

**FACTUAL BACKGROUND**

### A.    The Connecticut Trust Act

36.    The Connecticut Trust Act was enacted in 2013 to limit state and local law enforcement officials' participation in federal civil immigration enforcement. *See* Trust Act, Connecticut Pub. Act No. 13-155 (2013). As initially drafted, the Trust Act provided that no state law enforcement officer "who receives a civil immigration detainer with respect to an individual who is in the custody of the law enforcement officer shall detain such individual pursuant to such civil immigration detainer" unless the individual's history was especially egregious. *Id.* The Trust Act was amended in 2019 and amended again in 2025.[7]

37.    On March 26, 2026, the Connecticut Office of the Attorney General issued the Policy Guidance addressing the Trust Act and the protocols for sharing information with federal authorities. *See* Exhibit A.

38.    As amended, the Trust Act now impedes cooperation between state and local law enforcement and federal immigration authorities to enforce the immigration laws in several ways.

---

[7] The most recent amendments to the Trust Act were effective October 1, 2025. Conn. Gen. Stat. § 54-192h(b)(1)(A). The amendments provide for a private right of action against a municipality for injunctive or declaratory relief. *Id.* § 54-192h(h).

39.    *First*, the Act prohibits law enforcement officers from arresting or detaining individuals pursuant to a civil immigration detainer[8] unless: 1) "the detainer is accompanied by a warrant issued or signed by a judicial officer," 2)  the individual has been convicted of a violation of certain enumerated statutes (which pertain to the offenses of manslaughter, sexual assault, strangulation, burglary, violation of a protective order, and possession of child sexual abuse material),[9] 3) the individual has been convicted of a "class A or B felony offense,"[10] or 4) "the individual is identified as a possible match in the federal Terrorist Screening Database or similar database." Conn. Gen. Stat. § 54-192h(b)(1)(A).

40.    *Second*, the Act generally prohibits law enforcement officers from "[e]xpend[ing] or us[ing] time, money, facilities, property, equipment, personnel or other resources to

---

[8] "Civil immigration detainer" is defined as "a request from a federal immigration authority to a local or state law enforcement agency for a purpose including, but not limited to: (A) Detaining an individual suspected of violating a federal immigration law or who has been issued a final order of removal; (B) Facilitating the (i) arrest of an individual by a federal immigration authority, or (ii) transfer of an individual to the custody of a federal immigration authority; (C) Providing notification of the release date and time of an individual in custody; and (D) Notifying a law enforcement officer, through DHS Form I-247A, or any other form used by the [DHS] or any successor agency thereto, of the federal immigration authority's intent to take custody of an individual[.]" Conn. Gen. Stat. § 54-192h(a)(2).

[9] The exception allowing for arrest or detention pursuant to a civil immigration detainer for aliens convicted of certain enumerated offenses was added to the Trust Act in the amendments effective October 1. 2025. *See* Conn. Gen. Stat. § 54-192h(b)(1)(A); Mark Pazniokas, *Expansion of CT Trust Act Passes House*, *supra* note 2.

[10] According to guidance provided by the office of the Attorney General of the State of Connecticut, Class A and B felonies are "the most dangerous and serious crimes" including "murder, manslaughter, assault, kidnapping, and crimes against pregnant people, children, elderly adults and people with disabilities." Trust Act Guidance Memo (Jan. 15, 2025); https://portal.ct.gov/-/media/post/general_notices/2025/gn-25-02/trust-act-guidance-memo-20250115.pdf

communicate with a federal immigration authority[11] regarding the custody status or release of an individual targeted by a civil immigration detainer." *Id.* § 54-192h(b)(1)(B).

41.    *Third*, the Act prohibits law enforcement officers from arresting or detaining an individual based on an administrative warrant.[12] *Id.* § 54-192h(b)(1)(C).

42.    *Fourth*, the Act prohibits law enforcement officers from "giv[ing] a federal immigration authority access to interview an individual who is in the custody of a law enforcement agency" outside of a few, narrow circumstances, and requires that, even if an individual is the subject of an administrative subpoena issued pursuant to 8 U.S.C. § 1225(d)(4)(A), the individual must be "the subject of a court order issued under 8 U.S.C. § 1225(d)(4)(B)" for federal authorities to obtain access to such individual. *Id.* § 54-192h(b)(1)(D).

