**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:26-CV-00568-AWT |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, ET AL. | : | |
| *Defendants.* | : | JULY 6, 2026 |

**DEFENDANTS CITY OF NEW HAVEN'S AND MAYOR JUSTIN ELICKER'S**
**<u>MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.    FACTUAL BACKGROUND ...................................................................................... 3

    A.    New Haven Is, and Always Has Been, a Welcoming City .................................... 3

    B.    The Welcoming City Order Reflects the City's Constitutionally Protected Policy
    Decision to Focus Its Resources on the Safety and Wellbeing of Its Residents, While
    Leaving Federal Immigration Enforcement to the Federal Government ........................... 7

II.   LEGAL STANDARD ................................................................................................. 8

III.  ARGUMENT: THE COMPLAINT MUST BE DISMISSED .................................... 9

    A.    The United States Lacks Standing to Pursue Its Claims ...................................... 9

    B.    The Welcoming City Order Is Not Preempted by Any Federal Law ............................. 13

      1.    There Is No Conflict Preemption ..................................................................... 14

      2.    There Is No Express Preemption ...................................................................... 17

    C.    The Welcoming City Order Does Not Regulate the Federal Government nor
    Discriminate Against the Federal Government ................................................................. 22

      1.    The Welcoming City Order Does Not Regulate the Federal Government at All ......... 22

      2.    The Welcoming City Order Does Not Discriminate Against the Federal
      Government ............................................................................................................ 24

    D.    The United States's Attempt to Enjoin the Welcoming City Order Violates the Tenth
    Amendment ...................................................................................................................... 25

    E.    Mayor Elicker Is Not a Proper Defendant and Must Be Dismissed ............................. 32

IV.   CONCLUSION ......................................................................................................... 33

**INTRODUCTION**

In July 2020, New Haven Mayor Justin Elicker signed "An Executive Order to Affirm New Haven a Welcoming City" ("the Welcoming City Order" or "the Order"). As the Order's title states, it affirms New Haven's identity—which dates back to the pre-revolutionary period—as a friend to newcomers and a haven to those fleeing persecution. More than a century before there was a United States of America, the City of New Haven embodied the American promise of welcome. It continues to do so today, and it will do so for as long as this City stands.

The Welcoming City Order under challenge here was born from this history and addresses the practical problems facing the City today. The City's greatest duty to its residents is to ensure their safety and well-being. In this city of immigrants and their descendants, that duty is thwarted if residents fear that reporting a crime to local law enforcement, serving as a witness, or seeking city services may make them a target of a federal investigation into which the City itself has been conscripted. The Welcoming City Order merely confirms that as a matter of municipal policy, city officers and employees will continue to prioritize protecting and serving city residents, in accord with the City's priorities, values, and federal law.

To protect that trust, the Welcoming City Order directs New Haven officers and employees to leave federal immigration enforcement to the Federal Government, and to focus their time and the City's resources on building community trust, providing effective local law enforcement, and delivering public services to New Haven's residents.

This has been the City's stated policy since 2020, long before the events of the second Trump Administration. But that continuing policy choice has additional resonance now. As the current federal administration has ordered masked armed agents into America's cities to execute military-style renditions of citizens and noncitizens alike, New Haven's policy helps preserve its

1

well-earned trust with the community and makes clear that the City is not associated with the widespread constitutional abuses that the Federal Government has inflicted on communities across the United States.

Under New Haven's Order, city officials are directed to act, as the Order says, "as required by law." It is the Federal Government's prerogative to enforce our nation's immigration laws, and the Welcoming City Order does not prevent federal agents from enforcing those laws in New Haven. Within the bounds of the Constitution and federal law, federal agents remain free to conduct immigration enforcement in New Haven. What the Federal Government cannot do, however, is force New Haven to make its officers and employees available to do the Federal Government's job for it. It cannot force New Haven to offer its officers and employees for service in support of the federal immigration enforcement generally or conscript them to assist the current administration's unconstitutional campaign of fear.  Nothing in our nation's laws requires localities to enforce federal immigration law or accede to a federal agent's requests that they cooperate in federal immigration enforcement efforts. To the contrary, federal law makes local cooperation in immigration enforcement explicitly and unequivocally optional. Our courts have been absolutely clear on that point. Across the country, including in the Second Circuit, our courts have again and again and again rejected the claims made in the Complaint, because they have no basis in law and run afoul of the United States Constitution.[1]

---

[1] Similar claims have been dismissed by over a dozen courts—including by seven courts in the past year alone. *See United States v. City of Newark*, No. 25-cv-5081, 2026 WL 1816022 (D.N.J. June 24, 2026); *United States v. City of Los Angeles*, No. CV 25-5917, 2026 WL 1790971 (C.D. Cal. June 20, 2026); *United States v. City of Boston*, No. CV 25-12456, 2026 WL 1493706 (D. Mass. May 28, 2026); *United States v. Colorado*, No. 25-cv-01391, 2026 WL 878882 (D. Colo. Mar. 31, 2026), *appeal docketed*, No. 26-1214 (10th Cir. June 2, 2026); *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); *United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025), *appeal docketed*, No. 26-387 (2d Cir. Feb. 20, 2026); *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025); *United States v. New Jersey*, No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021); *McHenry Cnty. v. Raoul*, 574 F. Supp. 3d 571 (N.D. Ill. 2021), *aff'd*, 44 F.4th 581 (7th Cir. 2022); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen.*, 8 F.4th 176 (3d Cir. 2021); *United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in relevant part*, 921 F.3d 865 (9th Cir. 2019).

This memorandum of law makes four principal points. First, the United States lacks standing for its claims because the Complaint does not allege any injury in fact to the United States caused by the Welcoming City Order. The Complaint's allegations of financial harm and harm to the Federal Government's "sovereign interest" are factually unsupported, defeated by the plain language of the Order, and insufficient as a matter of law.

Second, the Order is not preempted by any federal law. The Complaint's theory of conflict preemption has been repeatedly rejected by federal courts across the country because no federal law compels state or local governments to assist in federal immigration enforcement. Ignoring that the Order explicitly requires city employees to comply with all requirements of federal law, the Complaint's express preemption claim invites the Court to stretch 8 U.S.C §§ 1373 and 1644 well beyond their text—an invitation that courts have rejected over and over again in multiple jurisdictions.

Third, the Welcoming City Order does not regulate the Federal Government or discriminate against the Federal Government. The Order only exercises New Haven's indisputable right to regulate city employees, and the Complaint's own allegations defeat its discrimination argument.

Fourth, the Federal Government's attempt to enjoin the Welcoming City Order violates the Tenth Amendment. The United States Constitution forbids this attempt to commandeer the City's personnel and resources to enforce a federal regulatory program of immigration enforcement.

For all these reasons, as further addressed below, Defendants City of New Haven's and Mayor Justin Elicker's Motion to Dismiss should be granted with prejudice.

## I.    FACTUAL BACKGROUND

### A. New Haven Is, and Always Has Been, a Welcoming City

From its founding, New Haven has been a welcoming city. Its very name suggests this: "New Haven" was seen as a safe harbor for its founders in both a literal and metaphorical sense.

New Haven's first European settlers in 1638 were Puritans who had left England during the reign of Charles I, and who conceived of this welcoming city as a place where they could pursue their faith as they believed it without fear.[2] John Davenport, a minister and founder of New Haven, himself had to flee England in disguise; one of his most well-known sermons in New Haven took as its text Isaiah 16:3: "hide the outcasts; betray not him that wandereth."[3] From that time forward, New Haven has continued to be a haven, including for those who have faced persecution or discrimination.

