**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:26-CV-00568-AWT |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, ET AL. | : | |
| *Defendants.* | : | JULY 6, 2026 |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
THE STATE DEFENDANTS' MOTION TO DISMISS</u>**

For over a decade, the Connecticut Trust Act has embodied the State of Connecticut's sovereign choice to decline to use state resources to carry out the federal government's immigration enforcement agenda. With the Trust Act's enactment in 2013, Connecticut lawfully determined that its law enforcement resources should be focused on and allocated to state issues, not commandeered into doing the federal government's job of immigration enforcement. Years later, the federal government now tries to coerce Connecticut into enforcing federal immigration law by overturning a state statute through this meritless lawsuit. But the Complaint fails to state a claim, the United States lacks standing, and the Tenth Amendment bars the result it seeks.

Plaintiff United States of America attempts to raise a facial challenge under the Supremacy Clause to Connecticut's Trust Act and a Guidance document issued by the Connecticut Office of the Attorney General. These claims fail under every theory of relief the United States advances. Tellingly, the United States has not been successful advancing even one of its theories in similar suits around the nation. Rather, every court to consider these arguments has rejected them outright. This Court should follow suit. For these reasons explained more fully below, this action should be dismissed with prejudice.

1

**BACKGROUND**

I.      **Connecticut's Trust Act**

The Connecticut Trust Act, Conn. Gen. Stat. § 54-192h, was enacted in 2013 to establish clear rules about when state law enforcement would make immigration arrests or respond to requests from federal Immigration and Customs Enforcement ("ICE") for information or assistance with an ICE detainer.

In its original form, the Trust Act limited the circumstances in which law enforcement[1] could detain a person pursuant to a civil immigration detainer. *See* P.A. 13-155 (2013). Subject to limited exceptions, law enforcement were prohibited from detaining individuals pursuant solely to a civil immigration detainer. In 2017, the Department of Justice ("DOJ") expressly conceded that the version of the Trust Act then in effect did not conflict with or violate 8 U.S.C. § 1373. *See* Letter from A. Hanson, Acting Asst. Atty. Gen. (Oct. 11, 2017) (admitting after review that "[t]he Department [of Justice] has found no evidence that the State of Connecticut is currently out of compliance with section 1373"), https://www.justice.gov/archives/opa/press-release/file/1003021/dl. In fact, after DOJ conducted its review, then Attorney General Jeff Sessions went out of his way to "commend . . . the State of Connecticut on [its] commitment to complying with Section 1373."[2]

---

[1] Law enforcement is defined by the 2013 Act as: "Each officer, employee or other person otherwise paid by or acting as an agent of the Department of Correction; (B) Each officer, employee or other person otherwise paid by or acting as an agent of a municipal police department; (C) Each officer, employee or other person otherwise paid by or acting as an agent of the Division of State Police within the Department of Emergency Services and Public Protection; and (D) Each judicial marshal and state marshal." Conn. Gen. Stat. § 54-192h(a)(4)(A)

[2] *See* Press Release, DOJ, "Justice Department Provides Last Chance for Cities to Show 1373 Compliance" (Oct. 12, 2017), https://www.justice.gov/archives/opa/pr/justice-department-provides-last-chance-cities-show-1373-compliance.

The Trust Act was amended in 2018, and again in 2025. The United States challenges four main areas of these amendments:

- **Arrest and Detention Provisions:** The Act prohibits law enforcement from arresting or detaining individuals pursuant to a civil immigration detainer[3] unless the detainer or administrative warrant is accompanied by a valid judicial warrant, the individual has been convicted of an A or B felony, or the individual is on a terrorist watch list. It also prohibits law enforcement from arresting anyone pursuant to an administrative warrant.[4]

- **Notice Provisions:** The Act directs law enforcement to provide a copy of any detainer to an impacted individual and inform the individual whether law enforcement intends to comply with the detainer request. If the law enforcement agency provides federal immigration enforcement with notification that the individual is going to be released, it must notify the individual and explain the reason the agency is complying with the detainer. *See* Conn. Gen. Stat. § 54-192h(e)(1).

- **Information Sharing Provisions:** The Act provides guidelines about information sharing relating to custody status and release of detained individuals,[5] as well as confidential information[6] of anyone who comes into contact with law enforcement.

---

[3] "Civil immigration detainer" means "a request from a federal immigration authority to a local or state law enforcement agency for a purpose including, but not limited to: (A) Detaining an individual suspected of violating a federal immigration law or who has been issued a final order of removal; (B) Facilitating the (i) arrest of an individual by a federal immigration authority, or (ii) transfer of an individual to the custody of a federal immigration authority; (C) Providing notification of the release date and time of an individual in custody; and (D) Notifying a law enforcement officer, through DHS Form I-247A, or any other form used by the [DHS] or any successor agency thereto, of the federal immigration authority's intent to take custody of an individual[.]" Conn. Gen. Stat. § 54-192h(a)(2).

[4] "Administrative warrant" means a warrant, notice to appear, removal order or warrant of deportation issued by an agent of a federal agency charged with the enforcement of immigration laws or the security of the borders, including ICE and the United States Customs and Border Protection, but does not include a warrant issued or signed by a judicial officer. *Id.* (a)(1).

[5] Law enforcement may not "expend or use time, money, facilities, property, equipment, personnel or other resources to communicate with a federal immigration authority regarding the custody status or release of an individual targeted by a civil immigration detainer, except as provided in subsection (e) of this section." *Id.* § (b)(1)(B).

[6] Confidential information means "any information obtained and maintained by a law enforcement agency relating to (A) an individual's (i) sexual orientation, or (ii) status as a victim of domestic violence or sexual assault, (B) whether such individual is a (i) crime witness, or (ii) recipient of

3

- **Access Provisions:** The Act dictates when state law enforcement may allow federal immigration officials to use their facilities to conduct interviews of incarcerated individuals.[7]

The Trust Act includes additional provisions about data reporting and declining to enter into voluntary cooperation agreements with federal immigration officials, but the United States does not focus on these provisions in this suit.

Of the challenged areas, only the restriction on making immigration arrests pursuant to administrative warrants is absolute. By contrast, state law enforcement may comply with a detainer in many instances, including when an individual has been convicted of a serious offense, the request is accompanied by a warrant, or the individual is on a terrorist watchlist. Similarly, subsection (b)(1)(B) provides that law enforcement may not "communicate with a federal immigration authority regarding the custody status or release of an individual targeted by a civil immigration detainer, *except as provided in subsection (e) of this section*."[8] Subsection (e) permits communication with federal officials so long as law enforcement complies with minimal notice requirements. And notably, nothing in subsection (b)(1)(B) in any way limits law enforcement's ability to communicate with federal officials about the information contemplated by 8 U.S.C. §

---

public assistance, or (C) an individual's income tax or other financial records, including, but not limited to, Social Security numbers." *Id*. § (a)(3).

[7] Pursuant to § (b)(1)(D), state and local law enforcement may not give "a federal immigration authority access to interview an individual who is in the custody of a law enforcement agency unless the individual (i) has been convicted of a class A or B felony offense, (ii) is identified as a possible match in the federal Terrorist Screening Database or similar database, or (iii) is the subject of a court order issued under 8 USC 1225(d)(4)(B)."