43.    *Fifth*, the Act prohibits agreements under 8 U.S.C § 1357(g), which authorizes the Secretary of Homeland Security to enter into written agreements with state or local law enforcement to permit designated officers to perform specified federal immigration enforcement functions and authorizing specific forms of cooperation even in the absence of such an agreement. *See* Conn. Gen. Stat. §§ 54-192h(b)(1)(E).

44.    *Sixth*, the Act burdens communications between federal immigration authorities and local law enforcement by requiring the written authorization of the alien to communicate regarding the "custody status" or "release" of removable aliens, as well as their "confidential

---

[11] "Federal immigration authority" is defined as "any officer, employee or other person otherwise paid by or acting as an agent of ICE or any division thereof or any officer, employee or other person otherwise paid by or acting as an agent of the [DHS] or any successor agency thereto who is charged with enforcement of the civil provisions of the Immigration and Nationality Act[.]" *Id.* § 54-192(a)(4).

[12] "Administrative warrant" is defined as "a warrant, notice to appear, removal order or warrant of deportation issued by an agent of a federal agency charged with the enforcement of immigration laws or the security of the borders, including ICE and the [CBP], but does not include a warrant issued or signed by a judicial officer." *Id.* § 54-192h(a)(1).

information." *See* Conn. Gen. Stat. §§ 54-192h(b)(1)(B), (d). Regarding the disclosure of an individual's "immigration status," the Policy Guidance states that "personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena." Policy Guidance at 12. The Policy Guidance further directs that "[a]gencies and officials should protect the privacy and legal rights of individuals, and should only share sensitive information as explicitly required by law." *Id.*

45.    *Seventh*, the Act requires law enforcement officers to "provide a copy of the detainer to the affected individual who is the subject of the detainer," and to "inform the individual whether the law enforcement agency intends to comply with the detainer." *Id.* § 54-192h(e)(1). The notification requirements serve to alert aliens that federal civil immigration authorities may be interested in detaining them. This directly thwarts DHS's ability to take such aliens into custody, forcing DHS to engage in difficult and dangerous efforts to re-arrest aliens who previously were in state custody, and endangering immigration officers, the alien at issue, and others who may be nearby. Connecticut has no lawful interest in assisting removable aliens to evade federal law enforcement. *See* 8 U.S.C. § 1324.

**B.    New Haven Executive Order**

46.    On July 23, 2020, City of New Haven Mayor Justin Elicker issued the Executive Order *See* Exhibit B. The Executive Order unlawfully impedes the operation of federal immigration laws in several ways.

47.    *First*, the order forbids New Haven officers and employees from disclosing "confidential information," defined to include an alien's "immigration status," without the consent of the alien. *See* Executive Order, §§ III(6), (7).

48.    *Second*, the Executive Order prohibits local law enforcement agencies from inquiring about or engaging in activities to ascertain an individual's immigration status. *Id.* §§ III(2)–(4).

49.    *Third*, the Executive Order states that "[l]ocal law enforcement agencies . . . shall not use agency or department resources . . . to . . . [d]etain or arrest a person, based on ICE detainer requests or administrative warrants entered by ICE . . . unless required by law." *Id.* § III(8). It further forbids city employees from using their resources "to investigate, enforce or assist in the investigation or enforcement of *any federal program* . . ." *Id.* § III(5) (emphasis added).

50.    Finally, the Executive Order subjects "[a]ny employee of the City who is found to have violated this Executive Order" to "discipline in accordance with applicable union contract [sic], civil service rules, or department work rules." *Id.* § III(10).

## THE CHALLENGED PROVISIONS' IMPACT ON FEDERAL IMMIGRATION ENFORCEMENT

**A.    Congress's Scheme of Cooperation**

51.    The challenged provisions prohibit even the most basic cooperation with federal officials. Congress, in comity to States, permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to removal. *See* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject

to limited exceptions, federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"). But Congress crafted a statutory scheme that clearly envisioned the Federal Government being able to detain and remove those aliens once their state proceedings and sentences concluded.