Next to its founding, the historical moment that most shaped New Haven's future was the harboring of "the regicides"—Edward Whalley, William Goffe, and John Dixwell—three judges who had voted for the execution of Charles I in 1649, following the end of the English Civil War. When they fled to America after the restoration of Charles II, the leaders of New Haven shielded them from the King's pursuing agents, helping Whalley and Goffe to hide at what is now still called "Judge's Cave" on West Rock; Dixwell thereafter lived under an assumed name for many years in New Haven, and was buried under Center Church on the Green.[4] By the Revolutionary period of the 1770s, the regicides were seen throughout the colonies as patriots whom New Haven had risked of the Crown's brutal revenge to save.[5] Their names have, since the early 1800s, graced

---

[2] *See* Edward R. Lambert, *History of The Colony of New Haven* 41 (1838) ("But nothing could retain them, as they were determined to plant a distinct colony, where they might establish a government modeled in both civil and religious matters, according to their own peculiar views, and have none to control them.").

[3] Alexander Winston, *The Hunt for the Regicides,* American Heritage (1964), *republished at* https://www.americanheritage.com/hunt-regicides; Ebenezer Davies, *American Scenes and Christian Slavery: A Recent Tour of Four Thousand Miles in the U.S.*, letter XXXI, at 258 (1849), *republished at* https://books.google.com/books?id=snfcDcG8UdMC&pg=PA252&source=gbs_toc_r&cad=2#v=onepage&q&f=false.

[4] The regicides had been subjected to bills of attainder and sentenced to death. *See* Mark Alden Branch, *Escape to New Haven,* 86 Yale Alumni Mag., May/June 2023, https://yalealumnimagazine.org/articles/5659-escape-to-new-haven; Winston, *supra* note 3.

[5] Ezra Stiles, *A History of Three of the Judges of King Charles I* at 339 (1794), *republished at* https://archive.org/details/historyofthreeof00stil/page/n6/mode/1up. Stiles, then-President of Yale, began his account of the regicides by quoting Hebrews 13:2: "Be not forgetful to entertain strangers; for thereby some have entertained angels unawares." Stiles noted that the regicides were to be numbered among those "intrepid and patriotic defenders

three principal streets of New Haven; and the City in 1896 placed a plaque at Judge's Cave on West Rock, with the inscription "Opposition to Tyrants is Obedience to God."[6]

Enslaved Africans who in 1839 rebelled and seized their slave ship, *The Amistad*, were a second group who famously found a safe harbor in New Haven. While New Haven—like Connecticut itself—had a checkered history with respect to slavery, Reverend Simeon Jocelyn, who studied at Yale, helped build the multiracial neighborhood in New Haven later known as Trowbridge Square.[7] With others, he formed the "Amistad Committee" to support the enslaved Africans who had been brought to New Haven to face charges arising out of their seizure of *The Amistad*.[8] While they were held, "the New Haven jail became an extraordinary meetinghouse for all kinds of people," from all ranks of life, "most of [whom] . . . 'express[ed] much sympathy with these much abused strangers . . . .'"[9] The *Amistad* rebels eventually were freed and returned to their homes in Africa after their case went to the Supreme Court, where former President John Quincy Adams argued on their behalf.[10] New Haven became "the epicenter of the struggle" when their hearings began, and "hundreds . . . crowded into the courtroom," ranging from "[t]he officers, professors, and students of Yale University [who] turned out in force," to "working people" and "[p]eople from all walks of life"—and "in this moment of 'thrilling interest,' the 'sympathy of the community' was clearly with" those who had come to New Haven as strangers.[11]

---

of real liberty" whose names "will be transmitted with honor, renown and glory, through all the ages of liberty and of man." *Id.*

[6] *See* Elijah Hurewitz-Ravich & Nellie Keeney, *Streets fan out from Broadway with names from English history,* Yale Daily News (Sep. 24, 2025), https://yaledailynews.com/articles/streets-fan-out-from-broadway-with-names-from-english-history; Hist. Marker Database, *Judges Cave*, https://www.hmdb.org/m.asp?m=34719. As to the possible origins of the quotation on the plaque, *see* Stiles, *supra* note 8, at 107.

[7] New Haven Preservation Tr., *Trowbridge Square*, https://nhpt.org/trowbridge-square (last visited July 6, 2026).

[8] Nat'l Park Serv., *The Amistad Committee*, https://www.nps.gov/people/the-amistad-committee.htm (last visited July 6, 2026).

[9] Marcus Rediker, *The Amistad Rebellion: An Atlantic Odyssey of Slavery and Freedom* 110–111 (2012).

[10] Nat'l Park Serv., *supra* note 8.

[11] Rediker, *supra* note 9, at 146 (internal quotation marks omitted).

By the mid-nineteenth century, New Haven became a welcoming city to yet a third class of "strangers": immigrants, first from Ireland, and then from across Southern and Eastern Europe.[12] New Haven was not free from prejudice against these newcomers,[13] but in the basement of a Catholic church in New Haven in 1882, Father Michael Joseph McGivney conceived of and brought into being the Knights of Columbus, a Catholic charitable society still headquartered in New Haven, now with more than two million members and an ongoing mission to aid immigrants.[14] Another founder of the Knights of Columbus—the Irish-born Cornelius Driscoll— went on to become the first immigrant mayor of New Haven in 1899,[15] signaling that the City would not only take in strangers, but would also make them part of the City's fabric.

In short, New Haven was founded as a refuge, a "new haven." The Welcoming City Order merely restates the City's founding purpose, embedded in its civic identity. Over the centuries, the City has repeatedly lived up to that ideal—not without occasional steps backward. But New Haven has never abandoned the goal of being a Welcoming City and embracing the moral command quoted by John Davenport, one of the founders of New Haven: "Let mine outcasts dwell with thee, . . . be thou a covert to them from the face of the spoiler."[16]

---

[12] In just 20 years, from 1850 to 1870, the percentage of Connecticut residents who were immigrants grew from ten percent to twenty-five percent, and by 1900 Connecticut had "one of the highest percentages of foreign-born residents in the country." Conn. Hist., *Late 19th Century Immigration in Connecticut* (Oct. 17, 2021), https://connecticuthistory.org/late-19th-century-immigration-in-connecticut/.

[13] It was in New Haven that the first Connecticut chapter of the "Know Nothing" was formed. *See* Steve Thornton, *Opinion: Connecticut's immigrant 'crisis' not its first,* CT Mirror (Nov. 27, 2015), https://ctmirror.org/2015/11/27/connecticuts-immigrant-crisis-not-its-first/.

[14] *See* Conn. Hist., *Knights of the Columbus Chartered—Today in History: March 29* (March 29, 2019), https://connecticuthistory.org/knights-of-columbus-chartered-today-in-history/ (last visited July 6, 2026); Knights of Columbus, *Our Fraternity*, https://www.kofc.org/who-we-are/our-fraternity (last visited  July 6, 2026); Garrett Shanley, *Miami Archbishop joins Knights on Bikes to pray for clergy access to Alligator Alcatraz,* Nat'l Cath. Reporter (July 23, 2025), https://www.ncronline.org/news/miami-archbishop-joins-knights-bikes-pray-clergy-access-alligator-alcatraz.

[15] *See* Pub. Art Archive, *Cornelius T. Driscoll*, https://publicartarchive.org/search/art/ef4d92c7 (last visited July 6, 2026).

[16] Ebenezer Davies, *supra* note 3, at 258 (quoting Isaiah 16:4).

**B.  The Welcoming City Order Reflects the City's Constitutionally Protected Policy Decision to Focus Its Resources on the Safety and Wellbeing of Its Residents, While Leaving Federal Immigration Enforcement to the Federal Government**

Mindful of this history, the Welcoming City Order, issued in July 2020—six years ago this month—addresses the practical needs of present-day New Haven, especially the City's need to promote public safety, encourage public collaboration with law enforcement, and conserve public resources.

The Order's stated purpose is to "promot[e] the safety of all who live [in New Haven]" and to "achieve the City's goals of protecting life, liberty, and property" by ensuring that "all persons … feel comfortable in their interactions with City officials for the safety and security of the entire community …." Ex. 1, Welcoming City Ord. at 1. This proposition raises no conflict with federal mandates. The Department of Justice itself advocates that "[b]uilding trust with the community is fundamental to safe and effective policing," because community members' comfort with interacting with the police leads to "increased crime reporting on the part of citizens and cooperation with law enforcement investigations and crime reduction initiatives." U.S. Dept. of Just., Cmty. Oriented Policing Servs., *Building Trust*, https://cops.usdoj.gov/buildingtrust (last visited July 6, 2026). Similarly, the Order recognizes that crime reporting may be deterred by fear among immigrant communities that contact with government officials "will bring the scrutiny of federal immigration authorities to their home." *See City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297–300 (E.D. Pa. 2018), *rev'd in part on other grounds*, 916 F.3d 276 (3d Cir. 2019) (recounting "credible" testimony that residents are less likely to use city services if they worry that they may be exposed to immigration-enforcement action as a result).