[8] Though not referenced in subsection (b)(1)(B), subsection (c) of the Trust Act also requires law enforcement to forward any "request for notification of the release date and time from custody of a law enforcement agency of an individual suspected of violating a federal immigration law or who has been issued a final order of removal" to the "head of the law enforcement agency" for review prior to responding. The United States also does not take issue with this provision.

4

1373; namely, an individual's "citizenship or immigration status." Finally, the confidential information provision provides such information may be shared when "otherwise required by law."

## II.    The Guidance from the Connecticut Office of the Attorney General

In March 2026, the Office of the Attorney General issued Guidance, attached to the Complaint as Exhibit A, to "provide[] guidance and information about immigration enforcement for state and local governments, and private businesses and organizations." ECF No. 1-2 p. 4. It was issued following outreach to the Office of the Attorney General with questions and concerns about what Connecticut residents, organizations, and businesses should and could do if ICE appeared at their doors. *Id.* p. 1. It "offers a broad overview of the law that governs potential interactions with ICE officials" and includes "answers to frequently asked questions people may have about immigration enforcement activities." *Id.* p. 4. It was intended "to assist organizations and entities . . . so they can continue to focus on the people and community they serve, their mission, and their essential work, while adhering to state and federal laws." *Id.*

## III.    This Lawsuit

The United States ("Plaintiff") has sued the State of Connecticut ("Connecticut") along with the Governor of Connecticut, Ned Lamont, and the Attorney General of Connecticut, William Tong (collectively, "Defendants" or "State Defendants"), as well as the City of New Haven and its Mayor, Justin Elicker (collectively, "New Haven Defendants"). Based on a facial Supremacy Clause challenge, the United States asks this Court to invalidate the Connecticut Trust Act and enjoin a Statement of Policy and Guidance Regarding Immigration Matters ("Guidance") issued by the Connecticut Office of the Attorney General. In Counts One and Three, the United States asserts both the Trust Act and Guidance are unconstitutional because they are conflict preempted, and expressly preempted. In Counts Five and Seven, the United States claims the Trust Act and Guidance are barred by intergovernmental immunity. It seeks the Court enter a declaratory

judgment and enjoin the Defendants from enforcing either the Trust Act or Guidance, and "any substantially similar policies, orders, or laws that may become effective in the future." ECF No. 1, p. 32

## STANDARD OF REVIEW

### I.      Motions to dismiss for lack of subject matter jurisdiction.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* Although the court accepts all material factual allegations in the complaint as true, it cannot draw inferences from the complaint favorable to the plaintiff or rely on conclusory statements in the Complaint. *See, e.g.*, *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)). *TransUnion LLC v. Ramirez,* 594 U.S. 413, 430 (2021). "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021). (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992)).

### II.      Motions to dismiss for failure to state a claim.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Not all allegations in a complaint are entitled to the presumption of truth. *Id.* A court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks omitted); *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (noting that "factual allegations must be sufficient to support necessary legal conclusions").

6

Factual allegations "must be enough to raise a right to relief above the speculative level," and dismissal is proper where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 558 (2007).

## **ARGUMENT**

The responsibility for enforcing our nation's immigration laws lies with the federal government, not the states. While Connecticut has determined that state and local law enforcement may assist federal officials in many aspects of that endeavor—including by complying with civil immigration detainers in appropriate circumstances and sharing information about an individual's custody status and release date from state facilities—it has exercised its own sovereign right, protected by the Tenth Amendment, to direct and control its own resources by not participating in other aspects of immigration enforcement. Nothing in the Trust Act regulates or impedes federal officials' performance of their own immigration duties. And it does not apply to or in any way restrict the sharing of information about a person's citizenship or immigration status, which is all that the statutes the United States primarily relies on require to be shared.

The United States' real complaint is not that the Trust Act conflicts with or impedes federal law, but that Connecticut has declined to do the federal government's job for it. It suggests the Trust Act impermissibly obstructs federal detention efforts because it forces immigration authorities to put more effort into investigations and arrests than they otherwise would if state officials carried these activities out for them. But nothing in Connecticut's laws "active[ly] frustrat[es] . . . the federal government's ability to discharge its operations." *United States v. California,* 921 F.3d 865, 885 (9th Cir. 2019). And "refusing to help is not the same as impeding." *Id.* at 888*; see also City of Chicago. v. Sessions,* 888 F.3d 272, 282 (7th Cir. 2018) (rejecting argument that refusal to provide information to immigration authorities constitutes "affirmative

interference" with immigration enforcement); *City of El Cenizo v. Texas,* 890 F.3d 164, 180 (5th Cir. 2018) ("Congress did not choose to make these laws [regarding state cooperation] voluntary; it could not have made them mandatory"). In the end, whatever marginal increase in resources the United States is compelled to use for its immigration priorities does not trump Connecticut's right to refrain from assisting in federal civil immigration enforcement efforts.

## I.      The Complaint fails to state a preemption claim.

The United States' complaint fails to state a claim for relief. The complaint argues the Trust Act and Guidance are preempted under two theories: 1.) that §§ 1373 and 1644 expressly preempt them and 2.) that they conflict with and/or obstruct provisions of the INA.  ECF No. 1 ¶¶ 73-82, 88-91. The preemption claim fails under either theory and should be dismissed.

The Supreme Court has recognized "three different types of preemption—'conflict,' 'express,' and 'field.'" *Murphy v. NCAA,* 584 U.S. 453, 477 (2018). The United States advances only express and conflict preemption here. ECF No. 1 ¶¶ 73-82, 88-91. Express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United State*s, 567 U.S. 387, 399 (2012). Conflict preemption, a form of implied preemption, occurs where "compliance with both federal and state regulations is a physical impossibility" or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted). All forms of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence." *Murphy,* 584 U.S. at 477. And the basis for preemption must always be "a valid statute enacted by congress" and not "some brooding federal interest." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020); *Virginia*

*Uranium, Inc. v. Warren,* 587 U.S. 761, 767 (2019) ("appealing to a judicial policy preference" is not enough).

The Supremacy Clause supplies only "a rule of decision;" it is "not an independent grant of legislative power to Congress." *Murphy,* 584 U.S. at 477. As such, for a federal statute to preempt state law, it "must be best read as one that regulates private actors," because Congress has "the power to regulate individuals, not States." *Id.* (citations omitted). If the federal statute upon which the United States bases its claim does not regulate private individuals, it cannot serve as a valid basis for preemption. *Id.*

The Court's analysis must begin "with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by [a federal act] unless that was the clear and manifest purpose of Congress.") (citations omitted). This presumption against preemption is "especially strong in areas where states traditionally wield police powers." *N.Y. Pet Welfare Ass'n, Inc. v. City of New York,* 850 F.3d 79, 86 (2d Cir. 2017); *see also Steel Institute of New York v. City of New York,* 716 F.3d 31, 36 (2d Cir. 2013) ("There is a strong presumption against preemption when states and localities 'exercise their police powers to protect the health and safety of their citizens'") (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (citations omitted)). The presumption may only be overcome if Congress' intent to preempt is "clear and manifest." *New York State Telecomms. Ass'n, Inc. v. Jame*s, 101 F.4th 135, 148 (2d Cir. 2024) (citations omitted).

The United States must overcome this "especially strong" presumption, *N.Y. Pet*, 850 F.3d at 86, because states like Connecticut have the historic, sovereign power to regulate and protect

9

the welfare, health, and safety of all their residents—explicit purposes of both the Trust Act and Guidance.[9] *United States v. Morrison*, 529 U.S. 598, 617 (2000) (there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). It cannot do so.