52.     Congress specified that the removal period begins immediately upon release from state criminal custody, *id.* § 1231(a)(1)(B)(iii), and detention during that period is mandatory, *id.* § 1231(a)(2); *see also* 8 U.S.C. §§ 1226(c)(3), 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody). Congress granted this permission expecting that states would then facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities. If ICE lacks knowledge of a criminal alien's release date from state custody, ICE cannot exercise its statutory responsibility of effecting an arrest upon the alien's release.

53.     Furthermore, federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See id.* §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities, *id.* § 1373(b); *see id.* § 1644.

18

**B.      The Trust Act and Policy Guidance Conflict with Congress's Command**

54.     Connecticut law directly conflicts with the scheme identified above. Under the Trust Act and Policy Guidance, state and local officers are explicitly prohibited from complying with immigration detainers or civil immigration warrants and subpoenas (with limited exceptions); they are also prevented from sharing critical immigration information. Conn. Gen. Stat. §§ 54-192h(b)(1)(A), (C), (d); Policy Guidance at 11 ("ICE detainer requests . . . do not carry the weight of a warrant, and they impose no legal obligation for local law enforcement to detain, arrest or jail someone."); *id.* ("Administrative subpoenas . . . generally do not require immediate responses and can be challenged in court. . . . penalties for failure to comply with an administrative subpoena are not automatic and may only occur if a subpoena enforcement action is brought in federal district court."); 12 ("personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena.").

55.     The Trust Act and Policy Guidance limit federal immigration authorities' ability to interview individuals in state custody, *see* Conn. Gen. Stat. § 54-192h(b)(1)(D), even though the INA expressly provides that aliens in this country "*shall* be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added); *see id.* § 1225(d)(4). The Trust Act also limits the circumstances in which federal immigration officers may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

56.     Furthermore, the Trust Act and Policy Guidance run directly afoul of 8 U.S.C. § 1373 by forbidding state and local officers from "[e]xpend[ing] or us[ing] time, money, facilities, property, equipment, personnel or other resources to communicate with a federal immigration authority regarding the custody status or release of an individual targeted by a civil immigration

detainer." Conn. Gen. Stat. § 54-192h(b)(1)(B); *see also* Policy Guidance at 12 ("personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena").

57.     Additionally, the Trust Act conflicts with 8 U.S.C. § 1644, which states that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." Connecticut has therefore prohibited the activities that federal law expressly ensures state and local officials may perform.

58.     The restrictions on arrest or detention based on an administrative warrant, *see* Conn. Gen. Stat. § 54-192h(b)(1)(C), and restrictions on arrest or detention or ICE access to removable aliens in state custody absent a judicial warrant (with limited exceptions), *see* Conn. Gen. Stat. §§ 54-192h(b)(1)(A), (D), conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

59.     The challenged provisions, *e.g.*, Conn. Gen. Stat. § 54-192h(b), (d), and (e), impede DHS's ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States as well as DHS's access to such aliens to facilitate the transfer of custody, even where DHS presents a congressionally authorized civil administrative warrant of arrest or removal, *see* 8 U.S.C. §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

60.    The numbers tell the tale. Since 2020, ICE has issued 3,070 civil immigration detainers in Connecticut. Connecticut has honored less than 20% of these detainers.

61.    Localities fare no better. The Enforcement and Removal Operations Office in Hartford reports that there are currently 403 active ICE detainers dating back to 2020 that are being tracked. But since 2020, the office has been permitted to securely pick up only 181 inmates for transport.

62.    In many instances, released individuals reoffended with serious conduct when Connecticut law enforcement did not honor their ICE detainers. The serious conduct of released individuals, including at least one suspected gang member, has included various degrees of assault, burglary, felony risk of injury to child, larceny, and felony violations of a protective order.