7

Contrary to the Complaint's incomplete and at times misleading quotations, the Welcoming City Order does not interfere with or prohibit federal immigration officers from carrying out their duties or enforcing federal law in New Haven. The Welcoming City Order reflects New Haven's policy decision that its limited municipal resources are best directed to issues of local concern for the people of New Haven, rather than involuntarily diverted to the task of federal immigration enforcement. *See United States v. Texas*, 599 U.S. 670, 680 (2023) (recognizing that "[i]n light of inevitable resource constraints and regularly changing public-safety and public-welfare needs," government actors "must balance many factors when devising arrest and prosecution policies"). To these ends, the Welcoming City Order directs city officers and employees to follow the law: by not inquiring about or seeking to ascertain a person's immigration status, unless required by law; not disclosing a person's immigration status to anyone, unless required by law or pursuant to certain exceptions; and not expending city resources on federal immigration enforcement, unless required by law. *See* Welcoming City Ord. § III(3)–(8).

To be clear, the Order explicitly directs city officers and employees to comply with all requirements of federal and state law, *see id.* § III(3)–(4), (7)–(8), and subjects them to disciplinary action if they fail to do so, *see id.* § III(10). Federal immigration officers remain fully able to enforce immigration law in New Haven. Contrary to the allegations in the Complaint, the Order simply reaffirms a constitutional division of labor whereby city officers and employees deal with local matters and leave enforcement of federal immigration law to the Federal Government.

## II.    LEGAL STANDARD

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Green v. Dep't of Educ.*, 16 F.4th 1070, 1075 (2d Cir. 2021) (citation and quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), "[t]he complaint must plead enough facts to state a claim to relief that is plausible on its face." *Id.* at 1076–77 (citation and quotation marks omitted); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90 (2d Cir. 2021). Courts "accept as true all factual allegations and draw from them all reasonable inferences; but [they] are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton*, 3 F.4th at 90–91 (quoting *Dane v. United Healthcare Ins. Co.,* 974 F.3d 183, 188 (2d Cir. 2020)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted).

The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the . . . court to draw on its judicial experience and common sense." *Id.* at 679.

## III.    ARGUMENT: THE COMPLAINT MUST BE DISMISSED

### A.  The United States Lacks Standing to Pursue Its Claims

"Article III standing is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *Texas*, 599 U.S. at 675 (citation and internal quotation marks omitted). Under Article III, "[f]ederal courts do not possess a roving commission to publicly opine on every legal question . . . . And federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). "[A] federal court may resolve only a real controversy with real impact on real persons." *Id.* at 424

9

(citation and quotation marks omitted). It is the plaintiff's burden to plead facts establishing its standing. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" of standing. *Id*. at 338 (citation and quotation marks omitted). Specifically, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423.

Here, the United States fails to establish standing for its claims against New Haven because the Complaint does not allege any injury in fact to the United States caused by the Welcoming City Order. The Complaint does not contain a single allegation that a New Haven officer or employee has chosen not to honor a detainer by Immigration and Customs Enforcement ("ICE") or administrative warrant or share a person's immigration status with federal officers because of the Order. At most, the Complaint contains vague, unfounded, and conclusory allegations that the Welcoming City Order "impose[s] financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in . . . New Haven" and "threaten[s] and harm[s] the United States' sovereign interest in the supremacy and enforcement of federal law, specifically the INA." Compl. ¶ 69. These allegations are insufficient to establish standing.

Although monetary loss can constitute an injury in fact for purposes of standing, it must be established through concrete factual allegations. *See Maddox v. Bank of N.Y. Mellon Tr. Co.,* 19 F.4th 58, 65–66 (2d Cir. 2021); *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 148 (2d Cir. 2021). Here, however, the Complaint does not allege any facts showing how the Welcoming City Order allegedly "increase[s] the costs of immigration enforcement in . . . New Haven." Compl. ¶ 69. For example, the Complaint does not allege that the United States has had

10

to hire additional immigration agents, pay overtime to agents, purchase additional equipment, or enter into additional contracts as a result of the Order. Because the Complaint lacks any factual allegations supporting the bald assertion of financial harm, it fails to "plead enough facts to make it plausible that [the United States] did indeed suffer the sort of [monetary] injury that would entitle [it] to relief." *Maddox*, 19 F.4th at 65–66 (quoting *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018)); *see also Spokeo*, 578 U.S. at 338 (plaintiff must "allege facts demonstrating each element" of standing) (citation and quotation marks omitted).[17]

The Complaint's assertion of harm to the federal government's "sovereign interest in the supremacy and enforcement of federal law," Compl. ¶ 69, also is insufficient to establish standing. As an initial matter, there appears to be no controlling authority in the Second Circuit holding that alleged harm to the United States' generalized interest in the enforcement of federal law is a concrete injury in fact. Rather, the Complaint offers an ill-defined and expansive reinterpretation of standing—that the *mere existence* of a state or local law is a sufficient harm to create standing—which other courts have rejected. *See, e.g.*, *City of Boston*, 2026 WL 1493706, at *9 (noting a lack of support for this "essentially limitless view of sovereign injury"). Such a generalized harm fails to satisfy the requirements of Article III standing.

But the Court need not address that question because the plain language of the Welcoming City Order, which is attached as an exhibit to the Complaint and incorporated by reference (*see* Compl. ¶ 46), makes clear that there is no such harm or threat of harm. The Complaint alleges—

---

[17] While rejecting the Federal Government's arguments on the merits in *United States v. Illinois*, a case involving ordinances similar to the Welcoming City Order, the Northern District of Illinois did hold that the United States had alleged sufficient facts to fulfill the injury prong of standing against the state and city defendants. 796 F. Supp. 3d at 509. But the *Illinois* court's ruling was based on several factual allegations notably absent from the present complaint, including at least one "specific instance" where the federal government's immigration enforcement was frustrated by the challenged policies. *Id.* Here, by contrast, the New Haven Welcoming City Order is almost six years old and plaintiff has not alleged any specific instances where it frustrated federal policy. *See* Compl. ¶¶ 67–72.

11

in large part by selectively quoting from the Welcoming City Order—that the Order violates federal law in three ways:

- "the order forbids New Haven officers and employees from disclosing 'confidential information,' defined to include an alien's 'immigration status,' without the consent of the alien." *See* Executive Order, §§ III(6), (7)," Compl. ¶ 47;

- "the Executive Order prohibits local law enforcement agencies from inquiring about or engaging in activities to ascertain an individual's immigration status. [Executive Order] §§ III(2)–(4)," *Id.* ¶ 48; and

- "the Executive Order states that '[l]ocal law enforcement agencies . . . shall not use agency or department resources . . . to . . . [d]etain or arrest a person, based on ICE detainer requests or administrative warrants entered by ICE . . . unless required by law.' [Executive Order] § III(8)." *Id.* ¶ 49.