### A. Neither §§ 1373 nor 1644 expressly preempt the Trust Act or Guidance.

The United States' express preemption claim fails at the outset because the Trust Act and Guidance are consistent with §§ 1373 and 1644.[10] The United States advances an overbroad and strained reading of both sections to manufacture a conflict with the Trust Act. The plain language of these federal laws restricts only *prohibitions* on sharing information "regarding" an individual's "citizenship or immigration status." But the Trust Act does not prohibit sharing information "regarding" an individual's "citizenship or immigration status" with federal immigration authorities, so it cannot be preempted by either section. Even more categorically, the Guidance—

---

[9] *See* ECF No. 1-2 p. 1 (the Guidance document was drafted because the Office of the Attorney General "heard from countless Connecticut residents concerned about their safety and that of their neighbors"); Pg. 2, (explaining the entire state "benefits when our immigrant friends, neighbors, and families feel safe, and state and local governments, and private businesses and organizations, can provide indispensable services without fear or disruption"); *see also* Office of the Att'y Gen. of the State of Conn., The Connecticut Trust Act (Conn. Gen. Stat. § 54-192h) p. 1 (Jan. 15, 2025), https://portal.ct.gov/-/media/ag/civil-rights/trust-act-guidancememo11525english.pdf?rev=fc734d574ff446dea087636839124427&hash=E87682E01 8BB5E41477839F3C1905705 ("[F]ostering trust between immigrant communities and law enforcement was a main reason why the Connecticut legislature enacted the Trust Act. . . . When residents feel safe interacting with law enforcement, they are more likely to make reports when they are witnesses to crimes in our communities or are personally victimized by harassment, intimidation, violence, or otherwise illegal conduct.").

[10] "Courts have generally held that the relevant provisions in Sections 1373 and 1644 have no meaningful difference and have analyzed them together." *United States v. New York,* 810 F. Supp. 3d 329, 349 n.8 (N.D.N.Y. 2025) (*citing Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 372 (D.N.J. 2020)); *see also Illinois*, 796 F. Supp. 3d at 514. Accordingly, throughout this brief Defendants refer to the provisions interchangeably. *See, e.g., City of Chicago. v. Barr,* 961 F.3d 882, 888-89 (7th Cir. 2020).

which is merely that, guidance, without force of law—does no such thing. There is no "clear and manifest" Congressional intent to preempt the Trust Act or Guidance through § 1373. Absent such clarity, the presumption against preemption cannot be overcome here.

### 1.   The Court should reject the United States' overbroad reading of § 1373.

The United States alleges the statute encompasses more than just information regarding "citizenship" and "immigration status." But its expansive reading of § 1373 is belied by the plain text of the statute, which is narrowly limited to a specific topic. Accordingly, every court to consider the United States' interpretation has rejected it.

Express preemption arises when "express language in a congressional enactment" so requires it. *Lorillard Tobacco Co. v Reilly,* 533 U.S. 525, 541 (2001). The beginning of any express preemption challenge is thus the plain language of the statutes identified. In construing a statute, courts must begin with the text itself, "and proceed from the understanding that 'unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer,* 569 U.S. 369, 376 (2013) (*quoting BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). The first step of that analysis "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450 (2002) (*quoting Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)). "In the context of express pre-emption," courts "read federal statutes whenever possible *not* to pre-empt state law." *PLIVA, Inc., v. Mensing,* 564 U.S. 604, 641 (2011) (emphasis added).

The United States misstates § 1373's preemptive scope. The statute only mentions "information regarding the citizenship or immigration status" of an individual.  But in contending that § 1373 expressly preempts the Trust Act and Guidance, the United States argues that this provision also mandates the disclosure to federal officials of an individual's "custody status," "release," and "confidential information" like sexual orientation, status as a victim of domestic

11

violence or sexual assault, financial records, or whether someone is a crime witness or recipient of public assistance. ECF No. 1 ¶¶ 90-91. The statutes they rely upon do not say that or support such an interpretation. The argument that by using the terms "citizenship or immigration status" Congress somehow meant to encompass "sexual orientation" or "custody status" is without support and the United States cites none.

The limited congressional authority expressed in the text is born out in caselaw. Every court to consider the issue has uniformly determined that the plain meaning of § 1373 limits its reach to information strictly pertaining to immigration status, "i.e. what one's immigration status is." *See United States v. California*, 314 F. Supp. 3d 1077, 1102 (E.D. Cal. 2018), *aff'd in part, rev'd in part and remanded,* 921 F.3d 865 (9th Cir 2019) (upholding district court determination that § 1373 must be read narrowly); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 764 (9th Cir. 2020) (upholding local laws that "restrict some information that . . . local officials may share with federal authorities" but do not restrict "information regarding a person's citizenship or immigration status, which is the only information to which § 1373 extends"); *United States v. New York,* 814 F. Supp. 3d 266, 277 (N.D.N.Y. 2025) (rejecting broad interpretation of § 1373); *United States v. Illinois,* 796 F. Supp. 3d 494, 516 (N.D. Ill. 2025) (concluding that the text, structure, and history do not support "the United States's capacious reading of § 1373" and collecting cases rendering same conclusion); *Cty. Of Ocean*, 475 F. Supp. 3d at 375-76 (rejecting attempt to sweep into the ambit of § 1373 "any information, including personal identifying data, concerning an alien in the United States"); *United States v. City of Boston*, No. 25-12456-LTS, 2026 U.S. Dist. LEXIS 117779, at *8 (D. Mass. May 28, 2026) (same); *City of Philadelphia v. Sessions,* 309 F. Supp. 3d 289, 332–33 (E.D. Pa. 2018) (when a person will be released from detention is not "'information

regarding' . . . immigration status"), *vacated in part on other grounds by City of Philadelphia v. Attorney General of United States*, 916 F.3d 276 (3d Cir. 2019).

Section 1373 is unambiguous. But to the extent any ambiguity exists, constitutional avoidance counsels adopting a more limited reading to avoid the Supremacy Clause concerns raised by the United States. *See United States v. Hansen,* 599 U.S. 762, 781 (2023) (applying constitutional avoidance doctrine to adopt statutory reading that was "at least fairly possible" (quotation marks omitted)). When serious constitutional questions involving statutory interpretation are at issue, "it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U. S. 22, 62 (1932). That is, "[i]f one [interpretation] would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *United States v. Coonan,* 143 F.4th 119, 128 (2d Cir. 2025). The reading of the statute that numerous courts have adopted—that it applies only to what one's citizenship and immigration status is—avoids any constitutional question because the Trust Act is entirely consistent with that reading.

This Court should not depart from the great weight of authority against the United States' broad and unsupported interpretation of § 1373.

### 2. The Trust Act's information sharing provisions do not conflict with § 1373.

Reading § 1373 narrowly—as every other court has done—it is obvious the United States' preemption claims fail. None of the information sharing provisions contained in the Trust Act conflict with § 1373 because the protections of the Trust Act do not even concern information sharing about "immigration or citizenship status." Further, the Trust Act's confidential information provision permits disclosure of confidential information where otherwise required by law and thus does not conflict with any federal law that requires its disclosure.