63.    By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (*e.g.*, an administrative warrant), the challenged laws frequently require federal immigration officers either (1) to engage in difficult and potentially dangerous efforts to re-arrest aliens who were previously in local custody, or (2) to determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.[13]

64.    Additionally, the Trust Act requires state law enforcement officers to inform removable aliens when the Federal Government issues a detainer against them, even if the state or locality does not intend to comply with the detainer. *See* Conn. Gen. Stat. § 54-192h(e)(1). That

---

[13] *See, e.g.*, Press Release, DHS, ERO Boston arrests twice-convicted sex offender in Connecticut after Department of Corrections ignores immigration detainer (Jan. 14, 2025), https://www.ice.gov/news/releases/ero-boston-arrests-twice-convicted-sex-offender-connecticut-after-department; Press Release, DHS, ICE issues subpoenas to obtain information refused under Connecticut's sanctuary policies (Feb. 13, 2020), https://www.ice.gov/news/releases/ice-issues-subpoenas-obtain-information-refused-under-connecticuts-sanctuary-policies.

requirement effectively alerts the aliens to the Federal Government's enforcement efforts. Connecticut has no lawful interest in assisting removable aliens' evasion of federal law enforcement.

65.    The Trust Act singles out Federal Government immigration enforcement authorities for its disfavored treatment. The Trust Act specifies that state law enforcement officers are not to communicate with "a federal immigration authority," or to "[g]ive a federal immigration authority access to interview [the] individual," or to "[p]erform any function of a federal immigration authority." *Id.* at §§ 54-192h(a)(4), (b)(1)(B), (D), (E), (d), (e).

66.    In rejecting congressionally authorized means of enforcing federal immigration law, in requiring judicial warrants, restricting access to information and hindering coordination by outlawing agreements pursuant Section 287(g) of the INA, 8 U.S.C §1357(g), these provisions constitute unlawful direct regulation of the Federal Government.

**C.    The New Haven Executive Order Frustrates Congress's Immigration Goals**

67.    The New Haven Executive Order of July 23, 2020, similarly, frustrates federal immigration enforcement. The order specifies that "[l]ocal law enforcement agencies . . . shall not use agency or department resources . . . to . . . [d]etain or arrest a person, based on ICE detainer requests or administrative warrants entered by ICE . . . unless required by law." New Haven Executive Order § III(8); *see also id.* § III(5).

68.    The Executive Order forbids New Haven officers and employees from ascertaining or inquiring into an individual's immigration status and from disclosing "confidential information" without the consent of the alien, defining "confidential information" to include "immigration status." *Id.* at §§ III(2)–(4), (6), (7).

**D.** **The Challenged Laws Conflict with Federal Law and Unlawfully Regulate and Discriminate Against the Federal Government**

69.     Connecticut's Trust Act, its Policy Guidance and New Haven's Executive Order threaten and harm the United States' sovereign interest in the supremacy and enforcement of federal law, specifically the INA. The challenged provisions also undermine and conflict with federal immigration enforcement policy and impose financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Connecticut and New Haven. A favorable ruling would redress the United States' harms.

70.     Connecticut and New Haven have no lawful interest in assisting removable aliens to evade federal law enforcement. The state's and city's prohibitions on cooperation with Federal immigration agencies have endangered public safety, resulting in criminals being released into Connecticut rather than turned over to immigration authorities for removal from the United States, as required by federal law.

71.     The challenged laws are not a mere passive effort to avoid providing state or local resources to Federal officials but rather are an active and deliberate effort to obstruct federal immigration enforcement by, among other things, impeding the communication between federal, state, and local law enforcement officials, and the safe apprehension and detention of unlawfully present aliens.

72.     These Connecticut and New Haven provisions are an obstacle to the Federal Government's enforcement of the immigration laws, are expressly preempted, constitute unlawful direct regulation of the Federal Government, and constitute discrimination against federal immigration enforcement.

23

**CLAIMS FOR RELIEF**

**COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE AND THE INA
(TRUST ACT AND POLICY GUIDANCE CONFLICT PREEMPTION)**

73.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

74.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

75.     The Connecticut Trust Act and its Policy Guidance "stand[] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

76.     Federal law codifies an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme reflects federal authority to inspect, interrogate, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357.