Tellingly, in all but one instance, the Complaint omits the Order's plain language requirement that city officers and employees *must follow the requirements of federal law at all times*. *See* Welcoming City Ord. § III(7) (city officers and employees may not disclose confidential information to anyone—not just federal immigration agents—"unless such disclosure is required by law"); *id.* § III(3)–(4) (city officers and employees may not inquire about or attempt to ascertain a person's immigration status "unless required by state or federal law"); *id.* § III(8) (local law enforcement may not use city resources to detain or arrest a person based on ICE detainer requests or administrative warrants "unless required by law").[18] These misleading omissions cannot

---

[18] The Complaint also alleges that the Order "forbids city employees from using their resources 'to investigate, enforce or assist in the investigation or enforcement of *any federal program* . . .' [Executive Order] § III(5)," Compl. ¶ 49 (emphasis in original). The elided language reveals this to be a shockingly misleading characterization of the Order, which in fact states that city resources must not be used in furtherance of "any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion or national or ethnic origin." Welcoming City Ord. § III(5). There is no claim that the *actual language* of the Order violates any federal law or interferes with federal

obscure the plain language of the Welcoming City Order, which makes clear that city officers and employees must comply with federal law. Nor does the Complaint contain any factual allegation that city officers or employees have violated the Order's requirement that they comply with federal law.[19] Given this, the Complaint fails to demonstrate that New Haven officials following the law cause any injury in fact to the United States' claimed "sovereign interest in the supremacy and enforcement of federal law." Compl. ¶ 69.

### B.  The Welcoming City Order Is Not Preempted by Any Federal Law

The Complaint claims that the Welcoming City Order is preempted by the Immigration and Nationality Act ("INA") through the doctrines of conflict preemption and express preemption. *See* Compl. ¶¶ 69, 83–87, 93–97. However, the Complaint fails to allege any actual conflict—express or implied—between the Welcoming City Order and federal law. That is because there is none. The Welcoming City Order complies fully with all requirements of federal law and simply exercises the City's established "*option*" to leave federal immigration enforcement to the federal government. *See United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019) (emphasis in original).

This brief directly addresses the Complaint's conflict preemption and express preemption claims below. However, certain "rules of preemption [that] flow from federalism" govern both claims, and should be recognized at the outset:

---

immigration enforcement. Nor could there be; this provision of the Order merely ensures that city officials will not assist in the creation of an official registry based on classes specifically protected under the State of Connecticut Constitution and state anti-discrimination laws. The undersigned are at a loss to explain how the United States could file such a misleading pleading, though this omission is not out of step with other similarly troubling actions taken by the Department of Justice. *See, e.g.*, *In re Admin. Subpoena 25 1431 032 to R.I. Hosp.*, No. 26-mc-00072026, WL 1392565, at *1 (D.R.I. May 14, 2026) (McElroy, J.), *appeal docketed*, No. 26-1568 (1st Cir. May 18, 2026).

[19] To be sure, the Complaint alleges that the Welcoming City Order "unlawfully impedes the operation of federal immigration laws," and "obstruct[s]" federal immigration law. *See, e.g.*, Compl. ¶¶ 11, 13. However, these are not factual allegations but rather "legal conclusions" and conclusory "labels," which the Court should not accept. *See, e.g.*, *Ashcroft*, 556 U.S. at 678. That is especially true where, as here, these unsupported assertions are belied by the plain text of the Welcoming City Order.

First, given Congress' limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not "some brooding federal interest." *Va. Uranium, Inc. v. Warren*, [587 U.S. 761, 767 (2019)] (citation omitted); *see also Kansas v. Garcia*, [589 U.S. 191, 202 (2020)].

Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States. *See Murphy* [*v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477-78 (2018)]. This is so because Congress may only legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their deliberate rejection of a plan that would have allowed Congress to legislate on States. *See New York v. United States*, [505 U.S. 144, 164-66 (1992)].

Third, courts assume that Congress does not preempt lightly. *See Gregory v. Ashcroft*, [501 U.S. 452, 460 (1991)]. Although Congress may legislate in areas traditionally regulated by States, preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona* [*v. United States*, 567 U.S. 387, 400 (2012)] (quoting *Rice v. Santa Fe Elevator Corp.*, [331 U.S. 218, 230 (1947)]).

*New York*, 810 F. Supp. 3d at 339–40.

### 1. There Is No Conflict Preemption

"Conflict preemption arises in two scenarios: (1) where it is impossible for a private party to comply with both state and federal requirements; or (2) where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 112 (2d Cir. 2025) (citations and quotation marks omitted). Here, the Complaint relies on obstacle preemption. *See* Compl. ¶¶ 84–85. "The burden of establishing obstacle preemption, like that of impossibility preemption, is heavy: the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *N.Y. State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135, 155 (2d Cir. 2024) (citation and quotation marks omitted). "Rather, there must be a sharp conflict between state law and federal policy . . . . [F]ederal law does not preempt state law under obstacle preemption analysis unless the repugnance

14

or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Williams v. Marinelli*, 987 F.3d 188, 198–99 (2d Cir. 2021) (citations and quotation marks omitted).

The gravamen of the Complaint's conflict-preemption allegations is that by exercising its constitutionally protected choice not to expend local resources enforcing federal immigration law, New Haven is unlawfully impeding federal immigration law. *See* Compl. ¶¶ 67–72, 84–85. However, it is well established that federal immigration law gives localities the *option* to collaborate with federal immigration enforcement; localities are under no obligation to do so. *See, e.g.*, *New York*, 810 F. Supp. 3d at 350 ("Fundamentally, the United States fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it. No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement.") (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)); *New York*, 814 F. Supp. 3d at 279 ("[T]he INA merely offers States the opportunity to assist in civil immigration enforcement . . . . [It] gives States the option to share information, but does not require it . . . ." (quoting *Illinois*, 796 F. Supp. 3d at 529, 531)); *California*, 921 F.3d at 888 (agreeing with district court's conclusion that "California's decision not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort. . . . [R]efusing to help is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles.") (internal quotation marks omitted); *McHenry Cnty.* 44 F.4th 581 at ("Congress may have hoped or expected that States would cooperate with any requests from the Attorney General . . . . But Illinois and the other States are not bound by that hope or expectation. . . . It

would make no sense to hold that a federal statute premised on State cooperation preempts a state law withholding that cooperation."); *Cnty. of Ocean*, 475 F. Supp. 3d at 381 (D.N.J. 2020) ("New Jersey has made the decision not to cooperate with the enforcement of federal immigration law in an effort to strengthen the relationship between its communities and police, and shore up more effective enforcement of state criminal law. That choice is a clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies. . . . There is no indication that Congress, in enacting the INA, sought to usurp that power. . . . As such, the federal government cannot strong arm the State into doing its own bidding.") (citations omitted). As a result, the Complaint's general challenges to the Welcoming City Order under the INA fail. As in the recent *Illinois* case, there is no conflict preemption of local policies "[b]ecause any collaboration under the INA is permissive, not mandatory." 796 F. Supp. 3d at 528–29, 531.

In addition to its general allegations about supposed conflicts with federal immigration law, the Complaint specifically alleges preemption of the Welcoming City Order's direction that city officers not detain or arrest any person based on an ICE detainer request or administrative warrant unless required by law, *see* Welcoming City Ord. § III(8)(c), because it conflicts with 8 C.F.R. § 287.7(a) and (d), which regulate ICE detainers. *See* Compl. ¶ 85. However, that regulation defines a detainer as "a *request* that [a local law enforcement agency] advise the Department [of Homeland Security] prior to release of [an] alien" in the local agency's custody. 8 C.F.R. § 287.7(a) (emphasis added); *see also id.* ("A detainer serves to *advise* another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency . . . .") (emphasis added); Compl. ¶¶ 30–31 (describing ICE detainers as "request[s]"). In accordance with this regulation, courts recognize that ICE detainers are optional requests rather than mandatory commands. *See, e.g., Morales v. Chadbourne*, 793 F.3d 208, 212 (1st Cir. 2015) ("[A]n

16

immigration detainer . . . is a *request* from ICE to another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation.") (emphasis added); *Galarza v. Szalczyk*, 745 F.3d 634, 639–42 (3d Cir. 2014) (rejecting argument that detainers issued pursuant to 8 C.F.R. § 287.7(d) impose mandatory obligations on state and local agencies and noting that "all federal agencies and departments having an interest in the matter have consistently described such detainers as requests" while "[a]ll Courts of Appeals to have commented on the character of ICE detainers refer to them as 'requests' or as part of an 'informal procedure'") (citation omitted); *see also Hernandez v. United States*, 939 F.3d 191, 207 n.11 (2d Cir. 2019) (noting that courts have "interpreted" the language of 8 C.F.R. § 287.7(d) "to mean that the honoring of detainers '[is] not mandatory'" (quoting *Galarza*, 745 F.3d at 642)). Indeed, as Judge Sorokin recently noted in dismissing similar claims against the city of Boston, "ICE's public website states, 'Immigration detainers are only requests. They *don't impose any obligations* on law enforcement agencies.'" *City of Boston*, 2026 WL 1493706, at *10 n.14 (emphasis in original) (quoting *Immigration Detainers*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/immigration-detainers [https://perma.cc/FX5P-GR7Z] (last visited July 5, 2026)).[20] Accordingly, the Complaint fails to establish any conflict between federal detainer regulations and the Welcoming City Order.