13

The plain language of the Trust Act does not restrict information sharing about immigration and citizenship status. The United States takes issue with two subsections of the Trust Act involving information sharing: subsections (b)(1)(B) and (d). ECF No. 1 ¶¶ 90-91. The United States claims these subsections "fall within the heartland of what 8 U.S.C. §§ 1373, 1644 preempt." *Id.* But neither provision has anything to do with "immigration or citizenship status," which is what Congress prohibits states from withholding from federal officials. Rather, subsection (b)(1)(B) only prohibits communication "***regarding the custody status or release*** of an individual targeted by a civil immigration detainer." And, subject to exceptions, subsection (d) restricts state and local law enforcement from sharing "***confidential information***" of anyone they encounter. "Confidential information" is a defined term that does not even arguably include immigration or citizenship status. Instead, it is expressly limited to categories of other information completely unrelated to immigration status, like sexual orientation or status as a victim of domestic violence, sexual assault or as a crime witness, among others. *See* Conn. Gen. Stat. § 54-192h(a)(3). Neither subsection restricts information sharing about "citizenship or immigration status" in any way, nor does any other provision of the Trust Act.

Further, the Trust Act permits confidential information to be shared when "otherwise required by law."[11] This express carve-out allows sharing when required by federal law, including § 1373. A nearly identical carve-out in California's analogue to the Trust Act led the Ninth Circuit to conclude there was no direct conflict with § 1373. *California*, 921 F.3d at 891; *accord Ocean Cty.*, 475 F. Supp. 3d at 379 (recognizing that New Jersey's carve-out for § 1373 "explicitly allows state, local, and county officials to share information regarding an individual's immigration

---

[11] Confidential information may also be shared with consent of the subject of the information, or in furtherance of a terrorism investigation. Conn. Gen. Stat. § 54-192h(d).

status"). Because the Trust Act allows law enforcement to exchange information to the extent required by § 1373, it is not preempted by those provisions.

Ultimately, express preemption exists when "a federal statute expressly directs that state law be ousted" and there is direct conflict with the statute. *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008). Congress did not do that here.

### B. There is no obstacle preemption because no federal law compels Connecticut to carry out immigration enforcement.

Lacking any expressly conflicting statute, the United States alleges the Trust Act and Guidance create an "obstacle" to Congress's immigration objectives and are therefore preempted. This too is incorrect. Connecticut's law and the Guidance do not impose an "obstacle" to any federal statute the United States cites. At best, the United States points to various statutory provisions regulating the conduct of *federal officials* in immigration enforcement. None of the provisions in the Trust Act obstruct or impede the conduct of any federal official.

Conflict preemption includes "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation and quotation marks omitted). The Complaint here does not allege any physical impossibility; to the contrary, it highlights the federal government's immigration enforcement efforts in the State. *See* ECF No. 1 ¶¶ 4, 13. The United States instead advances a theory broader than the statutory language—namely, that the Trust Act and Guidance pose an "obstacle" to immigration enforcement. To prove preemption under this theory, a "high threshold must be met"; the obstacle must be concrete, not merely in tension with federal statutory objectives. *See Chamber of Commerce of U.S. v. Whiting,* 563 U.S. 582, 599

(2011) (plurality opinion); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 104 (2d Cir. 2010).

An obstacle preemption claim "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Whiting*, 563 U.S. at 607 (quotation marks omitted). "[S]uch an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Id.* What constitutes an "obstacle" is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372 (2000). Because control of its own law enforcement officers is an area of traditional state regulation, "the conflict between state law and federal policy must be a 'sharp' one" to warrant preemption. *Marsh v. Rosenbloom,* 499 F.3d 165, 178 (2d Cir. 2007).

Here, the federal statutory scheme explicitly makes state cooperation with federal immigration enforcement entirely voluntary, and nothing in the Trust Act conflicts with the statutory provisions the United States cites.[12]

---

[12] *See City of Chicago v. Session*s, 888 F.3d 272, 282 (7th Cir. 2018) (noting, with respect to "refusal of the local law enforcement to aid in civil immigration enforcement," that "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities"); *Cnty. of Ocean,* 475 F. Supp. 3d at 362, 381-82 ("There is no indication that Congress, in enacting the INA, sought to usurp" local "decision[s] not to cooperate with the enforcement of federal immigration law," which are "a clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies"; "the fact that the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption."); *Illinois,* 796 F. Supp. 3d, at 529 n.18 ("The United States repeatedly conflates the INA's 'codification of comity,' with a requirement that States facilitate federal immigration enforcement. This is incorrect. Comity by definition is not a legal requirement.") (citations omitted).

16

### 1. Arrest and Detention Provisions

*First*, the United States argues that Connecticut's sovereign choice not to allocate its finite resources to federal immigration arrests and detentions conflicts with 8 U.S.C. § 1357(g).[13] *E.g.*, ECF No. 1 ¶ 80. This is incorrect.  That section only provides the federal government "*may*" enter into agreements to use state resources for arrest and detention purposes, 8 U.S.C.§ 1357(g)(1); by its express terms it is permissive and does not *require* states to agree. *See id.* § 1357(g)(9) (providing that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement"). This was as far as Congress could go—it could not force states to cooperate. *See infra Section III.*  Indeed, the United States concedes, as it must, that assisting federal authorities with immigration arrests or detentions "is voluntary" and states and localities retain the choice to participate. ECF No. 1 ¶ 29. Connecticut exercising this entirely voluntary choice to decline to enter into such agreements, or let the federal government use its resources, is thus consistent with § 1357(g) and the optional nature of the federal statutory scheme.

The United States also argues various federal statutory and regulatory provisions authorizing or requiring its own officials to make arrests and use administrative warrants and immigration detainers to carry out their duties conflicts with the Trust Act. *See* ECF No. 1 ¶¶ 30-31. Not so. While federal law authorizes or requires *the federal government* to make immigration arrests and detain individuals for immigration violations, it does not require *state law enforcement* to do so.[14] *See City of El Cenizo*, 890 F.3d at 178 ("Federal law does not suggest the intent—let

---

[13] The Trust Act permits local and state law enforcement to arrest or detain an individual pursuant to a civil immigration detainer if the detainer is accompanied by a judicial warrant, if the individual is a possible match in a federal terrorist database, or if they have been convicted of an A or B felony or other serious offense identified in the statute. Conn. Gen. Stat. § 54-192h(b)(1).

[14] It is an unsettled question of Connecticut state law whether state and local officials even have jurisdiction or authority to arrest or hold a person based solely upon a violation of federal immigration law at all. *See Lunn v. Commonwealth*, 78 N.E.3d 1143, 1160 (Mass. 2017) (holding,

alone a 'clear and manifest' one—to prevent states from regulating whether their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all."). Similarly, as to detainer requests, while the statutory and regulatory schemes authorize federal officials to issue them, nothing requires state officials to comply. C.F.R. § 287.7(a) ("The detainer is a *request* that such agency advise the Department, prior to release of the alien . . . .") (emphasis added); *see also Galarza v. Szalczyk*, 745 F.3d 634, 641, 643 (3d Cir. 2014). That in some situations the federal government is statutorily mandated to *issue* detainer requests does not impose an obligation on the states to *comply* with them. *See* ECF No. 1 ¶ 31 (citing 8 U.S.C. § 1357(d)).