77.     Federal law further contemplates cooperation, including sharing resources and information, between state and local authorities and the Federal Government to achieve uniform governance of immigration and alien status. *E.g.*, 8 U.S.C. §§ 1226(a), (c), (d), 1231(a), 1357(g).

78.     Federal law also authorizes the use of immigration detainers, warrants, subpoenas, and other mechanisms to assist in the arrest and removal of aliens. *See* 8 C.F.R. § 287.7; 8 U.S.C. §§ 1103(a)(3), 1225(d)(4), 1226(a), (c), 1231(a), 1357(d).

24

79.     Federal law makes clear that efforts to hamper its federal immigration enforcement mandates are prohibited by imposing affirmative penalties on attempts to protect aliens from such enforcement. *See* 8 U.S.C. § 1324(a)(1)(A)(ii).

80.     Nonetheless, the Connecticut Trust Act and Policy Guidance frustrate the accomplishment and execution of federal immigration law, create obstacles that undermine general federal immigration enforcement efforts, and inhibit cooperation underlying the immigration laws, barring state and local officials from sharing material with federal immigration officials even when they wish to do so and prohibiting law enforcement agencies from entering or performing immigration enforcement functions pursuant to a § 1357(g) agreement. *See* Conn. Gen. Stat. §§ 54-192(b)(1)(A)–(E), (d), (e); Policy Guidance at 11, 12.

81.     Federal law does not contemplate any of those limitations on federal immigration authorities' ability to interrogate or inspect aliens who are unlawfully present in this country or otherwise enforce federal immigration law.

82.     The Connecticut Trust Act and its Policy Guidance are thus preempted by federal immigration law.

## COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE AND THE INA (NEW HAVEN EXECUTIVE ORDER CONFLICT PREEMPTION)

83.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

84.     The New Haven Executive Order is likewise conflict preempted as its restricted disclosure of an individual's "immigration status to a specific set of local exceptions," *see* New Haven Executive Order §§ III(6), (7), frustrates the principles of cooperation and the full purposes and objectives of Congress intended to facilitate open communication between local and federal officials. The policy stands as an obstacle to federal immigration enforcement by preventing ICE

from obtaining critical intelligence necessary to carry out its statutory mandate to identify and remove aliens unlawfully present in the United States. *See id.* §§ III(2)–(5).

85. New Haven Executive Order § III(8) likewise creates a significant obstacle to federal law by prohibiting local officers from using resources to assist in the enforcement of federal immigration law, including by barring the detention of individuals based on detainer requests or administrative warrants unless "required by law." *Id*. §§ III(5), (8). This refusal to maintain custody undermines the federal regulatory framework, including specifically 8 C.F.R. § 287.7(d), which contemplates that local agencies will maintain custody for up to 48 hours to ensure the safe and orderly transfer of criminal aliens to federal authorities.

86. Federal law does not contemplate any of those limitations on federal immigration authorities' ability to collect information, communicate, or cooperate with local authorities to investigate, detain, and remove aliens who are unlawfully present in this country or otherwise enforce federal immigration law.

87. The New Haven Executive Order is thus preempted by federal immigration law.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE AND THE INA (TRUST ACT AND POLICY GUIDANCE EXPRESS PREEMPTION)

88. Plaintiffs hereby incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

89. The Connecticut Trust Act and its Policy Guidance violate the Supremacy Clause because it is expressly preempted by 8 U.S.C. §§ 1373 and 1644's requirement that States "not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373.

90.     The Connecticut Trust Act and Policy Guidance expressly forbid (in all but unusual cases) state law enforcement officials from communicating with federal immigration authorities regarding the "custody status" or "release" of removable aliens, as well as their "confidential information." Conn. Gen. Stat. § 54-192h(b)(1)(B), (d); *see* Policy Guidance at 12 ("personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena").

91.     These provisions thus fall within the heartland of what 8 U.S.C. §§ 1373, 1644 preempt.

92.     The Connecticut Trust Act and its Policy Guidance are thus preempted by 8 U.S.C. §§ 1373, 1644.

## COUNT FOUR – VIOLATION OF THE SUPREMACY CLAUSE AND THE INA
### (NEW HAVEN EXECUTIVE ORDER EXPRESS PREEMPTION)

93.     Plaintiffs hereby incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

94.     The New Haven Executive Order is expressly preempted because it prohibits the sharing of information with federal immigration authorities in most instances.