### 2. There Is No Express Preemption

"Express preemption occurs where 'Congress . . . withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision.'" *Art & Antique Dealers*

---

[20] Like detainers, ICE administrative warrants also do not impose any obligation to comply on city officers or employees. *See, e.g.*, *California*, 921 F.3d at 887; *Illinois*, 796 F. Supp. 3d at 528; *Lopez-Lopez v. Cnty. of Allegan*, 321 F. Supp. 3d 794, 799 (W.D. Mich. 2018). Indeed, ICE administrative warrants are not even directed to local law enforcement. As the Massachusetts Supreme Judicial Court has explained, ICE administrative warrants are "approved by, and directed to, Federal immigration officials. [They do not] require[] the authorization of a judge. [They are n]either . . . criminal arrest warrant[s n]or . . . criminal detainer[s]." *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1151 n.17 (Mass. 2017).

*League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

The Complaint alleges that the Welcoming City Order is expressly preempted by 8 U.S.C. §§ 1373, 1644 (2024). *See* Compl. ¶¶ 93–97. Specifically, the Complaint alleges that the Order "violates the[se] express statutory provisions" because it "prohibits the sharing of information with federal immigration authorities in most instances," "prohibits city employees from inquiring about an individual's immigration status or disclosing an individual's 'immigration status' unless authorized by narrow local criteria," and "limits the use of local resources to detain or arrest individuals based on administrative warrants entered by ICE into federal databases." *Id.* ¶¶ 94–96.

Once again, these allegations ignore the plain language of the federal statutes and the Welcoming City Order and assert a conflict that simply does not exist. Section 1373 states, in relevant part: "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1373(b) (imposing similar restriction with respect to "[s]ending," "[m]aintaining," and "[e]xchanging" immigration-status information). Section 1644 is functionally identical.[21] As their plain language makes clear, these are narrow statutes that "reach only information about an individual's citizenship or immigration classification (*e.g.*, lawful permanent resident, visa holder, asylum seeker), and not all personal information about an individual." *New York*, 810 F. Supp. 3d at 349–50 (citation omitted).

---

[21] "Courts have generally held that the relevant provisions in Sections 1373 and 1644 have no meaningful difference and have analyzed them together." *New York*, 810 F. Supp. 3d at 349 n.8; *see also, e.g.*, *New York*, 814 F. Supp. 3d at 276 n.6.

18

As an initial matter, the Welcoming City Order does not conflict with §§ 1373 and 1644 because it does not prohibit city officers or employees from communicating with federal immigration authorities about a person's citizenship or immigration status. The Order defines a category of "confidential information," which, in addition to "immigration status," includes a range of other highly personal information, such as a person's status as a victim of sexual assault or a person's sexual orientation. *See* Welcoming City Ord. § III(6). To protect the privacy of individuals who interact with city officers and employees, the Order prohibits city officers or employees from disclosing such confidential information to *anyone*; the provision is not tailored to immigration officials. However, to ensure that disclosure may occur in line with the law, the Order expressly states that this prohibition does not apply where "required by law." *Id.* § III(7). Because §§ 1373 and 1644 require that city officers and employees remain free to communicate immigration-status information to federal immigration agents, if they so choose, the Welcoming City Order's "as required by law" exception permits city officers and employees to voluntarily communicate immigration-status information to federal authorities. In *City & County of San Francisco v. Garland*, the appeals court similarly found no conflict between state law that prohibited disclosure of immigration-status information and § 1373 where the state law's savings clause "requir[ed] compliance with federal law." 42 F.4th 1078, 1086 (9th Cir. 2022) (citing *City & County of San Francisco v. Barr*, 965 F.3d 753, 763–64 (9th Cir. 2020)). Accordingly, there is no conflict between the Order and §§ 1373 and 1644.

Further, §§ 1373 and 1644 pertain solely to the communication and maintenance of immigration-status information; as a result, there is no conflict between these statutes and the Order's provisions, which restrict inquiry into immigration status and compliance with administrative warrants. *See* Compl. ¶¶ 95–96. To assert such a conflict, the Complaint necessarily

19

invites the Court to stretch §§ 1373 and 1644 well beyond their statutory text—an effort the United States has undertaken and lost over and over again across the country. *See, e.g.*, *New York*, 814 F. Supp. 3d at 277 (finding it "unnecessary to spill further judicial ink on the issue" of interpreting §§ 1373 and 1644 and collecting cases). That effort should also be rejected here. Sections 1373 and 1644 concern only information *sharing*. *See New York*, 810 F. Supp. 3d at 349 (noting that these statutes "relate to information-sharing between state and federal officials"). The statutes are silent as to information collection—and that fact dooms the Complaint's express preemption challenge to the Order's limits on inquiring into immigration status. *See Los Angeles*, 2026 WL 1790971, at *2 (rejecting as "unpersuasive" the United States's contention that § 1373 preempted a local ordinance that restricted city officials "from inquiring into or collecting information about a person's citizenship or immigration status," because the ordinance "says nothing about the City's ability to maintain or share such information"); *New York*, 814 F. Supp. 3d at 277 (finding "no conflict" between § 1373 and a state law "prohibit[ing] inquiry by state officials" into "citizenship or immigration status"). Similarly, §§ 1373 and 1644 have nothing to do with administrative warrants—again, dooming that claim.[22] Thus, the Complaint's invitation to expand these statutes beyond their plain text relies not on express federal directive, but on the very "brooding federal interest" in immigration enforcement that cannot support preemption. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019). These claims violate the presumption that state police powers (like those in the Order) "are not superseded 'unless that was the clear and manifest purpose of Congress.'" *New York*, 810 F. Supp. 3d at 340 (quoting *Arizona*, 567 U.S. at 400).

---

[22] Presumably, that is why the Complaint does not bother to allege an express conflict between §§ 1373 and 1644 and the Order's limitation on complying with such warrants—instead, the Complaint baldly asserts the Order is unlawful "[t]o the extent" there is a conflict, despite there being none. Compl. ¶ 96. Such a patently deficient allegation may be rejected out of hand.

In addition, the provisions of the Welcoming City Order that restrict inquiry into immigration status and compliance with administrative warrants explicitly state that city officers and employees must inquire into immigration status and detain individuals based on ICE detainers or administrative warrants where "required by law." Welcoming City Ord. § III(3), (8). So, even if §§ 1373 and 1644 had anything to do with local officials inquiring into immigration status or detaining individuals under ICE administrative warrants—and they do not—the Welcoming City Order would be in full compliance with those requirements.

Finally, regardless of the content of the Order's challenged provisions, §§ 1373 and 1644 cannot be preemption provisions at all because, as noted above, "a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States." *New York*, 810 F. Supp. 3d at 340 (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477–78 (2018)); *see also New York*, 814 F. Supp. 3d at 276 (similar). "By their plain terms, [§§ 1373 and 1644] affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption." *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020). Numerous other courts have held the same. *See, e.g.*, *Cnty. of Ocean*, 475 F. Supp. 3d at 372; *Illinois*, 796 F. Supp. 3d at 521–22; *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019), *aff'd in part, vacated as moot in part on other grounds, remanded sub nom. City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir.