In addition, neither 8 U.S.C. §§ 1226(a) nor 1231(a) preempt the Trust Act, as the United States alleges. *See* ECF No. 1 ¶ 58. Section 1226(a) allows the U.S. Attorney General to arrest and detain certain individuals based on an administrative warrant. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained . . . ."). And § 1231(a) imposes duties on the U.S. Attorney General with respect to the detention of individuals ordered removed from the United States. *See* 8 U.S.C. § 1231(a)(1)(A) ("[W]hen an alien is ordered removed, the Attorney General shall remove the alien . . . ."). But neither law puts a duty on states. Ultimately, federal immigration authorities would simply prefer to commandeer Connecticut's resources instead of expending their own, even though Congress did not require Connecticut officials to perform these functions and the Constitution does not allow Congress to compel them to do so. *See McHenry Cty. v. Raoul,* 44 F.4th 581, 592 (7th Cir. 2022) ("Congress may have hoped or expected that States would cooperate with any requests from the Attorney

---

as a matter of state law, that Massachusetts officials have no authority to arrest or hold a person solely on the basis of a federal civil immigration detainer); *City of Boston,* 2026 U.S. Dist. LEXIS 117779, at *26 (dismissing nearly identical suit because Massachusetts officers have no authority under state law to hold individuals on immigration violations, and so the United States lacked standing to challenge Boston's Trust Act).

General to house detainees in their facilities. But . . . States are not bound by that hope or expectation."); *Illinois,* 796 F.Supp. 3d at 529 ("[B]ecause the INA merely offers States the opportunity to assist in civil immigration enforcement, [Illinois' analogous statutes] don't make ICE's job more difficult, they just don't make it easier."). That preference is not the standard for preemption.

### 2. Notice Provisions

*Second,* the United States argues the Trust Act's notice requirements conflict with federal law and impede their enforcement efforts. But the Trust Act merely requires state officials, if they receive an immigration detainer, to provide a copy of the detainer to the affected individual and inform the individual whether the law enforcement agency intends to comply with the detainer—it does not stop federal officials from doing anything. Nor does the Notice Provision itself prevent state officials from complying with any detainer they receive. The United States nevertheless goes so far as to vaguely threaten Connecticut officials with criminal sanctions if they follow these notice requirements, ECF No. 1 ¶ 45 (citing 8 U.S.C. § 1324). But §1324(a) criminalizes actions "that [are] intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, or other material comfort—and also [are] intended to help prevent the detection of the alien by the authorities." *United States v. George,* 779 F.3d 113, 118 (2d Cir. 2015).

The Trust Act does no such thing. Providing a copy of a detainer request to an incarcerated individual—whose location the federal government obviously knows when they make the detainer request—before complying with it, does not evince intent to "conceal" or "prevent detection" nor provide "substantial help" to remain in the country as required. *Id.* (*citing United States v. Vargas-Cordon*, 733 F.3d 366, (2d Cir. 2013)). And the United States' vague suggestion that informing

19

people when these requests are made "thwart[s]" immigration enforcement is belied by its own policies.

The provision does not apply to federal officials at all; it only regulates interactions between state law enforcement and a detainee in state custody. The notice provision also does not obstruct federal enforcement efforts: as the United States recognizes, it may arrest or detain an individual immediately after their release from state custody. And release dates and incarceration information are not a secret; such information is generally publicly available and accessible by the federal government. Indeed, the I-247A detainer request form explicitly *requires* notice be provided to the subject of the detainer. *See* Immigration and Customs Enforcement, DHS Form I-247A (3/17), https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf. And the I-247 form, while not requiring notice, still clearly contemplates it. *See* Immigration and Customs Enforcement, DHS Form I-247; *see also* ECF No. 1-2 pp. 26-27 (giving immigration authority the option to request that the state "[p]rovide a copy to the subject of this detainer" and including section entitled "NOTICE TO THE DETAINEE").  Given that the federal government's own forms contemplate notice to a detainee of its detainer request, and no provision of federal law prohibits state officials from providing such notice, there is no conflict.

In addition, the notice requirements serve important objectives. First, providing basic notice and information to an individual who is the subject of a federal immigration detainer helps state law enforcement maintain the trust of immigrant communities. This advances the state's own law enforcement interests to ensure that vulnerable communities are not exploited and feel safe in reporting crime and seeking governmental services. The notice requirements demonstrate to the individual and the community more broadly that a person's detention is because of the federal government's priorities, not the State's. Second, the notice provisions allow officers to obtain

20

important information about a detainee before they choose to comply with a detainer or request for information. For example, it allows them to confirm identity and ensure the detainer or request is appropriately directed at the individual in their custody. Finally, advance notice allows detainees to seek legal advice, gather evidence, communicate with their families, and otherwise prepare for immigration proceedings. In doing so, the notice provisions ensure individuals subject to immigration proceedings can obtain counsel and present their cases to the immigration courts in an orderly fashion. "The United States . . . fails to provide any support for th[e] speculative position that by providing an alien with adequate notice that federal immigration authorities have requested information, seek to interview, or detain him, will somehow assist aliens with avoiding removal. Such a vague and unsupported assertion cannot serve as a basis to preempt a state law." *United States v. New Jersey*, Civil Action No. 20-1364 (FLW) (TJB), 2021 U.S. Dist. LEXIS 14089, at *23 (D.N.J. Jan. 26, 2021).

The United States cannot overcome the "strong presumption against preemption" based on nothing more than a general complaint about enforcement costs. Simply providing individuals in custody and subject to a detainer request notice poses no "obstacle" and is not preempted by federal law.

### 3. Access Provisions

*Third,* the access provisions in the Trust Act do not conflict with federal law. The Trust Act prohibits, in some circumstances, state law enforcement from giving federal authorities access to interview incarcerated individuals.[15] Laws requiring immigration officers to "inspect" persons

---

[15] In some circumstances Connecticut has chosen to permit the allocation resources to facilitating federal immigration enforcement.  The Trust Act permits state and local officials to allow access for interviews of individuals who are a possible match in a federal terrorist database, if they have been convicted of an A or B felony or other serious offense identified in the statute, or if they are

seeking admission to the United States, 8 U.S.C. § 1225(a)(3), again impose no requirements on state actors, just federal authorities. The federal statute requires federal immigration officers to inspect "aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." *Id*. This law imposes obligations on federal officials and may regulate how diverse federal officials interact with individuals entering the United States, it is not a mandate to the States. The United States cites nothing in federal law that requires state authorities to give federal agents free run of their detention facilities to access or interview individuals in state custody.

Further, Connecticut unquestionably has a property interest in deciding who may or may not enter and access its state property, such as a correctional facility. *See State v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 205-06 (5th Cir. 2024) (where the state was "acting as a proprietor, not a regulator," it was not "prohibiting the federal government from enforcing immigration law"; a state "is not seeking to 'regulate' the Defendants merely by . . . prevent[ing] trespass"). As such, the Trust Act's access provision does not conflict with the sections cited by the United States.

### 4.  Information Sharing Provisions

*Fourth,* the Trust Act's information sharing provisions do not conflict with or obstruct the federal statutes relied upon. As discussed above, the United States cites no federal statute that requires state law enforcement to supply information about detainees to federal immigration officials. And the information sharing provisions pose no obstacle to federal immigration enforcement prerogatives. The United States fails to explain why knowing any individual's

---

subject to a court order to be interviewed pursuant to 8 U.S.C. § 1225(d)(4)(B).   This is Connecticut's choice to make and it could change its policy at any time.

(including those not subject to any immigration detainer or investigation) sexual orientation or other personal information in any way is essential to performing their immigration enforcement duties. Similarly, restrictions on sharing custody status and release information do not impede the federal government's efforts. *See City of Chicago*, 888 F.3d at 282 (local restrictions on notifying federal authorities about release dates and granting federal immigration officials access to local detention facilities do not constitute "any interference whatsoever with federal immigration authorities").