95.     The New Haven Executive Order expressly prohibits city employees from inquiring about an individual's immigration status or disclosing an individual's "immigration status" unless authorized by narrow local criteria. *See* New Haven Executive Order, §§ III(2)–(4), (6), (7). These provisions are expressly preempted by 8 U.S.C. §§ 1373 and 1644, which mandate that no local government entity or official may "in any way restrict" any government entity from sending immigration status information to federal authorities.

96.      Section III(8) of the New Haven Executive Order likewise limits the use of local resources to detain or arrest individuals based on administrative warrants entered by ICE into

federal databases. To the extent this policy prohibits or restricts local entities from "maintaining" or "exchanging" immigration status information with federal agencies, it violates the express statutory provisions codified by Congress in 8 U.S.C. §§ 1373 and 1644.

97.     The New Haven Executive Order is thus preempted by 8 U.S.C. §§ 1373, 1644.

**COUNT FIVE – VIOLATION OF THE SUPREMACY CLAUSE AND THE INA (TRUST ACT AND POLICY GUIDANCE UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**

98.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

99.     Connecticut's Trust Act violates basic principles of intergovernmental immunity by unlawfully regulating the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

100.    The Trust Act and Policy Guidance do just that by directing state and local law enforcement officials not to arrest or detain an individual pursuant to a civil immigration detainer, with limited exceptions, unless it is "accompanied by a warrant issued or signed by a judicial officer." Conn. Gen. Stat. § 54-192h(b)(1)(A)(i); *see* Policy Guidance at 10–11. But Connecticut cannot require the Federal Government to obtain such warrants when federal law expressly *declines* to demand them in the immigration context. *See* 8 U.S.C. §§ 1226(a), 1231(a). The Act and Policy Guidance also prohibit state law enforcement officials from arresting or detaining an individual pursuant to an administrative warrant. Conn. Gen. Stat. § 54-192h(b)(1)(C); *see* Policy Guidance at 10–11. But federal law establishes a system of civil administrative warrants as the basis for immigration arrest and removal and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a). The judicial warrant requirement directly regulates DHS's operations by demanding something more than is required

by federal law. Congress explicitly declined to mandate a judicial warrant requirement before localities assisted in federal immigration enforcement efforts.

101.    The Trust Act and Policy Guidance single out the Federal Government by restricting its access to vital information in furtherance of immigration enforcement. The Trust Act specifies that law enforcement officers are not to communicate with "a federal immigration authority[.]" *Id.* at § 54-192h(b)(1)(B). Further, the Trust Act prohibits law enforcement officers from "[g]iv[ing] a federal immigration authority access to interview an individual who is in the custody of a law enforcement agency" outside of a limited set of narrow circumstances: (1) when the individual has been convicted of a violation of certain enumerated statutes; (2) when the individual was convicted of a class A or B felony offense; (3) when the individual is a possible match on a terrorist screening database; or (4) the individual is the subject of an order enforcing a subpoena under § 1225(d)(4). Conn. Gen. Stat. § 54-192h(d). The Policy Guidance further restricts the Federal Government's access to critical immigration information, stating that "personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena." Policy Guidance at 12.

102.    The Connecticut Trust Act also regulates the Federal Government by prohibiting law enforcement agencies from entering or performing immigration enforcement functions pursuant to valid 8 U.S.C. § 1357(g) agreements. Conn. Gen. Stat. § 54-192h(b)(1)(E).

103.    Accordingly, Connecticut's Trust Act and Policy Guidance violate the Intergovernmental Immunity Doctrine by regulating the Federal Government in violation of the Supremacy Clause.

**COUNT SIX – VIOLATION OF THE SUPREMACY CLAUSE**
**(NEW HAVEN EXECUTIVE ORDER UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**

104. Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

105. The New Haven Executive Order likewise regulates the Federal Government because it requires a judicial warrant to detain or arrest persons subject to ICE detainers or administrative warrants even though federal law expressly declines to demand one in the immigration context. *See* New Haven Executive Order, § III(8); 8 U.S.C. §§ 1226(a), 1231(a).