21

2020).[23] The fact that §§ 1373 and 1644 "cannot serve as a basis for preemption" is "fatal" to the Complaint's preemption argument. *See Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 182.[24]

### C. The Welcoming City Order Does Not Regulate the Federal Government nor Discriminate Against the Federal Government

The Complaint also alleges that the Welcoming City Order unlawfully regulates the federal government and unlawfully discriminates against the federal government. *See* Compl. ¶¶ 105–07, 114–17. Like the preemption claims, these claims fail because they ignore the actual language of the Welcoming City Order and the governing law.

### 1. The Welcoming City Order Does Not Regulate the Federal Government at All

"[T]he intergovernmental immunity doctrine bars States from directly regulating the federal government." *New York*, 810 F. Supp. 3d at 352 (citing *McHenry Cnty.*, 44 F.4th at 592). The stereotypical examples of unlawful regulation of the federal government are "taxing the federal government or prohibiting the federal government from taking a particular action." *Id.* (citing *McHenry Cnty.*, 44 F.4th at 592). "The key question is whether state law seeks to improperly control the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets.'" *New York*, 810 F. Supp. 3d at 352

---

[23] In *State v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020), the Second Circuit questioned a district court's finding that § 1373 has no preemptive effect, but expressly declined to rule on the issue. *Id.* at 114 n.27; *see also New York*, 810 F. Supp. 3d at 350 n.9 (N.D.N.Y. 2025) (noting that the Second Circuit has not ruled on the preemptive effect of § 1373). The dicta in *State* is, of course, not binding here, and courts ruling on the question before and after *State* have held that § 1373 is not a preemption provision under *Murphy*. *See Illinois*, 796 F. Supp. 3d at 521 (collecting cases).

[24] If the Court were to find a potential conflict between these statutes and the Order (though none exists) and that the statutes have preemptive effect (though there is none), the Court would then confront the question of whether §§ 1373 and 1644 can legally bind the City under the Tenth Amendment. *See, e.g.*, *Cnty. of Ocean*, 475 F. Supp. 3d at 378 n.20 (collecting cases finding §§ 1373 and 1644 unconstitutional under the Tenth Amendment); *see also infra* Part III.D.

(quoting *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024)) (citation modified).

The Complaint alleges that the Welcoming City Order "regulates the Federal Government because it requires a judicial warrant to detain or arrest persons subject to ICE detainers or administrative warrants even though federal law expressly declines to demand one in the immigration context." Compl. ¶ 105. As clarified above, this claim ignores the actual language of the Welcoming City Order. The Order does not prohibit ICE or any other federal agency from arresting or detaining anyone. Indeed, it does not prohibit them from doing anything. Federal agents remain free to conduct immigration enforcement operations in New Haven, including arresting persons for whom there is an ICE administrative warrant. What the Order actually does is direct city law enforcement officers not to themselves "[d]etain or arrest a person, based on ICE detainer requests or administrative warrants . . . unless required by law." Welcoming City Ord. § III(8)(c). In other words, the Order does not regulate federal officers at all. It regulates the activities of New Haven officers, which the City unquestionably has a right to do. *See New York*, 810 F. Supp. 3d at 348 (noting that it "does not run afoul of the intergovernmental immunity doctrine" to "defin[e], as a proprietor, what activities are not permissible in state-owned facilities"). Accordingly, there simply is no regulation of the Federal Government. *See id.*; *New York*, 814 F. Supp. 3d at 281 (rejecting a similar claim); *McHenry Cnty.*, 44 F.4th at 592–93 (same); *Illinois*, 796 F. Supp. 3d at 535 (same); *Cnty. of Ocean*, 475 F. Supp. 3d at 385 (same).

Moreover, the Order's direction that New Haven officers and employees not detain individuals on the basis of ICE detainers or administrative warrants is merely an exercise of the option that the INA empowers the City to make—to decline to assist with immigration enforcement. As explained earlier, no federal law or regulation requires New Haven officers to

23

enforce immigration law, including by assisting in the execution ICE detainers or administrative warrants. *See Galarza*, 745 F.3d at 640 ("[N]o provisions of the Immigration and Nationality Act . . . authorize federal officials to command local or state officials to detain suspected aliens subject to removal."). Contrary to the Federal Government's claim, the City's decision to exercise an option that federal law allows cannot be considered an impermissible regulation of the Federal Government. Accordingly, this provision of the Order fully complies with federal law, and this claim too should be dismissed.

### 2. The Welcoming City Order Does Not Discriminate Against the Federal Government

"A state law or regulation discriminates against the Federal Government if it treats comparable classes of federal and state employees differently, advantaging the state employees, and no significant differences between the two classes justify the differential treatment." *New York*, 810 F. Supp. 3d at 353 (citations and internal quotation marks omitted). "However, a comparator is necessary; 'the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination.'" *Id*. (*quoting McHenry Cnty.*, 44 F.4th at 594) (alteration in original). "The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983).

The Complaint alleges that the Welcoming City Order unlawfully discriminates against the Federal Government through its detainer and administrative warrant provision, its direction to city officers and employees not to inquire about or attempt to ascertain the immigration status of individuals, and its direction to city officers and employees not to disseminate confidential immigration status information. Compl. ¶¶114–15. Once again, the Complaint ignores that these provisions explicitly direct city officers and employees to follow federal law. And, as established

24

above, all of these provisions comply with the requirements of federal law, which renders state and local cooperation with immigration enforcement optional. City officials following federal law does not constitute discrimination.

But even setting that aside, the Complaint's unlawful discrimination claim fails because it does not—and cannot—identify the required "comparator." *New York*, 810 F. Supp. 3d at 353. As Judge D'Agostino recently explained in rejecting this same claim against New York's information-sharing regulations, "[t]he United States does not identify any state or local government entity that might be entitled to the information it is prevented from obtaining because of the Executive Orders." *Id.*; *New York*, 814 F. Supp. 3d at 282–83 (similar); *McHenry Cnty.*, 44 F.4th at 594 (similar); *Illinois*, 796 F. Supp. 3d at 533–34 (similar). The Complaint alleges that "[o]n information and belief, the City of New Haven does not impose similar or equivalent restrictions on other law enforcement agencies." Compl. ¶ 116. But according to the Complaint itself, there are no other law enforcement agencies responsible for enforcing federal immigration law. *See, e.g.*, Compl. ¶¶ 4, 18, 24, 25; *New York*, 810 F. Supp. 3d at 353 ("[T]he United States concedes that only the Federal Government is authorized to enforce civil immigration law. However, the fact that a law affects an exclusively federal domain is not evidence of discrimination, and failure to identify a comparator ends the inquiry.").

### D. The United States's Attempt to Enjoin the Welcoming City Order Violates the Tenth Amendment

As discussed above, the challenged provisions of the Welcoming City Order require that city officials comport their conduct as "required by law." To that end, the Order leaves the Federal Government to enforce its immigration agenda without interference by city officials. But the Federal Government must itself act as "required by law." That requirement includes following the constitutional mandate of the Tenth Amendment. This Amendment prohibits the Federal

25

Government from imposing its will beyond the limited powers expressly enumerated in the Constitution by displacing the authority of States and localities to determine how best to execute their own legislative priorities; or compelling States and localities to commit local resources to implement the Federal Government's immigration agenda. *See Printz*, 521 U.S. at 925, 935. When the Federal Government so acts, it seeks to commandeer New Haven in violation of the Tenth Amendment, and its Complaint seeking to do so should be dismissed.

The Constitution "created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). "States are not mere political subdivisions of the United States." *New York*, 505 U.S. 144, 188 (1992). The Founders, familiar with the dangers of an unrestrained central authority, preserved "substantial sovereign powers" in the States. *Ashcroft*, 501 U.S. at 452. Under the Constitution's system of dual sovereignty, only certain enumerated powers are delegated to the Federal Government. The rest are "reserved to the States respectively, or to the people." U.S. Const. amend. X. This structure "secures the freedom of the individual" by "allow[ing] States to respond . . . to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power." *Bond v. United States*, 564 U.S. 211, 221 (2011).