Even if the Court could somehow read § 1373 to encompass "custody status or release" information—it does not—the Trust Act does not impose any burden on federal immigration officials and instead adds notice requirements for state law enforcement before they may share such information. Subection (b)(1)(B) provides that law enforcement may not "[e]xpend or use time, money, facilities, property, equipment, personnel or other resources to communicate with a federal immigration authority regarding the custody status or release of an individual targeted by a civil immigration detainer, *except as provided in subsection (e) of this section*."[16] Subsection (e) imposes minimal notice requirements on law enforcement if they receive a detainer request, requiring them to provide a copy of any detainer to an impacted individual and inform the individual whether they intend to comply with the detainer request, as discussed above. If the law enforcement agency provides federal immigration enforcement with notification that an individual is going to be released, they must notify the individual and explain the reason the agency is complying with the detainer. Therefore, even the limited information sharing provisions in the

---

[16] Though not referenced in subsection (b)(1)(B), subsection (c) of the Trust Act also requires law enforcement to forward any "request for notification of the release date and time from custody of a law enforcement agency of an individual suspected of violating a federal immigration law or who has been issued a final order of removal" to the "head of the law enforcement agency" for review prior to responding.

23

Trust Act are not categorical prohibitions or restrictions as the United States incorrectly asserts, and officers may choose to share such information so long as they follow the notice requirements in the statute.

Considering the federal statutory scheme "as a whole," it is clear there is nothing in "its purpose and intended effects" to force states to carry out the federal government's immigration enforcement duties. *Crosby,* 530 U.S. at 372. Ultimately, Connecticut's entirely appropriate decision "not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort." *California*, 314 F. Supp. 3d at 1104-05; *accord Illinois*, 796 F. Supp. 3d at 530-31.

### C. The United States' failure to identify a statute regulating private conduct is fatal to its preemption claims.

The United States' preemption claims also fail because a federal statute only has preemptive effect if it regulates private actors, and most, if not all, of the federal laws at issue here do not regulate private actors. *See Murphy,* 584 U.S. at 477.

Congress has "the power to regulate individuals, not States." *Id.* at 477 (quotation marks omitted). As a result, for a federal statute to preempt state law, it "must be best read as one that regulates private actors." *Id.* In *Murphy*, for example, the Court determined that the Professional and Amateur Sports Protection Act ("PASPA"), which barred states from adopting legal sports gambling schemes, did not constitute a preemption provision because it regulated *states*—there was "no way in which this provision can be understood as a regulation of *private actors*." *Id.* at 479 (emphasis added). After providing some examples of preemption, the Court reiterated, for a third time, that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 479. PASPA neither conferred any federal rights nor imposed

24

any federal restrictions on private actors. It could be understood only as "a direct command to the States." *Id.* at 480. As a result, the federal government's preemption argument in *Murphy* failed.

So too here. Similar to PASPA, § 1373 only regulates government: "*a Federal, State, or local government entity or official* may not prohibit, or in any way restrict" communication with federal immigration authorities. 8 U.S.C. § 1373(a) (emphasis added). This language "do[es] [not] regulate private actors in language or effect." *Illinois,* 796 F. Supp. 3d at 521. Multiple courts have found § 1373 does not apply to private actors because private actors are categorically unable to "prohibit[], or in any way restrict[]" the actions of local government officials. *See, e.g.*, *Oregon v. Trump,* 406 F. Supp. 3d 940, 972 (D. Or. 2019) ("[T]here is simply no way to understand the provisions as anything other than direct commands to the States.") (cleaned up); *Cty. of Ocean*, 475 F. Supp. 3d at 372 ("these provisions plainly regulate the sharing of such information by state and local government officials, and significantly, they do not regulate private actors in any way"); *Colorado v. U.S. Dep't of Justice,* 455 F. Supp. 3d 1034, 1059 (D. Colo. Apr. 23, 2020) ("By their plain terms, the provisions affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption.").

The fact that neither provision regulates private conduct "is a death knell to . . . United States' arguments on preemption." *Cty. Of Ocean,* 475 F. Supp. 3d 355, 372. No court has determined otherwise, and this Court should follow suit.

### D. The Guidance is not preempted because it is entirely consistent with federal statutes, has no legal effect and cannot be said to impose an obstacle to federal law.

The United States' claim challenging the Guidance is nonsensical. To start, preemption is based upon a conflict of *law,* not interpretation of law, policy, or any statements from political opponents with which the federal government disagrees. *See Kansas,* 589 U.S. at 201 (preemption

25

provides "'a rule of decision' for determining whether federal or state *law* applies in a particular situation") (emphasis added; citations omitted). A prerequisite to preemption is that a state law or regulation "confers rights or imposes restrictions" in conflict with federal law. *See Murphy,* 584 U.S. at 477. The Guidance is not a law or regulation subject to preemption. It regulates nothing and no one.[17] It "confers" no rights and "imposes" no restrictions. *Id*.

Instead, it is a document directed to Connecticut organizations, agencies, and entities containing completely accurate and appropriate descriptions of the law. It was issued to address a real problem: Connecticut residents' confusion about the combative and escalating federal immigration enforcement practices.[18] It is a perfectly appropriate exercise of the Attorney General's rights and authority as a chief legal officer to engage in protected speech about state and federal law. *See NRA of Am. v. Vullo*, 49 F.4th 700, 714-15 (2d Cir. 2022) (*vacated on other grounds*) (in issuing a guidance document "a government official has the right to speak for herself (and her agency) and to select the views she wishes to express"). The federal government's preference that the targets of immigration enforcement be ignorant of or confused about their legal rights does not transform a state Attorney General's speech about the law into a conflict with federal law. The Court should not permit the United States' absurd effort to silence a constitutional officer of the State of Connecticut through frivolous legal claims simply because it disagrees with that officer's message.

---

[17] *See* ECF No. 1-2 p. 4 ("Nothing in this document constitutes legal advice or a formal legal opinion of the Attorney General. This statement of policy and guidance is not binding nor precedential, but rather an overview of potentially relevant legal principles in the context of immigration enforcement.").

[18] ECF No. 1-2 p. 4 ("through the Office of the Attorney General hereby provides *guidance and information* about immigration enforcement for state and local governments, and private businesses and organizations.").

26

Even if the Court were to consider the merits of the federal government's preemption claims here—which it ought not do because of their facial invalidity—those claims fail on the merits as well. The Guidance in no way contravenes the plain language of these statutes, thus no conflict exists. The Guidance highlights certain Fourth Amendment principles and provides "a broad overview of the law that governs potential interactions with ICE." ECF No. 1-2 p. 5. And the United States does not argue that anything in the Guidance is inaccurate or constitutes an incorrect statement of the law—indeed, most of the document mirrors the United States' own description of its authority in the complaint. *See, e.g., id*. at 11-13 (describing immigration enforcement officials' arrest and detention authority).