106. The judicial warrant requirement directly regulates DHS's operations by demanding something more than is required by federal law. Congress explicitly declined to mandate a judicial warrant requirement before localities assisted in federal immigration enforcement efforts.

107. Accordingly, the New Haven Executive Order violates the Intergovernmental Immunity Doctrine by regulating the Federal Government in violation of the Supremacy Clause.

**COUNT SEVEN – VIOLATION OF THE SUPREMACY CLAUSE**
**(TRUST ACT AND POLICY GUIDANCE UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**

108. Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

109. Connecticut's Trust Act "singles out" federal immigration authorities for disfavored treatment, expressly and impliedly, which is exactly what intergovernmental-immunity principles bar. *Dawson v. Steager*, 586 U.S. 171, 178 (2019). The Act restricts *only* cooperation with "federal immigration authorit[ies]." Conn. Gen. Stat. § 54-192h(a)–(e); *see* Policy Guidance at 10–12.

110.    On information and belief, the State of Connecticut does not impose similar or equivalent restrictions on other law enforcement agencies.

111.    Such discriminatory targeting of the Federal Government is unlawful. *See, e.g.*, *Washington*, 596 U.S. at 839 (A "state law discriminates against the Federal Government . . . if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." (citations and alterations omitted)).

112.    Accordingly, Connecticut's Trust Act and Policy Guidance violate the Intergovernmental Immunity Doctrine and are therefore invalid.

**COUNT EIGHT – VIOLATION OF THE SUPREMACY CLAUSE**
**(NEW HAVEN EXECUTIVE ORDER UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**

113.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

114.    Similarly, the New Haven Executive Order prohibits local law enforcement from "[d]etain[ing] or arrest[ing] a person[] based on ICE detainer requests." New Haven Executive Order § III(8). It further prohibits New Haven employees from "inquir[ing] about" or "engag[ing] in activities designed to ascertain" an alien's immigration status. *Id.* §§ III(2)–(4). It prevents the use of city resources "to investigate, enforce or assist in the investigation or enforcement of any *federal* program . . ." *Id.* § III(5). It thus singles out federal immigration authorities for disfavored treatment.

115.    Rejecting congressionally authorized means of enforcing federal immigration law, the New Haven Executive Order prohibits sharing of vital information with federal immigration authorities in most instances. New Haven Executive Order § III(7). This restriction of

disseminating necessary information acts to single out federal government authorities for disfavored treatment and frustrates the system of cooperation contemplated by federal law.

116. On information and belief, the City of New Haven does not impose similar or equivalent restrictions on other law enforcement agencies.

117. Accordingly, the New Haven Executive Order violates the Intergovernmental Immunity Doctrine in violation of the Supremacy Clause.

## PRAYER FOR RELIEF

The United States respectfully requests the following relief:

A. That this Court enter a judgment declaring that the challenged provisions of the Connecticut Trust Act (Conn. Gen. Stat. § 54-192h), the State of Connecticut's Policy Guidance, and the New Haven Executive Order of July 23, 2020 (New Haven Executive Order §§ III(2)–(8)) violate the Supremacy Clause, violate federal law, and are therefore invalid;

B. That this Court enter a permanent injunction barring Defendants, as well as any of their successors, agents, or employees, from enforcing the challenged provisions of the Connecticut Trust Act (Conn. Gen. Stat. § 54-192h), Policy Guidance, and the New Haven Executive Order of July 23, 2020 (New Haven Executive Order §§ III(2)–(8)), and any substantially similar policies, orders, or laws that may become effective in the future;

C. That this Court award the United States its fees and costs in this action; and

D. That this Court award any other relief it deems just and proper.

DATED: April 13, 2026

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANNA EDWARDS
Counsel to the Associate Attorney General

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

*/s/ Jackson M. Story*
JACKSON M. STORY
Trial Attorney (FL Bar No. 1032001)
U.S. Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 451-7304
jackson.m.story@usdoj.gov

*Attorneys for the United States of America*

33