Inherent in each state's "inviolable sovereignty," *Printz*, 521 U.S. at 919 (internal quotation marks omitted), is the authority to make laws and regulations in furtherance of the safety and wellbeing of its citizens. *See Bond*, 572 U.S. 844, 854 (2013); *United States v. Morrison*, 529 U.S. 598, 599 (2000) (stating that the Founders "undeniably left" the "police power" "reposed in the States and denied the central Government"). Through the state constitution and legislation, Connecticut has delegated to New Haven and other municipalities many of these broad police powers, including the authority: to collect taxes, borrow, and decide how municipal resources will

26

be spent; to "[p]rovide for police protection, regulate and prescribe the duties of the persons providing police protection . . . and do all other things necessary or desirable for the policing of the municipality"; to define the scope of employment and duties of municipal officers and employees; and to take all action necessary to "protect or promote the peace, safety, good government and welfare of the municipality and its inhabitants." Conn. Gen. Stat. § 7-148(c)(2), (4), (5), (7)(H); *see also* Conn. Const. art. X, § 1. As a result, New Haven's Welcoming City Order is nothing more than the constitutionally protected exercise of its residents' right to have their city government further their safety and well-being and spend their tax dollars on addressing issues of local concern—especially local policing—while leaving federal immigration enforcement to the federal government. *See New York*, 505 U.S. at 168 ("If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program . . . .").

Through the relief requested in this lawsuit, the Federal Government impermissibly seeks to displace the City's authority to enact policies to protect public safety and attempts to control how New Haven expends its limited resources, manages city personnel, and protects residents' confidential information. As courts throughout the country have concluded, this attempt violates the Tenth Amendment because it would "compel" New Haven to "enforce a federal regulatory program" and "conscript[]" the City's officers to "administer and enforce" federal policy. *See Printz*, 521 U.S. at 935.[25]

The Supreme Court has repeatedly held that, under the division of authority the Constitution prescribes, "the Federal Government may not compel the States to implement, by

---

[25] *See, e.g.*, *California*, 921 F.3d at 891; *Illinois*, 796 F. Supp. 3d at 531–32; *New York*, 810 F. Supp. 3d at 350–51; *Colorado*, 2026 WL 878882, at *4–5.

legislation or executive action, federal regulatory programs." *Id.* at 925. "No matter how powerful the federal interest involved," the Constitution nowhere empowers the Federal Government to "conscript" state and local officials "as its agents" to advance its own agenda. *New York*, 505 U.S. at 178. Moreover, the Federal Government may exercise its limited powers to "*allow*[] but . . . not *require* the States to implement a federal program." *Murphy*, 584 U.S. at 476 (emphasis in original). Neither a State nor the cities that it charters can be "compelled to enforce [federal] standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever." *Hodel v. Va. Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 288 (1981); *see also New York*, 810 F. Supp. 3d at 348 ("Settled federalism principles and the Tenth Amendment generally empower the States to control the use of their own facilities, manage their internal affairs, and direct the control of their officials without federal interference.").

As often as the Federal Government has devised new methods of commandeering the States and their localities, the Supreme Court has rejected them. In *Printz v. United States*, the Court invalidated a federal statute that required local law-enforcement officers to conduct background checks for prospective handgun purchasers. 521 U.S. at 903–04. The Court held the Federal Government could not "circumvent" the anticommandeering rule by "conscripting the State's officers" to carry out federal law rather than requiring the States to do so directly. *Id.* at 935. The Federal Government could not force State employees to use State resources, "databases," and "records" to facilitate its own policy preferences, *id.* at 932 & n.17—even though the burden on state employees was "minimal" and "temporary"—because "the whole *object*" of the federal policy was "to direct the functioning of the state executive." *Id.* at 932 (emphasis in original).

Later, in *Murphy v. Nat'l Collegiate Athletics Ass'n*, the Court made clear that, even where the Federal Government does not directly conscript local resources, it violates the Tenth

Amendment where it attempts to "dictate[] what a state legislature may and may not do." 584 U.S. at 474. In *Murphy*, the Supreme Court invalidated a federal law prohibiting States from legalizing sports gambling, holding that the Federal Government can neither affirmatively compel a State to advance a federal agenda by enacting laws, nor do so indirectly by preventing it from enacting policies relating to that conduct. *Id.* at 475. Whether Congress seeks to command the States to take "affirmative acts" or seeks to prohibit the states from acting, "the basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.* Under "[t]he basic principle" of the Tenth Amendment, any "distinction" between "command[ing] 'affirmative' action as opposed to imposing a prohibition" is "empty." *Id.*

Here, the relief the Federal Government seeks in its Complaint violates the rules of law laid out in both *Murphy* and *Printz*.[26] As described above, the Welcoming City Order sets forth the City's determination of how best to direct city officials' interactions with residents of New Haven and merely directs city officials to focus on the City's policy priorities. The injunction that the Federal Government seeks would override this clear policy choice. Under the Order, New Haven officials are already acting "as required by law." But the Complaint would go further, asking this Court to restrain New Haven's ability to use its resources in the manner the City deems best. Instead of directly mandating that the City allocate resources to advance a federal agenda, it

---

[26] The requested relief would also undermine the three reasons for the anticommandeering rule that the Supreme Court identified in *Murphy*. First, enjoining the Welcoming City Order would damage "political accountability" by preventing New Haven voters from "know[ing] who to credit or blame" for federal immigration-enforcement efforts in their community. *Murphy*, 584 U.S. at 473. Second, it would allow the Federal Government to "shift[] the costs" of immigration enforcement onto New Haven by barring the City from directing its employees to instead advance the City's policies and goals. *Id.* at 474. Third, it would harm dual sovereignty, "one of the Constitution's structural safeguards of liberty," by wresting away local law-enforcement authority from the source closest to the people. *Id.* at 473 (quoting *Printz*, 521 U.S. at 921).

seeks to prohibit the City from choosing otherwise. Yet whether this request is characterized as an affirmative directive or a prohibition is an "empty" distinction under *Murphy*. 584 U.S. at 475.[27]

By requesting an injunction against Sections III(2)–(8) of the Order, the Federal Government effectively seeks to exercise a veto over how the City uses its personnel's time and its own resources. *See* Compl. ¶ 32. This would give the Federal Government, rather than New Haven, control over whether or not city employees "perform discrete, ministerial tasks" on behalf of the Federal Government, exactly what *Printz* foreclosed. *Printz*, 521 U.S. at 929–30; *see also California*, 921 F.3d at 890–91 ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration] efforts.").

The requested injunction, standing alone, would violate the Tenth Amendment. But the Federal Government has repeatedly made clear in public statements and in other litigation that its ultimate goal goes well beyond the relief it seeks in the Complaint. This Court may take notice of the recent finding by Chief Judge Schiltz of the District of Minnesota that, since January 2025, the Federal Government has "taken aim at so-called 'sanctuary' jurisdictions" in an evident effort to coerce State and local officials to aid federal agents in enforcing federal immigration policy, and to retaliate against those who refuse to do so. *See In re Subpoenas*, No. 26-mc-0043, at *3–4, 14–

---

[30] While a number of courts have found §§ 1373 and 1644 unconstitutional under the Tenth Amendment, *see Cnty. of Ocean*, 475 F. Supp. 3d at 378 n.20 (collecting cases), the Second Circuit—in a case decided before *Murphy*—held that §§ 1373 and 1644 do not implicate the Tenth Amendment. *City of New York v. United States*, 179 F.3d 29, 34–35 (2d Cir. 1999). But that decision can no longer be given precedential weight, since it relied on precisely the distinction between "affirmative acts" and "prohibiting conduct" that the Supreme Court explicitly rejected in *Murphy*. *See Murphy*, 584 U.S. at 475. Similarly, while the Second Circuit has upheld the legality of § 1373's prohibitions, it did so "*as applied here* to a federal funding requirement," basing this holding on Congress's Spending Clause power, *State*, 951 F.3d at 114 (emphasis in original). That holding is inapposite to the constitutionality of barring state and local information-sharing regulations outside of the context of federal-funding requirements. In any event, it is not necessary to reach the constitutionality of §§ 1373 and 1644 here, since as we have shown above, the Order's "required by law" clause already mandates full compliance with the directives of §§ 1373 and 1644. Because the constitutional question here remains open here, constitutional avoidance favors interpreting §§ 1373 and 1644 to be consistent with the Order, rather than imposing obligations that raise grave Tenth Amendment concerns. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (invoking the "cardinal principle" that "[w]hen a serious doubt is raised about the constitutionality of an Act of Congress," courts "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