At best, the United States takes issue with one statement in the Guidance and argues that the description of subpoenas and warrants amounts to "encourage[ment] . . . to flout administrative subpoenas." ECF No. 1 ¶ 9. The Guidance merely explains that "personnel are generally not required to disclose any non-public information" and "agencies and officials should protect the privacy and legal rights of individuals and should only share sensitive information as explicitly required by law." ECF No. 1-2 p. 12. The Guidance recommends that public agencies and officials "consult with legal counsel" when presented with a request for data or documents. *Id.* And in describing administrative subpoenas, the document explains that, unlike judicial subpoenas, "penalties for failure to comply with an administrative subpoena are not automatic and may only occur if a subpoena enforcement action is brought in federal district court." *Id*. This statement is not only true, but it aligns with the United States' own allegations. *See* ECF No. 1 ¶ 27 ("federal district courts are authorized to issue orders requiring individuals to comply with such subpoenas"). The Guidance further recommends all subpoenas be shared with legal counsel of organizations for review. Tellingly, the United States fails to identify any inaccuracy with these

27

statements or identify any law that compels a different approach.  Plaintiff fails to allege even a tension between the Guidance and federal law, nevermind an actual conflict.

The United States has the power to challenge laws that are preempted by federal law. It does not and should not have the power to file suit against state officials based merely on a disagreement with an official's First Amendment protected speech. To do so is an abuse of the federal government's "extraordinary power." *Gregory,* 501 U.S. at 460. The United States ignores the Supreme Court's cautionary admonishment by challenging the Guidance. Inclusion of the Attorney General's Guidance in this suit—which the United States has no standing or legal basis to challenge under any theory—is a thinly veiled attempt to intimidate state officials from issuing guidance or policy statements the federal government disagrees with. This Court should dismiss all claims challenging the Guidance in the strongest terms.

## II.    Neither the Trust Act nor the Guidance violates intergovernmental immunity principles.

The Trust Act and the Guidance do not violate the intergovernmental immunity doctrine because they do not directly regulate or discriminate against the federal government. The Trust Act itself is a neutral law that, by its plain language, applies only to state and local actors. The Guidance, which does not have the force of law, does not "regulate" anyone or discriminate against anything; it discusses legal principles.

In Counts Five and Seven, the United States argues the intergovernmental immunity doctrine bars the Trust Act and Guidance. This immunity bars a state from seeking to "regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington,* 596 U.S. 832, 838 (2022). A state law can only be said to discriminate against the federal government when it singles the federal government out for less

28

favorable treatment. *See Washington v. United States*, 460 U.S. 536, 546 (1983). The Trust Act neither regulates nor discriminates against the federal government.

The Court should dismiss Count Five because of the lack of direct regulation. *Washington*, 596 U.S. at 833. "[T]he key question is whether state law seeks to improperly 'control' the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment . . . .'" *United States v. New York*, 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025) (quoting *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024); *see also North Dakota v. United States*, 495 U.S. 423, 434-35 (1990) ("[T]he Court decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional, . . . and that view has now been 'thoroughly repudiated.'") (cleaned up).

By its plain terms, the Trust Act only regulates the conduct of state and local law enforcement. State law enforcement are not the agents of the federal government and any collateral effect on the federal government is indirect and largely incidental. *See McHenry Cty.*, 44 F.4th at 593. Likewise, the Guidance has no direct legal force and directly prohibits no one, not even state actors, from assisting the federal government. "A state regulation is invalid only if it regulates the United States directly." *North Dakota*, 495 U.S. at 435. Intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881. That is the case here.

Not only do the Trust Act and Guidance not directly regulate the federal government, but they also do not discriminate against it either. Thus, this Court should dismiss Count Seven for lack of discrimination. The United States bears the burden to identify some actor similarly situated to the federal government that receives more favorable treatment under the Trust Act or Guidance. *See McHenry Cty.*, 44 F.4th at 594 ("Differential treatment is critical to a discrimination-based

29

intergovernmental immunity claim."); *North Dakota*, 495 U.S. at 438 ("[T]he State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them.") (quoting *Washington*, 460 U.S. at 544). It has utterly failed to do that here. The United States does not allege, nor can it allege, that the State treats any actor more favorably than the federal government because the Trust Act and Guidance do not require state officials to treat federal officials less favorably than any other law enforcement agency or official.

There is ultimately no authority to justify Plaintiff's attempt to invalidate, on intergovernmental immunity grounds, the State of Connecticut's voluntary and constitutionally authorized decision to not participate in federal immigration enforcement. *See Murphy*, 584 U.S. at 471; *California*, 921 F.3d at 891 (rejecting similar intergovernmental immunity claim by plaintiff because of obvious inconsistency with anticommandeering rule); *see also Washington,* 460 U.S. at 546 (state law did not discriminate against the federal government where it "merely accommodated" a Constitutional requirement). There is even less support for any claim against the Guidance. Both claims should be dismissed.

**III.    The Trust Act and Guidance are valid exercises of Connecticut's Tenth Amendment rights.**

The United States' claims are not only doctrinally unsound, but they also violate Connecticut's rights protected by the Tenth Amendment. In advancing its baseless claims of preemption and immunity against Connecticut, the United States transgresses basic principles of federalism. The suit is an improper and thinly veiled attempt by the federal government to commandeer state resources for its own purposes. Our federal Constitution, however, does not tolerate this abuse of federal power and the entire suit should be dismissed for this additional reason.

"Federalism, central to the constitutional design, adopts the principal that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona,* 567 U.S. at 398-99. By constitutional design, states retain "'a residuary and inviolable sovereignty.'" *Murphy,* 584 U.S. at 470 (quoting The Federalist No. 39, at 245 (J. Madison)). "The federal government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). This is a bedrock of the Constitution's "structural protections of liberty" which promotes a healthy balance of power between the states and the federal government thereby reducing the risk of tyranny and abuse from either. *Murphy,* 584 U.S. at 473 (citations omitted). Federalism prohibits state and local resources from being "dragooned . . . into administering federal law." *Id.*

This is especially so in the realm of traditional state powers, like the health, welfare, and safety of state residents. States "remain independent and autonomous within their proper sphere of authority." *Printz,* 521 U.S. at 928. The Framers envisioned that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed," which are "more local and more accountable than a distant federal bureaucracy." *Id.* (citing The Federalist No. 45, at 293 (J. Madison)). "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)

The Trust Act is undoubtedly a proper exercise of Connecticut's authority to direct its own law enforcement resources. The Trust Act "regulate[s] the State's internal law enforcement activities," which "is a quintessential police power" exercise. *California*, 921 F.3d at 887 n.11 (citing *United States v. Morrison*, 529 U.S. 598 (2000)). "[T]he right to set the duties of office for

31

state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within a State's sovereign powers. *City of New York v. United States,* 179 F.3d 29, 36 (2d Cir. 1999). But success in this suit would plainly conscript state time and resources—it would require state officials to collect information for the federal government, open the doors of state detention facilities for the federal government, and hold individuals in custody for the federal government.

Not only does Connecticut have the right to direct the use of its own resources, but the federal government does not have the power to direct Connecticut's state and local officials as it seeks to do. *See New York*, 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.") The anticommandeering doctrine prohibits the federal government from compelling states to enact or administer a federal regulatory program, and that rule "holds true no matter how strong the federal interest at play." *New York*, 810 F. Supp. 3d at 354 (*quoting New York*, 505 U.S. at 178).[19]

In accord, courts across the country have held similar attempts to force state participation in federal immigration enforcement to be inconsistent with the Tenth Amendment and violative of the anticommandeering doctrine. *See California*, 921 F.3d at 890 (holding that "the choice of a state to refrain from participation" in federal civil immigration enforcement activities "cannot be invalid . . . where it retains the right of refusal"); *accord City of El Cenizo*, 890 F.3d at 178; *Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014); *see also United States v. New York,* 810 F. Supp. 3d 329, 354 (N.D.N.Y. 2025); *Illinois*, 796 F. Supp. 3d at 530-531 (E.D. Ill. 2025); *City of Philadelphia*, 309 F. Supp. 3d at 329; *City of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951

---

[19] *New York v. United States DOJ,* 951 F.3d 84 (2d Cir. 2020) does not compel a different outcome. *New York* was a conditions-on-funding case concerning Spending Clause legislation that did not address an assertion of Tenth Amendment rights on facts such as these.