30

15 (D. Minn. June 22, 2026) (ECF No. 1). It has done so through a wide variety of methods: targeting politically unaligned cities for expanded deportation efforts; calling for officials who oppose the deployment of the National Guard troops for immigration enforcement to be jailed; threatening to cut off federal funding to "sanctuary" jurisdictions; suing jurisdictions with ordinances similar to New Haven's Welcoming City Order; and, as in *In re Subpoenas*, issuing grand jury subpoenas to "harass" or "coerce" state and local political opponents into "taking official action—particularly official action that the federal government cannot directly require those political opponents to take." *See id.* at *3-4, *15. Indeed, the Federal Government has recently asserted that it can "impose a *mandate*" on state and local officials to assist in federal civil immigration enforcement, such that any official who does not do so "*defies* a federal mandate." *City of Boston*, 2026 WL 1493706, at *10 n.14 (emphases in original). This type of fiat smacks of a retaliatory animus toward a local official like Mayor Elicker, who has engaged in First Amendment-protected speech expressing New Haven's identity and policy as a welcoming city, as a personal and official expression of his commitment to defending the rule of law.[28] Thus, while the Complaint itself seeks relief that runs afoul of the Tenth Amendment, there can be no serious question that this lawsuit also reflects the Federal Government's broader intent to commandeer New Haven and its officials—an even more chilling prospect under the Tenth Amendment's anticommandeering rule that should be stopped now.

"No matter how powerful the federal interest involved," the Constitution nowhere empowers the Federal Government to "commandeer" local policymaking processes, *Murphy*, 584

---

[28] Even after President Trump made clear his intention to target alleged "sanctuary" jurisdictions by withholding federal funding, Mayor Elicker reasserted his commitment to New Haven's founding mission. "Whatever your immigrant status, document status, race, sexual orientation, ethnicity, you are welcome in New Haven," he affirmed. *See* Zoe Strothers & Bryant Reed, New Haven Joins Lawsuit Against Trump Administration to Protect Sanctuary Cities, WFSB (Feb. 7, 2025), https://www.wfsb.com/2025/02/07/new-haven-joins-lawsuit-against-trump-administration-protect-sanctuary-cities/. As protected individual speech, these statements, and others like them, are entitled to the full extent of First Amendment protection.

U.S. at 474, nor to "conscript" state and local officials "as its agents" to advance its own agenda, *New York*, 505 U.S. at 178. In sum, the Government cannot enjoin any part of Section III of the Welcoming City Order without displacing New Haven's prerogatives and prohibiting New Haven from directing its own employees regarding how to conduct the City's business. The Tenth Amendment forbids such commandeering, whether carried out through statute, order, or lawsuit.[29] This Court should dismiss the Complaint as an unconstitutional attempt to commandeer New Haven.

### E.  Mayor Elicker Is Not a Proper Defendant and Must Be Dismissed

"[A]n official-capacity suit is . . . treated as a suit against the entity." *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, "[w]ithin the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Apatow v. Town of Stratford*, 651 F.Supp.3d 573, 583 (D. Conn. 2023) (collecting cases); *see also, e.g.*, *A.P. v. Dannhauser*, No. 25-1030, 2025 WL 3120444, at *1 (2d Cir. Nov. 7, 2025) (summary order) (stating that "Plaintiffs' suit against officers in their official capacities is redundant because Plaintiffs have already named the City as Defendant," and noting the claims against those officers were properly

---

[29] While the Court need not reach this question to dismiss the Complaint, Plaintiff's very act of bringing this vexatious litigation smacks of an effort to commandeer. The instant suit is part of a fusillade of cases against similar regulations, repeating arguments that have been consistently rejected by courts nationwide, across multiple venues. *See City of Boston*, 2026 WL 1493706, at *8 n.10. The Federal Government's initiation of litigation that it surely knows is meritless should be viewed as a yet another means of coercing the City into adopting its policy prerogatives. *See* Bridget Fahey, *The New Commandeering*, 2026 Sup. Ct. Rev. 167, 202–03 (noting the Federal Government's increasing use of litigation against local officials to provide them "with strong motive to comply—even if the request constitutes unlawful commandeering."). The anticommandeering rule is "simply the expression of a fundamental structural decision" to "withhold from [the Federal Government] the power to issue orders directly to the States" and localities. *Murphy*, 584 U.S. at 470. It applies even where the Federal Government "indirectly coerces" rather than "directly commands" obedience by States and localities. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577, 585 (2012); Fahey, *supra*, at 181 ("There is no constitutional magic to the particular form of coercion at issue in *NFIB* and *Dole*. . . . They should instead be viewed more basically as examples of the potentially broad range of coercive acts[.]"). Invoking judicial process, as Plaintiff does here, to "harass" and "coerce" cities and States into taking "official action that the federal government cannot directly require" raises serious anticommandeering concerns. *See In re Subpoenas*, No. 26-mc-0043, at *14–15.

dismissed). The United States's claims against Mayor Elicker—who is being sued solely in his official capacity as Mayor, with no allegations made that distinguish him from the City—are duplicative of the claims against the City and should therefore be dismissed.

## IV.    CONCLUSION

The 2020 Welcoming City Order simply reaffirms New Haven's founding credo. It is not preempted by any lawful federal mandate. It neither regulates nor discriminates against the Federal Government. New Haven's action causes the Federal Government no injury because it is the Federal Government's actions, not New Haven's, that violate the Tenth Amendment.

For all these reasons, the Complaint states no claim upon which relief can be granted. Accordingly, the Motion to Dismiss should be granted.

Respectfully submitted,

DEFENDANTS

CITY OF NEW HAVEN
JUSTIN ELICKER

By:    /s/ Christopher M. Mattei
Christopher M. Mattei (ct27500)
Margaret M. Donovan (ct31787)
Colin S. Antaya (ct31355)
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVE.
BRIDGEPORT, CT 06604
TEL: 203-336-4421
FAX: 203-368-3244
cmattei@koskoff.com
mdonovan@koskoff.com
cantaya@koskoff.com

By:    /s/ Allison R. Jacobs
Allison Jacobs (ct31207)
Corporation Counsel for the City of
New Haven
Office of the Corporation Counsel

33

165 Church Street, 4th Floor
New Haven, CT 06510
475-331-3244
ajacobs@newhavenct.gov

By:   */s/ Harold Hongju Koh*
Harold Hongju Koh (ct01347)[30]
Bruce C. Swartz* (DC Bar # 358928)
Peter Gruber Rule of Law Clinic[31]
Yale Law School
127 Wall Street, P.O. Box 208215
203-432-4932
harold.koh@ylsclinics.org
mary.hahn@ylsclinics.org
bruce.swartz@yale.edu

*Application for Admission Pro Hac Vice
Forthcoming.*

By:   */s/ Toby Merrill*
Toby Merrill** (MA Bar # 601071)
Erin Monju** (DC Bar # 90036952)
Kayla Svihovec** (DC Bar # 1735588)
Patrick Archer** (NY Bar # 6194757)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby.merrill@publicrightsproject.org
erin.monju@publicrightsproject.org
kayla.svihovec@publicrightsproject.org
patrick.archer@publicrightsproject.org

*** Application for Admission Pro Hac Vice
Forthcoming. Not licensed to practice law in
California.*

---

[30] Law-student interns Kit Beyer, John David Cobb, Emily- Elledge, Riler Holcombe, Jake Mattis, and Henry Wykowski contributed to this brief's drafting under supervision by counsel.

[31] This brief sets forth the position of the signatories, as represented by counsel and law-student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of Yale Law School or Yale University.

34