(N.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018), *aff'd and remanded*, 957 F.3d 772 (7th Cir. 2020); *Cty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 534 (N.D. Cal. 2017). Connecticut's choice not to implement the federal immigration enforcement scheme is well within its sovereign rights, and the United States' efforts to force them to do so is unconstitutional.

## IV. Plaintiff lacks standing.

Even if the Court disagrees and somehow finds the United States' complaint states a claim and does not violate the Tenth Amendment, all claims should still be dismissed because the United States lacks standing. Article III "standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). To maintain a case in federal court, a plaintiff must demonstrate that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And "standing is not dispensed in gross." *TransUnion v. Ramirez,* 594 U.S. 413, 431 (2021). Instead, a plaintiff "'must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri,* 603 U.S. 43, 61 (2024) (*quoting TransUnion,* 594 U.S. at 431). The federal government is required to prove standing, just like any other plaintiff. *United States v. Mattson,* 600 F.2d 1295, 1297 (9th Cir. 1979); *see also United States v. California,* No. 2:25-cv-06230-MCS-AGR, 2026 U.S. Dist. LEXIS 61221, at *4-5 (C.D. Cal. Mar. 18, 2026). "Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008).

The United States lacks standing to bring any of its claims asserted here. First, neither Governor Lamont nor Attorney General Tong are proper parties, and all claims against them should

be dismissed. Second, any claims regarding the Guidance fail because the alleged injury arising from that document is completely hypothetical, given that it has no force of law, and this Court could not fashion any redress related to that document.

### A. Governor Lamont and Attorney General Tong are not proper Defendants.

Neither Governor Lamont nor Attorney General Tong are proper defendants here because neither enforces the Trust Act.[20]  For each claim, Plaintiff must establish the conduct from which it seeks relief is "fairly traceable" to, and "likely to be redressed by a favorable ruling" against, each defendant. *Doe v. Hochul,* 139 F.4th 165, 184 (2d Cir. 2025); *see also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("'The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.'") (quotations omitted). Here, it cannot do so.

Like the *Ex Parte Young* exception for Eleventh Amendment immunity, for a party to be a proper defendant to any facial statutory challenge, the defendant must have sufficient connection with enforcement of the statute such that an order enjoining enforcement would provide some relief. *See United States v. Walz,* No. 25-cv-2668 (KMM/DTS), 2026 U.S. Dist. LEXIS 65486, at *8 (D. Minn. Mar. 27, 2026) (collecting cases). "[T]he official being sued must have (1) a particular duty to enforce the law in question and (2) a demonstrated willingness to exercise that duty." *We the Patriots USA, Inc. v. Lamont*, No. 3:23-cv-00737 (KAD), 2024 U.S. Dist. LEXIS 51190, at *6 (D. Conn. Mar. 22, 2024); *see also Grant v. Lamont*, No. 3:22-cv-01223 (JBA), 2023 U.S. Dist. LEXIS 147954, at *4 (D. Conn. Aug. 23, 2023) (same). General enforcement power is not enough. *See Connecticut Assn. of Health Care Facilities v. Rell*, No. 3:10-CV-136 (PCD), 2010 U.S. Dist.

---

[20] Governor Lamont also has no connection to the OAG Guidance. While Attorney General Tong issued the Guidance, as discussed above and below, the Guidance is not "enforceable" and the United States has suffered no injury from the Guidance that is redressable.

LEXIS 54649, at *16 (D. Conn. June 2, 2010) *Cinicola v. Lamont*, No. 3:25-CV-493 (VDO), 2026 U.S. Dist. LEXIS 592, at *11 (D. Conn. Jan. 5, 2026).

Neither the Governor nor the Attorney General have any enforcement duty associated with the Trust Act. Neither the Governor's general constitutional duty to "take care that the laws be faithfully executed," nor the Attorney General's position as chief legal officer of the State make them proper parties. Conn. Const. art. IV, § 12. Any alleged injury from the Act is not traceable to the defendants, nor would any order enjoining them from "enforcing" the Act accomplish anything. Such an order would not redress any hypothetical injury the United States asserts. Therefore, all claims against Governor Lamont and Attorney General Tong should be dismissed.

**B. The United States does not have standing to challenge the Guidance.**

The United States' claim challenging the Guidance exemplifies the abuse of the courts for political purposes against which the standing doctrine provides a valuable safeguard. *See All. for Hippocratic Med.*, 602 U.S. at 380. The United States suffers no harm if Connecticut residents understand their rights under the complex immigration enforcement statutory scheme. It suffers no injuries from Connecticut residents understanding general principles of Fourth Amendment law and knowing how they can and should respond if ICE officials show up at their door. Indeed, the complaint is entirely devoid of any alleged injury connected to the Guidance itself.

To the extent the United States alleges it is injured because it is impeded in carrying out immigration enforcement, any such claim is neither redressable nor traceable to the Guidance. *See Murthy,* 603 U.S. at 73. The federal government is free to carry out its immigration enforcement prerogatives, and the existence of the Guidance does not change that. An order "enjoining enforcement" of the unenforceable Guidance would not redress anything. In short, there is a fatal

disconnect between the injury the United States alleges and the judicial relief it seeks. *See Murthy,* 603 U.S. at 73.

"A federal district court is not a roving beacon of justice, free to opine on each question any party presents." *City of Boston*, 2026 U.S. Dist. LEXIS 117779, at \*18 (*citing All. for Hippocratic Med.*, 602 U.S. at 378-82). It should decline to entertain the United States' absurd challenge to the Guidance and dismiss it.

## CONCLUSION

Ultimately, the refusal to cooperate in civil immigration enforcement is within the State of Connecticut's "residuary and inviolable sovereignty," *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (J. Madison). The Trust Act is an expression of Connecticut's sovereignty. For all the foregoing reasons, the Court should reject the United States' attempts to invalidate Connecticut's law and conscript state resources to carry out its immigration enforcement agenda. Defendants respectfully request the Court grant their motion and dismiss the complaint in its entirety.

<div style="margin-left:40%">

Respectfully submitted,
STATE DEFENDANTS

WILLIAM TONG
ATTORNEY GENERAL

By: /s/ *Janelle Medeiros*
Janelle Medeiros (ct30514)
Special Counsel for Civil Rights
Michael Rondon (ct31022)
Edward Rowely (ct30701)
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Tel:  (860) 808-5020

</div>

Fax: (860) 808-5347
E-mail: Janelle.Medeiros@ct.gov
Michael.rondon@ct.gov
Edward.Rowley@ct.gov

## **CERTIFICATION**

I hereby certify that on July 6, 2026, a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

U.S. DOJ-Civil Rights Dept.
Jackson Story
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Jackson.m.story@usdoj.gov

/s/ *Janelle Medeiros*
Janelle Medeiros (ct30514)
Assistant Attorney General