**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE UNITED STATES OF AMERICA,

    Plaintiff,

    v.

STATE OF CONNECTICUT, et al.,

    Defendants.

No. 3:26-cv-568-AWT

JULY 27, 2026

**MEMOANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFF'S**
**CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.      Federal Supremacy Principles.................................................................................. 3

II.     Congress's Comprehensive and Cooperative Immigration Scheme................................. 4

III.    The Challenged Laws ............................................................................................ 10

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT...................................................................................................................... 11

I.      The Challenged Laws Are Preempted..................................................................... 11

        A.      The Challenged Laws stand as an obstacle to the immigration goals and objectives of Congress. ............................................................................ 12

        B.      Congress expressly preempted state restrictions on information sharing and no presumption against preemption applies.................................................. 16

        C.      The provisions of the INA regulate aliens. ..................................................... 21

        D.      No presumption against preemption applies..................................................... 21

II.     The Challenged Laws Violate Intergovernmental Immunity Principles.......................... 23

        A.      The Challenged Laws facially discriminate against the Federal Government. .....23

        B.      The Challenged Laws impermissibly regulate the Federal Government...............30

III.    Invalidating the Challenged Laws Would Not Implicate the Tenth Amendment. ........... 35

IV.     The United States Has Standing. .......................................................................... 38

CONCLUSION.................................................................................................................. 40

**INTRODUCTION**[1]

Under both the Constitution and the Immigration and Nationality Act ("INA"), the Federal Government has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The immigration framework, established by Congress and administered by federal agencies, reflects a careful balance of law enforcement, foreign affairs, and public safety concerns—concerns that belong to the Nation as a whole, not a single state. That framework accordingly does not permit a patchwork of state and local policies that attempt to set their own rules for the implementation of federal immigration laws. Although a state may regulate legitimate areas of local concern, it may not do so in a manner that conflicts with and stands as an obstacle to the operations of the Federal Government, contradicts federal law, imposes mandates or prohibitions on the Federal Government, or singles out the Federal Government for disfavored treatment. The State of Connecticut and City of New Haven have crossed this constitutional line. Despite their overt attempts to impede the enforcement of federal immigration law by (i) restricting the flow of necessary information between state and federal law enforcement officers; (ii) mandating that state and local officials refuse to comply with administrative detainers, warrants, and subpoenas; (iii) prohibiting federal officials' access to inspect and interview aliens in custody and cooperative immigration enforcement agreements; and (iv) requiring state and local officials to provide notice of the issuance of, and sometimes the consent of the alien to comply with, detainers issued concerning aliens in custody, Defendants moved to dismiss the United States' Complaint. *See* Dkt. Nos. 29, 30 ("City MTD"), 31 ("State MTD"), 1 ("Complaint" or "Compl."). The Court should deny their requests and instead enter summary judgment in the United States' favor because the challenged provisions of the

---

[1] Capitalized terms not otherwise defined herein shall bear the meanings ascribed to such terms in the Statement of Undisputed Material Facts ("SOF") submitted contemporaneously herewith.

Connecticut Trust Act, as implemented in accordance with the Policy Guidance, and New Haven Executive Order ("Challenged Laws") are preempted and violate intergovernmental immunity.

Individually and collectively, the Challenged Laws seek to make it more difficult for federal immigration officers to investigate and effectuate lawful (and, in some cases, mandatory) arrests within Connecticut and New Haven. They were designed to interfere with the Federal Government's enforcement of immigration laws by restricting state and local officials from sharing information about and granting access to aliens in custody. These laws have the purpose and effect of making it more difficult for federal officers to detain and remove criminal aliens upon their release from state and local custody by depriving federal agents of basic information necessary to perform their immigration functions. For instance, although the INA requires federal agents to detain certain criminal aliens upon their release from state custody, state and local officials are prohibited from sharing information federal authorities need to do so, such as an alien's custody status or release date. These provisions undermine the Federal Government's ability to enforce the immigration laws in Connecticut and New Haven, and beyond. Connecticut and New Haven have no authority to deliberately obstruct the enforcement of federal law in this manner. The Challenged Laws are thus invalid under the Supremacy Clause for several independent, but related, reasons.

First, the Challenged Laws are preempted both expressly and because they conflict with and stand as obstacles to Congress's purposes and objectives as set out in the INA. Pursuant to its authority to regulate immigration matters, Congress set out a comprehensive scheme governing federal agents' ability to obtain information concerning and access to apprehended aliens from state and local authorities. Numerous provisions of the immigration laws reflect Congress's expectation that states would not obstruct the work of federal immigration authorities. Connecticut and New Haven cannot reject this immigration framework in favor of one they prefer. Second, the

Challenged Laws contravene principles of intergovernmental immunity because they attempt to regulate the Federal Government's performance of its core federal functions of apprehending and detaining illegal aliens. They likewise violate intergovernmental immunity because they single out federal immigration authorities for less favorable treatment than any comparable state or local law-enforcement agencies.

While Defendants largely characterize the federal immigration scheme as voluntary and justify their obstruction of federal immigration law as purported exercises of police powers, compliance with federal immigration law is mandatory and interference with federal immigration enforcement, direct regulation of the Federal Government, and discrimination against the Federal Government are not legitimate state interests. In any event, it is a fundamental Supremacy Clause principle that no state interest can justify state laws that regulate the Federal Government's operations, discriminate against it, or conflict with a federal statutory framework Congress has established. The Court should thus grant the United States summary judgment on all claims, declare the Challenged Laws to be unconstitutional and invalid, and enjoin their enforcement.

## BACKGROUND

### I.     Federal Supremacy Principles

The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. "State law[s] may run afoul of the Supremacy Clause in two distinct ways." *North Dakota v. United States,* 495 U.S. 423, 434 (1990) (plurality opinion). First, a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Second, a state

3

enactment is invalid if it "regulat[es] the United States directly," *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted), or "discriminate[s] against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). The Supremacy Clause incorporates principles of both preemption and intergovernmental immunity. The Challenged Laws do both, as they attempt to undermine the "supremacy of the national power" on matters of "immigration, naturalization and deportation." *Hines*, 312 U.S. at 62.

## II.    Congress's Comprehensive and Cooperative Immigration Scheme

"[O]ver no conceivable subject is the" federal power "more complete," and thus more supreme, "than it is over" immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotations omitted). "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution." *Hines*, 312 U.S. at 62. The regulation of immigration is a "national matter[] . . . intrusted to the government of the Union." *Ping v. United States*, 130 U.S. 581, 605–06 (1889). As a result, Congress "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893). Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which the states cannot obstruct or discriminate against. *See Arizona*, 567 U.S. at 394–95; *accord North Dakota*, 495 U.S. at 435; *id.* at 444–47 (Scalia, J., concurring).

The Constitution grants Congress the powers to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. It affords the President the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3. Congress has exercised its authority as reflected in various

4

immigration laws, including the provisions of the INA, 8 U.S.C. § 1101, *et seq.*, which reflects an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. The INA confers extensive authority on the Executive to inspect, investigate, arrest, detain, and remove aliens. *See* 8 U.S.C. §§ 1182, 1224–1228, 1231. Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") as well as its component agencies, including, among others, Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP").

Congress granted DHS several tools to fulfill its mission. For example, the INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative, not judicial, warrants. *See* 8 U.S.C. § 1226(a) ("[A]n alien may be arrested and detained" pending a removal proceeding based on "a warrant issued by the [DHS]."). The statute thus authorizes federal immigration agents to rely on administrative warrants, which are issued by the Executive Branch rather than a judicial officer. *Id.* DHS is also authorized to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to state or local custody pending prosecution, *see* 8 U.S.C. §§ 1182, 1225; 8 C.F.R. § 235.2, and "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). DHS is further authorized to arrest and search individuals without a warrant. *See id.* § 1357(a)(2), (4), (5), (c). Federal immigration authorities further are authorized to issue subpoenas "concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service," and federal district courts are authorized to issue orders requiring individuals to comply with such subpoenas. *See id.* § 1225(d)(4).

The Executive's authority to enforce the nation's immigration laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee*

*v. Davis*, 100 U.S. 257, 263 (1879) (the Federal Government "can act only through its officers and agents"). Courts have recognized that DHS may avail itself of publicly owned property for the purpose of carrying out its mission. *See, e.g.*, *United States v. King Cnty., Wash.*, 122 F.4th 740, 758 (9th Cir. 2024) ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways."). DHS has "broad discretion" to implement these laws. *Arizona*, 567 U.S. at 396.

Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(4), 1357(d). The INA further authorizes, and in some cases requires, federal immigration officials to assume custody immediately upon the alien's release from state or local custody. *See id.* § 1226(a), (c). Indeed, an alien with a final order of removal cannot be detained before his release from custody. DHS "shall detain" an alien with an order of removal "[d]uring the removal period," but for an alien who "is detained or confined" by state authorities, that period starts only when "the alien is released." *Id.* § 1231(a)(l)(B)(iii),

6

(a)(2). To bridge the gap between the end of custody by state or local officials and the beginning of federal custody, DHS officials may issue an immigration "detainer" requesting that a state or local agency advise DHS prior to an alien's release so that DHS can arrange to assume custody for the purpose of arresting and removing the alien. *See* 8 U.S.C. § 1226(c)(3), *see also* 8 C.F.R. § 287.7(a); 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible" and is issued "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Once a detainer is issued to a local agency, "such agency *shall* maintain custody of the alien for a period not to exceed 48 hours." 8 C.F.R. § 287.7(d) (emphasis added). In certain circumstances such as when an alien has committed a listed crime and is inadmissible on certain grounds, DHS "shall issue a detainer," and when the alien is no longer "detained by . . . State or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" *Id.* § 1226(c)(1)(E)(ii).

The INA also requires collaborative information-sharing between the states and the Federal Government. If state officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c). At the same time, the INA ensures that state and local officials cannot block federal officials from receiving information pertinent to their immigration duties. Federal, state, and local government

7

entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* §§ 1644, 1357(g)(10)(A) (no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence). Congress passed Section 1373 to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of New York*, 179 F.3d at 35 (rejecting claim that Section 1373 commandeers state and local governments in violation of Tenth Amendment). In enacting Section 1373, "Congress 'sought to give State and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary.'" *Dep't of Just.*, 951 F.3d at 97 (citations omitted). Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii).

These laws promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). Thus, in 1996, Congress amended 8 U.S.C. § 1226 to mandate the detention of certain aliens who, based on their commission of specified "predicate" crimes, pose a

threat to public safety. *See id.* And last year, again recognizing the vital importance of having federal and state/local law enforcement work together, Congress strengthened the INA in passing The Laken Riley Act, thereby "mandat[ing] the federal detention of illegal immigrants who are accused of burglary, theft, larceny, shoplifting, or assaulting of a law enforcement officer, and any crime that causes death or serious bodily injury to another person[.]" *Id.* § 1226(c)(1)(E)(ii). Congress has also authorized states and localities "to cooperate with the [DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). Additionally, Section 287(g) of the INA, 8 U.S.C § 1357(g), authorizes the DHS to enter into written agreements with state or local law enforcement permitting designated officers to perform specified federal immigration enforcement functions. Participation is voluntary and designated officers receive training at the Federal Government's expense. When a state or locality decides to participate, its officers act pursuant to federal authority under federal direction and oversight.

At various points in the removal process, Congress required immigration officers to provide notice to specified individuals. For example, aliens convicted of certain criminal offenses are subject to expedited removal, *see id.* § 1228, and those individuals are entitled to "reasonable notice of the charges" against them before removal is effectuated, *id.* § 1228(b)(4)(A). A similar notice requirement applies to ordinary removal proceedings, *see id.* § 1229(a), and other removal hearings, *id.* § 1534(b). In narrow circumstances, the Attorney General must "notify [an] alien" regarding the availability of "temporary protected status." *Id.* § 1254a(a)(3). By contrast, no statute or regulation requires informing aliens that they are under investigation. *Cf. id.* § 1226 (discussing apprehension of aliens); 8 C.F.R. § 287.7 (providing for immigration detainers). And doing so may constitute criminal harboring. *See* 8 U.S.C. § 1324(a)(1)(A)(iii); *Kearns v. Cuomo*, 981 F.3d 200,

9

208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

## III.    The Challenged Laws

The United States challenges certain provisions in the Challenged Laws. First, the United States challenges the restrictions on sharing information regarding immigration status, including custody status and release date. SOF at ¶¶ 2, 6, 12, 16, 17. Second, the United States challenges restrictions on state and local compliance with federal civil administrative devices, including detainers, warrants, and subpoenas. SOF at ¶¶ 1–4, 6–8, 12–14, 16–19. Third, the United States challenges restrictions on its access to aliens, including those that prevent inspection, interrogation, and arrest, as well as the ability to enter voluntary cooperative agreements to facilitate the enforcement of immigration law. SOF at ¶¶ 4, 5. Finally, the United States challenges the provisions that require local authorities to notify aliens of, and sometimes obtain their consent before complying with, detainers and requests for information. SOF at ¶¶ 7, 8.

## LEGAL STANDARD

"Summary judgment is required if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (citations/quotations omitted); *see also* Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

On a 12(b)(6) motion to dismiss, the court "accept[s] all of the complaint's factual allegations as true and draw[s] all reasonable inferences in the plaintiffs' favor." *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 103 (2d Cir. 2019). If a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged," then the motion must be denied. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations/citations omitted).

## ARGUMENT

### I.      The Challenged Laws Are Preempted.

The United States asserts both express and conflict preemption claims. *See* Compl. ¶¶ 73–97. Express preemption occurs when Congress, by statute, explicitly supersedes certain state enactments. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983). Federal statutes may expressly preempt state laws by declaring that intent on their face. *Arizona*, 567 U.S. at 399. "Preemption fundamentally is a question of congressional intent and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) (citations omitted); *see Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015) (similar). Under conflict preemption principles, a state or local enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, or if it "frustrates the purpose of the national legislation or impairs the efficiency of the[] agencies of the federal government to discharge the duties for the performance of which they were created," *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896).

The Challenged Laws expressly and impliedly conflict with Section 1373(a) insofar as they prohibit disclosing an alien's citizenship or immigration status—*i.e.*, his legal status under federal

11

immigration law—or any other information that would bear on that status. The provisions in the Challenged Laws that operate to prevent state and local officials from sharing information regarding immigration status with federal immigration authorities, SOF ¶¶ 2, 12, 16, 17, run headlong into Congress's express decision to bar such information-sharing restrictions, which prohibit any state statute that "in any way restrict[s]" state actors' ability to share "information regarding . . . citizenship or immigration status" with the Federal Government. 8 U.S.C. § 1373(a). Defendants can neither ignore the facial conflict between federal law and the Challenged Laws nor improperly narrow the preemptive effect of Section 1373(a).

Moreover, the (i) restrictions on state and local compliance with administrative detainers, warrants, and subpoenas, SOF ¶¶ 1–4, 6–8 12–14, 18; (ii) restrictions on access to interview or inspect aliens in state or local custody, *id.* ¶¶ 4, 19; (iii) provisions requiring notice to aliens concerning detainers and information sharing, *id.* ¶¶ 6–8, 16; and (iv) provisions prohibiting the performance of Section 287(g) agreements, *id.* ¶ 5, are also preempted, as they conflict with and frustrate the objectives of Congress's scheme. *See* 8 U.S.C. §§ 1182, 1225(a), (d), 1226(a), (c), 1231(a), 1373, 1357(a), (d), (g), 1644; 8 C.F.R. 235.2.

### A. The Challenged Laws stand as an obstacle to the immigration goals and objectives of Congress.

"[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Accordingly, state law conflicts with federal law—and thus is "conflict" preempted— where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotations omitted); *see, e.g.*, *Hines*, 312 U.S. at 67. A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the

12

federal government to discharge the duties for the performance of which they were created." *Davis*, 161 U.S. at 283; *see also Crosby*, 530 U.S. at 373.

The Challenged Laws stand as an obstacle to the Federal Government's ability to communicate with state and local entities regarding information relating to immigration status and require judicial warrants to compel compliance with administrative warrants, subpoenas, and detainers, and foreclosing the Federal Government's ability to interview and access aliens. *See* SOF ¶¶ 1–4, 12–14, 16–19. This "frustrates the purpose of the national legislation [and] impairs the efficiency of [] the federal government to discharge th[eir] duties." *Davis*, 161 U.S. at 283. And requiring the Federal Government to obtain court orders to obtain the information and access authorized by Congress through administrative warrants, detainers, and subpoenas that would require the Federal Government "resort to legal processes in every routine or trivial matter" rendering immigration enforcement a "practical impossibility." *City of New York*, 179 F.3d at 35.

Congress authorized the Federal Government to use administrative, not judicial, warrants and subpoenas to obtain access to aliens and related information, *see* 8 U.S.C. §§ 1125(d)(4), 1226(a), and authorized warrantless arrests to detain aliens, *id.* § 1357(a). Congress even sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). DHS is also authorized to inspect all applicants for admission or "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1); *see id.* §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. Yet, the State of Connecticut and City of New Haven seek to pose obstacles to the implementation of Congress's goals by requiring judicial warrants, detainers, and subpoenas, and burdening the

13

Federal Government's access to inspect and interview aliens. SOF ¶¶ 1–4, 12–14, 16–18. Moreover, Congress expressly authorized the formation of cooperative agreements whereby states and localities could assist in the enforcement of federal immigration law under the color of federal authority. *See* 8 U.S.C. § 1357(g). Yet the Challenged Laws specifically bar the performance of actions consistent with those authorized under Section 287(g). SOF ¶¶ 5, 19. This prohibition conflicts with and stands as an obstacle to federal law.

Even worse, by requiring notice to aliens of detainers issued by the Federal Government and the state or local entity's intent to cooperate with such detainer, as well as requiring the alien's consent to share certain information, the Challenged Laws stand as obstacles to the implementation of Congress's immigration scheme. SOF ¶¶ 6–8, 16. The INA does not contemplate any such notice in connection with detainers (while contemplating notice to aliens in connection with the performance of other immigration functions). *Compare* 8 U.S.C. §§ 1228(b)(4)(A), 1229(a), 1534(b), *with id.* § 1226; 8 C.F.R. § 287.7. Such notice will adversely affect the Federal Government's ability to obtain access to the alien by tipping the alien off as to the Federal Government's desire to detain the alien and presenting the alien with the opportunity to abscond.

Defendants argue that the Challenged Laws merely withhold assistance or are simply withholding cooperation. *See* State MTD at 15–24; City MTD at 14–17. That is incorrect; the Challenged Laws are explicitly about frustrating federal operations. *See infra* Argument § I.B. In any event, cooperation is *central* to enforcing our Nation's immigration laws. *Arizona*, 567 U.S. at 411. Congress permitted states and localities to impose criminal punishment on an alien *before* the alien is removed from the country. But in honoring the state's and locality's interests in enforcing their laws, Congress did not waive its own. Once an alien's state or local detention ends, the alien is removable and *must* be detained by federal immigration authorities. *Id.* §§ 1226(c);

14

1231(a)(4)(A). Continued cooperation is not optional after a locality takes up the Federal Government's invitation to involve itself in an exclusively federal area. That is why Congress *requires* federal immigration agents to detain criminal illegal aliens immediately upon their release from local custody, 8 U.S.C. §§ 1226(c), 1231(a), and why Congress has prohibited federal immigration authorities from taking custody before the alien's sentence of imprisonment is completed. *See, e.g.*, *id.* §§ 1231(a)(4)(A) ("the [Secretary of DHS] may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"); 1231(a)(1)(B) ("The removal period begins . . . the date the alien is released from detention or confinement."). That is only feasible if states and localities share the information and access necessary for an immediate (and safe) transfer. *Id.* §§ 1225(b)(2)(A), 1226(c); *see id.* § 1231.

Congress could have asserted first right over all aliens, but it permitted states and localities to prosecute and incarcerate aliens for non-federal crimes first, with the understanding that the Federal Government would subsequently take custody when the state and local process concluded. *Id.* § 1231(a)(4)(A). By detaining removable aliens for state and local criminal law violations, state and local law enforcement make a deliberate choice to embrace that cooperative scheme. Refusing to transfer aliens to federal custody on the back end is not simply passive; it is "state interference with acts 'necessary and proper' to the accomplishment of" the "federal dut[y]" to continue to enforce the immigration laws. *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993).

In sum, the Challenged Laws conflict with and stand as obstacles to several provisions of the INA and are thus preempted. Connecticut and New Haven have attempted to create their own laws that require the defiance of the Congressionally authorized administrative warrants, detainers, and subpoenas, and prevent DHS from interviewing or interrogating aliens. Defendants also attempt to restrict the Federal Government's receipt of information necessary to implement the

mandatory detention of aliens after their completion of state sentences. Performance of 287(g) agreements are specifically barred, despite Congressional authorization. As such, the Challenged Laws are impliedly preempted.

**B.      Congress expressly preempted state restrictions on information sharing and no presumption against preemption applies.**

While the Challenged Laws clearly conflict with and stand as obstacles to the enforcement of federal immigration law and are thus impliedly preempted, certain provisions that restrict the sharing of information regarding an alien's status are also expressly preempted. Section 1373 provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1373(b). Section 1644 is similar. *Id.* § 1644. The plain meaning of prohibit is "1. *trans.* To forbid (an action or thing) by or as by a command or statute; to interdict." OXFORD ENGLISH DICTIONARY (2d Ed. 1989). The plain meaning of "restrict" is "1. *trans.* To confine (some person or thing) *to* or *within* certain limits; to limit or bound." *Id*. By using "in any way" to modify "restrict," Congress indicated an intent to encompass a broad range of actions that could restrict the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See United States v. Krown*, 675 F.2d 46, 50 (2d Cir. 1982) (construing statutory use of "in any way" broadly).

Both Sections 1373(a) and 1644 state that they apply "notwithstanding any other provision of Federal, State, or local law." 8 U.S.C. §§ 1373(a), 1644. That statement "clearly signal[s] the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). Such phrases are "commonly interpreted by Courts of Appeals to 'supersede all other laws.'" *Id.*

16

(collecting cases). In the face of such a clause, "courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621–22 (2011) (discussing scope and meaning of notwithstanding clause in the Supremacy Clause).

Consistent with the plain text of Sections 1373 and 1644, the Second Circuit observed that "'[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *Dep't of Just.*, 951 F.3d at 114 (quoting *Arizona*, 567 U.S. at 411). It also observed that while *Arizona* found that the federal scheme left room for a state policy *requiring* information sharing, "[t]he same conclusion may not be so easy to reach . . . with respect to a state policy *prohibiting* information sharing." *Id.* (emphasis original). It reached that conclusion even in view of *Murphy v. NCAA*, 584 U.S. 453 (2018). Under Sections 1373(a) and 1644, state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35. Thus, Sections 1373 and 1644 permit a state or locality to *require* information sharing, *Arizona*, 567 U.S. at 411, but do not permit a state or locality to *prohibit* the sharing of information regarding immigration status with federal authorities, *see Dep't of Just.*, 951 F.3d at 114.

The phrase "citizenship or immigration status," as used in Section 1373(a), refers to a person's legal classification under federal law. The same subsection explains that, at least by way of example, an individual's "immigration status" may be "lawful or unlawful," referring to the individual's lawful presence in the country. *Id.* § 1373(a); *see also id.* §§ 1373(b) (same), 1644 (similar). And other provisions in the immigration scheme are in accord. *See, e.g., id.* §§ 1255 (referencing "unlawful immigration status"), 1357(g)(10)(A) (whether an alien is "lawfully present" provided as an example of information "regarding . . . immigration status"). Thus, by itself, the phrase "citizenship or immigration status" covers any legal classification under the

17

immigration laws—*e.g.*, whether an individual is a citizen, national, alien, or a lawful permanent resident and, with regard to aliens, whether they are removable.

The Challenged Laws here are invalid at least insofar as they bar disclosure of citizenship or immigration status itself. *See* SOF at ¶¶ 2, 12, 16. But the problem runs deeper. By using the phrase "information *regarding* the citizenship or immigration status," Congress intended to encompass more than simply the status itself. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (Statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."); *accord Patel v. Garland*, 596 U.S. 328, 338 (2022). At minimum, this must include facts that bear on an individual's citizenship or immigration status. Such information includes, for example, an alien's current address, *see id.* § 508(3), whether an alien has a social security number, *see id.*, and an alien's employment status, *see id.*, which can all be relevant to determine citizenship or immigration status and other information that bears on whether an alien's presence is lawful, including release date from custody (at which point an alien becomes removable). *See* 8 U.S.C. § 1306(b) (must notify government of new address); *id.* § 1305 (mandatory detention and removal); *id.* § 1231(a)(4)(A) (alien removable upon release from custody); *id.* § 1324a(h)(3) (defining aliens not authorized for employment); *cf.* Act § (a)(3) (defining confidential information to include an alien's income tax or other financial records, including social security numbers).

With Sections 1373 and 1644, "Congress sought 'to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary.'" *Dep't of Just.*, 951 F.3d at 97 (citations omitted). In every clause of Sections 1373(a) and 1644, Congress indicated its intent that state and local officials shall not be restricted from such information-

sharing. *See* 8 U.S.C. §§ 1373, 1644. In the same section, Congress required DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." *Id.* § 1373(c). The absence of "regarding" in Subsection (c) underscores the need to give effect to the breadth the word carries in Subsection (a). *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (presumption that "differences in language like this convey differences in meaning" (quotation marks omitted)). Congress must have intended Section 1373(a) to reach information beyond the legal status of individuals.

Consideration of legislative history reaffirms the point. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (The provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report accompanying Section 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19–20 (1996).

The Challenged Laws restrict the sharing of information regarding immigration status, including an alien's custody status and release date. *See* SOF at ¶¶ 2, 6, 12, 16, 17, 19. Defendants argue that information regarding their citizenship or immigration status is narrow and limited to information strictly pertaining to immigration status (i.e. what one's immigration status is), *see* State MTD at 11–13, City MTD at 19–21, but Defendants' arguments are flatly contrary to caselaw

19

that holds that "regarding" is a broadening term, and would render that word surplusage. *Lamar,* 584 U.S. at 717–18; *Patel*, 596 U.S. at 338; *Nat'l Ass'n of Mfrs. v. Dep't of Def.,* 583 U.S. 109, 128–29 (2018) ("As this Court has noted time and time again, the Court is obliged to give effect, if possible, to every word Congress used." (quotations/citations omitted)). Moreover, the EO specifically limits the sharing of immigration status information. SOF at ¶ 16. The Policy Guidance also specifically states that law enforcement officials are not obligated to share information regarding "information status" absent a judicial warrant or subpoena. SOF at ¶ 12. These prohibitions fall squarely within Section 1373.

In addition to the restrictions on sharing of information status specifically, the Act and Policy Guidance expressly forbid (in all but unusual cases) state law enforcement officials from communicating with federal immigration authorities regarding the "custody status" or "release" of removable aliens, as well as their "confidential information." SOF ¶¶ 2, 6 (citing Act §§ (b)(1)(B), (d)); *see* SOF ¶ 12 (quoting Policy Guidance at 12 ("personnel are generally not required to disclose any non-public information, including personal information or immigration status, unless presented with a valid judicial warrant or subpoena")). The EO expressly prohibits city employees from inquiring about an individual's immigration status or disclosing an individual's "immigration status" unless authorized by narrow local criteria. *See* SOF at ¶¶ 16, 17 (citing EO §§ III(2)–(4), (6), (7)). The Challenged Laws likewise limit compliance with administrative subpoenas, detainers, and warrants. SOF at ¶¶ 1 (citing Act § (b)(1)(A)), 3 (citing Act § (b)(1)(C)), 4 (citing Act § (b)(1)(D)), 12–14 (citing Policy Guidance 11–12), 18 (EO § III(8)). To the extent these provisions prohibit or restrict local entities from "maintaining" or "exchanging" information regarding immigration status with federal agencies, they are preempted. The Challenged Laws are thus expressly preempted because they prohibit the sharing of information regarding immigration

20

status with the Federal Government that is necessary to enforce federal immigration law. As a result, they cannot be reconciled with Sections 1373 and 1644 or the Supremacy Clause.

### C.      The provisions of the INA regulate aliens.

Contrary to Defendants' arguments that the INA does not regulate private actors, *see* State MTD at 24–25, City MTD at 21, the INA is a comprehensive scheme for regulating *aliens*. *See Arizona*, 567 U.S. at 395. To that end, the INA includes the authority to issue administrative warrants and subpoenas concerning aliens and conduct warrantless arrests and interrogations of aliens. 8 U.S.C. §§ 1182, 1225, 1226(a), 1225(d)(4), 1357(a). The INA aims to regulate *aliens*, even if they might require a city or state to provide access to information or the aliens themselves. *See* 8 U.S.C. §§ 1357(a), (c), 1225(d)(4). Despite Defendants' attempts to confine this analysis to a few cherry-picked statutes, the Court must construe "the federal statute as a whole . . . identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. The totality of the INA regulates aliens, not states or localities. Moreover, all express preemption provisions implicitly restrict the conduct of states and localities by preventing the enactment of laws that invade the federal regulatory sphere. But that does not mean that express preemption provisions, including that in Section 1373, regulate local governments rather than aliens. The Second Circuit, following *Murphy*, has rejected that idea in *New York v. Department of Justice*, concluding that it "does not follow" from *Murphy* that "§ 1373, on its face, violates the Tenth Amendment." 951 F.3d 84, 112–13 (2d Cir. 2020). Thus, the INA regulates aliens, not state or local governmental entities. *See infra* Argument § III.

### D.      No presumption against preemption applies.

Lacking textual support, Defendants fall back on atextual arguments to override the statutes. Defendants argue that their laws are entitled to a "presumption against preemption" despite the clear expression of Congress's preemptive intent. *See* State MTD at 9–11, City MTD

21

at 14. The Supreme Court has flatly rejected that approach when, as here, "the statute 'contains an express preemption clause,'" stating that "we do not invoke any presumption against preemption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S.* v. *Whiting*, 563 U.S. 582, 594 (2011)). The Second Circuit has repeatedly affirmed the same. *DCC Propane, LLC v. KMT Enters.*, 147 F.4th 171, 174 (2d Cir. 2025); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).

Defendants' invocation of the state's "police powers" changes nothing. *See* State MTD at 9–10, 31, City MTD at 14, 16, 20, 26–27. Defendants cite nothing to suggest that a "police powers" exception to express preemption survives *Franklin*, *DCC Propane*, or *Buono*. Indeed, to the contrary, the Supreme Court has rejected the notion that a state or local government's characterization of its "purpose" can act as a shield in the preemption analysis because "such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply . . . articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Perez v. Campbell*, 402 U.S. 637, 651–52 (1971). Moreover, even as to conflict preemption, the law is clear that no presumption against preemption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 90 (2000); *see also Ting v. AT & T*, 319 F.3d 1126, 1136 (9th Cir. 2003). Immigration is an area that is "inherently federal in character." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001). Thus, there is also no presumption as to the conflict preemption analysis. *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (declining to apply the presumption "because immigration is an area

22

traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (similar).

## II.    The Challenged Laws Violate Intergovernmental Immunity Principles.

The Challenged Laws are invalid under the intergovernmental immunity doctrine. A state law violates intergovernmental immunity if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *See North Dakota*, 495 U.S. at 435. That prohibition applies even without preemptive legislation because the Supremacy Clause itself invalidates such state regulations: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 328 (3d Cir. 2025) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 430).

### A.    The Challenged Laws facially discriminate against the Federal Government.

"[A] state law discriminates against the Federal Government . . . if it 'singles [it] out' for less favorable 'treatment' or if it regulates [it] unfavorably on some basis related to [its] governmental 'status.'" *Washington*, 596 U.S. at 839. The Challenged Laws illegally discriminate against the Federal Government because they facially "single[] out" federal officials for less favorable treatment expressly and impliedly, and regulate them unfavorably based on their status as federal officials, which is exactly what intergovernmental immunity principles bar. *Dawson v. Steager*, 586 U.S. 171, 178 (2019).

**1.** The Act, bearing the title "civil immigration detainers" facially and explicitly singles out the Federal Government for disfavored treatment in numerous respects. First, it specifically restricts state and local governmental entities from complying with federal civil warrants, detainers, and subpoenas, all of which are specifically authorized by Congress. Second, it specifically restricts state and local governmental entities from sharing information regarding

23

immigration status. Third, it prevents state and local governmental entities from granting federal immigration enforcement officials access to interview or inspect aliens despite specific authorization to do so under federal law. Fourth, it prevents the formation of agreements under INA § 287(g). Finally, it requires notice to and consent from an alien to cooperate with federal civil immigration detainers and to share certain information. These provisions single out the Federal Government for disfavored treatment and are discriminatory for several reasons.

To start, the Act imposes restrictions on the Federal Government's ability to perform a core government function (i.e., enforce immigration law). It prohibits the arrest or detention of an alien "pursuant to a civil immigration detainer" unless certain criteria found nowhere in the INA are satisfied. SOF ¶ 1 (citing Act § (b)(1)(A)). It prevents the "[a]rrest or detention of an individual based on an administrative warrant" without any exceptions. SOF ¶ 3 (citing Act § (b)(1)(C)). The discriminatory intent of these sections of the Act is made abundantly clear by the definitions section, which expressly and facially identifies (i.e., singles out) the Federal Government and its enforcement entities by name and applies only to activities performed by the Federal Government, sometimes expressly excluding comparable actors from the same disfavored treatment. For example, "'[a]dministrative warrant' means a warrant, notice to appear, removal order or warrant of deportation *issued by an agent of a federal agency* charged with the *enforcement of immigration laws* or the *security of the borders*, including *ICE* and the *United States Customs and Border Protection*, but *does not include* a warrant issued or signed by a judicial officer." Act § (a)(1) (emphasis added). "'Civil *immigration* detainer' means a request from *a federal immigration authority*" for purposes including (A) Detaining an individual suspected of *violating a federal immigration law* or who has been issued a final *order of removal*; (B) Facilitating the (i) arrest of an individual by a *federal immigration authority*, or (ii) transfer of an individual to the custody of

24

a *federal immigration authority*; (C) Providing notification of the release date and time of an individual in custody; and (D) Notifying a law enforcement officer, through *DHS* Form I-247A, or any other form *used by [DHS]* or any successor agency thereto, of the *federal immigration authority's* intent to take custody of an individual." Act § (a)(2) (emphasis added).[2] Thus, the Act singles out the Federal Government and the Federal Government's powers for disfavored treatment and apply burdens solely to immigration enforcement operations that are exclusively federal prerogatives. *Washington*, 596 U.S. at 839.

The Act further prevents law enforcement entities from communicating with "federal immigration authorit[ies] regarding the custody status or release of an individual targeted by a "civil immigration detainer," with certain limited exceptions found nowhere in the INA. SOF at ¶ 2 (citing Act § (b)(1)(B)). The Act prohibits state officials from disclosing information only to federal immigration authorities conducting federal civil immigration enforcement. SOF ¶¶ 2, 6, 12–14, 16, 17. It further requires law enforcement officers to deny access requested by federal immigration officials to interview an alien unless certain conditions, again, found nowhere in the INA, are met. SOF ¶¶ 2, 4 (citing Act § (b)(1)(D)). It does not bar sharing information or access to individuals in custody with any other law-enforcement agencies—such as those of other states and localities—or with members of the public. State actors remain free to share at least some additional information with a host of other law enforcement agencies, and other law enforcement agencies retain access to interview individuals in custody, so long as they are not federal immigration authorities. In fact, Connecticut law specifically permits political subdivisions to

---

[2] If the Act was not sufficiently clear that it was applying solely to the Federal Government based on its text, the Act overtly defines the federal entities themselves to make it abundantly clear that it singles out the Federal Government and only the Federal Government for negative treatment. *See* Act §§ (a)(4) (defining "Federal immigration authority" to include DHS and ICE), (5) (defining "ICE" as the United States Immigration and Customs). Thus, on its face, the Act singles out the Federal Government for less favorable treatment.

25

share resources, training, and information for law enforcement purposes. *See* Intrastate Mutual Aid Compact, Conn. Gen. Stat. § 28-22a (contemplating "intelligence sharing" and "joint training," among other coordination efforts among law enforcement agencies); *see also* Con. Gen. Stat. § 7-277a ("Any municipality . . . may enter into an agreement with any other municipality or municipalities, with respect to requesting and supplying police assistance and reimbursing or receiving reimbursement for the same."). These provisions for non-federal law enforcement entities stand in stark contrast to the onerous restrictions placed on federal agencies attempting to carry out Congress's mandate in the INA, and specifically Section 287(g). *See* SOF ¶ 5.

Finally, the Act requires that the alien who is the subject of a civil immigration detainer be (i) provided a copy of the detainer, (ii) notified as to whether the law enforcement agency will comply with the detainer (as if it were optional), and (iii) if the law enforcement agency is to provide so called confidential information to a federal immigration officer, the alien must provide written consent to do so. SOF ¶¶ 6–8 (citing Act §§ (d)(1), (e)(1)). These provisions single out federal immigration officials for less favorable treatment. Only requests by immigration officials are subject to these requirements; similar requests by Connecticut's law-enforcement officials, or other state law-enforcement officials, do not trigger these statutory provisions. The Act thus "explicitly treats" federal immigration authorities "differently from" everyone else. *United States v. King Cnty.*, 122 F.4th 740, 757 (9th Cir. 2024) (quotation marks omitted).

The Policy Guidance, issued by the chief legal officer of Connecticut tasked with enforcing the Act, specifies that the administrative subpoenas authorized by Congress are another civil administrative device to be defied. SOF ¶¶ 10, 12, 14 (citing Policy Guidance at 11–12). Thus, the Act applies only to civil arrests by federal immigration authorities—not civil arrests by state and

26

local law enforcement personnel or any other categories of persons. The Act thus "explicitly treats" federal immigration authorities "differently from" everyone else. *King Cnty.*, 122 F.4th at 757.

The provisions that limit the functions of law enforcement officers to cooperate with the Federal Government's Congressionally authorized administrative tools are also, without doubt, targeted at those "with whom [the federal government] deals." *North Dakota*, 495 U.S. at 437 (plurality opinion). A "regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *Id.* at 438. Accordingly, those regulations must be "imposed on some basis unrelated to the object's" relationship with the Federal Government. *See id.*; *see also, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014) (holding that statute which "single[d] out" a Federal Government contractor for "a substantially more stringent cleanup scheme" unlawfully discriminated against the Federal Government (quotation marks omitted)). The Act fails that test: only those individuals who would otherwise provide information to, grant access to, or cooperate with federal immigration authorities are prohibited from doing so. To the extent a comparator is required for this provision, law enforcement officials who have no interactions with federal immigration authorities serve as such.

**2.** The same is true of the EO, which only prohibits local law enforcement from "[d]etain[ing] or arrest[ing] a person[] based on *ICE* detainer requests," SOF ¶ 18 (citing EO § III(8)) (emphasis added), prohibiting New Haven employees from "inquir[ing] about" or "engag[ing] in activities designed to ascertain" an alien's immigration status, SOF ¶ 17 (citing EO §§ III(2)–(4)), and preventing the use of city resources "to investigate, enforce or assist in the investigation or enforcement of any federal program . . . requiring registration of individuals on the basis of . . . national . . . origin." SOF ¶ 20 (citing EO § III(5)). These restrictions apply solely

to the Federal Government and its performance of a core federal function (i.e., enforcement of federal immigration law) and thus discriminate against the Federal Government.

**3.** Defendants argue that the Challenged Laws do not discriminate against the Federal Government because the United States had not identified a "comparator." Defendants further argue that the Challenged Laws target immigration enforcement only, not the federal government itself. State MTD at 29–30; City MTD at 24–25. These illusory distinctions fail because *only* the Federal Government exercises plenary power of immigration enforcement. *See, e.g.*, *Fiallo,* 430 U.S. at 792 ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens."). Moreover, there is no need for comparators because, by their terms, the Challenged Laws impose burdens unique to the Federal Government by name and by its performance of a core federal function. A comparator is unnecessary because the Challenged Laws discriminate against the Federal Government based on the "status" of federal immigration officials as federal immigration officials. *North Dakota*, 495 U.S. at 438. Simply put, Defendants are targeting the Federal Government and one of its core functions.

The Ninth Circuit has already rejected Defendants' tailored-discrimination argument. In *Boeing Co. v. Movassaghi*, the court held that a state enactment applicable only to a single nuclear site owned by the Federal Government discriminated against the Federal Government. 768 F.3d at 842. And that makes sense. It would be extraordinary if local officials could discriminate against the Federal Government by simply naming those activities rather than identifying the Federal Government specifically—although the challenged policies *do* discriminate against ICE, DHS, and CBP by name. Troublingly, this principle suggests that states have *more* leeway to discriminate against certain federal functions *because* they are inherently federal. The obvious purpose and self-evident operation of the law is to treat the Federal Government poorly by applying only to the

28

Federal Government and impairing only a core Federal Government function. The Ninth Circuit held as much, explaining that "[b]y 'burden[ing] federal operations, and *only* federal operations,' the Executive Order violates the anti-discrimination principle of the intergovernmental immunity doctrine." *King Cnty.*, 122 F.4th at 757 (quoting *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019)). The fact that only the Federal Government is authorized to enforce civil immigration law underscores the point. Defendants cannot discriminate against the Federal Government by identifying activities in which only the Federal Government engages any more than it could expressly discriminate against the Federal Government by name. *See California*, 921 F.3d at 882 (concluding that state law was discriminatory because it "relates exclusively to federal conduct," namely, immigration detention). After all, a law regulating only an exclusively federal function, such as coining money, would plainly "single[] out the Federal Government for unfavorable treatment." *See Washington*, 596 U.S. at 840. Nor can the Tenth Amendment allow states to discriminate against the Federal Government in violation of the Supremacy Clause. *See infra* Argument § III. This turns the intergovernmental immunity doctrine, which is meant to protect the Federal Government, on its head. Imagine if the law singled out other functions that are unique to the Federal Government like military functions or the minting of coins. Discriminating against pregnancy, for example, is discrimination on the basis of sex because only women get pregnant. 42 U.S.C. § 2000e(k) ("because of or on the basis of pregnancy").

Even if specific comparators were required and did not exist, intergovernmental immunity "is not a formalist doctrine[;]" courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation" of a state law to see whether it achieves indirectly what it could not do directly. *CoreCivic*, 145 F.4th at 322 (cleaned up); *see id.* at 325 (State law carried "the same sting as a law whose text applies expressly to the federal government" because

29

it functionally eliminated the United States's chosen method of detaining immigration detainees in New Jersey.). The Challenged Laws treat federal immigration authorities differently from any other entity that requests information from the state or seeks to detain an individual in custody. These laws facially treat the Federal Government differently from any comparator one could imagine. And it is not hard to imagine comparators. While the Act requires providing an alien notice after detainer requests by federal immigration authorities, it does not require the same notice for requests by any other law enforcement agencies—from Connecticut officials, from municipalities, or from other states, for example—for any purpose. While the Challenged Laws prohibit sharing information with federal immigration authorities for purposes of federal immigration enforcement, they do not preclude disclosure to any other law enforcement agency for any other purpose. In any event, as discussed, it is not difficult to imagine that other law enforcement agencies may desire information like custody status or release date to support an investigation or prosecution under state or local law. By not applying these information and access restrictions to other law enforcement agencies, but denying the same information and access to federal immigration authorities, the Challenged Laws provide a comparator.

In sum, because the Challenged Laws subject the Federal Government to disfavored treatment by expressly identifying the Federal Government and its agencies by name and by applying to only core federal functions, they run afoul of the intergovernmental immunity doctrine.

**B.      The Challenged Laws impermissibly regulate the Federal Government.**

The Challenged Laws also violate the United States' intergovernmental immunity because they purport to regulate the Federal Government's core functions. For centuries, the Supreme Court has repeatedly stated that, absent express congressional authorization, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445

30

(1943). Political subdivisions "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. Accordingly—because no one contends Congress authorized otherwise—the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause.").

Decisions of the Supreme Court and courts of appeals illustrate the kinds of state laws that unlawfully regulate the Federal Government's operations. For instance, in *Johnson v. Maryland*, the Supreme Court held that a state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "require[] qualifications in addition to those that the [Federal] Government has pronounced sufficient." 254 U.S. 51, 57 (1920). Similarly, in *Hancock v. Train*, the Supreme Court concluded that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." 426 U.S. 167, 179–80 (1976) (quotation marks omitted). And in *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), the Ninth Circuit invalidated local ordinances that prohibited federal military recruiters from recruiting minors. *Id.* at 991–92. "By constraining the conduct of federal agents and employees," the ordinances impermissibly "regulate[d] the [federal] government directly." *Id.* at 991; *see also United States v. California*, No. 26-926, 2026 WL 1088674, at *5 (Apr. 22, 2026) (holding statute requiring federal law enforcement officers to visibly display identification invalid because it "attempt[ed] to directly regulate the federal government in its performance of law enforcement operations."); *id.* (noting

31

that the "degree [the California statute] interfered with the activities of the United States" was irrelevant because it "directly regulate[d] the conduct of the United States").

These principles apply with full force to the Federal Government's immigration-enforcement functions. Several courts of appeals have held, for example, that state bans on private detention facilities unlawfully regulated the Federal Government. *See, e.g.*, *CoreCivic*, 145 F.4th at 325–27; *GEO Grp.*, 50 F.4th at 759–61. Such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function"—immigration detention. *CoreCivic*, 145 F.4th at 325; *see also GEO Grp.*, 50 F.4th at 757 (state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). And these cases involved regulation of federal *contractors*; the Federal Government itself and federal employees have "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see North Dakota*, 495 U.S. at 436–37 (plurality opinion).

Under a straightforward application of these principles, the Challenged Laws improperly seek to regulate the Federal Government's performance of its immigration enforcement functions. The Challenged Laws require immigration enforcement authorities to procure judicial warrants to access detainees and receive information when Congress has authorized federal immigration officials to use detainers, administrative warrants, and administrative subpoenas for those purposes. *See* 8 U.S.C. §§ 1225(d)(4), 1226(a), 1357(a), (c); 8 C.F.R. § 287.7; *see Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers). Thus, the Challenged Laws impose a mandate on the Federal Government that obligates the Federal Government to do more than Congress required. They further impose prohibitions on the Federal Government's ability to obtain information concerning an alien's immigration status in contravention of federal law. *See* 8 U.S.C. §§ 1373(a), 1644.

Whereas administrative warrants issue on probable cause that the individual is an alien subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 1227(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that the subject has committed a crime, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but the Challenged Laws prevent federal agents from doing so unless they satisfy the latter, higher standard. By requiring a judicial warrant to access aliens and information, the Challenged Laws foreclose federal immigration officials' use of Congressionally authorized tools and directly impose a different method—with a different standard—on the Federal Government. Defendants have no such power. *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)). States have no authority to determine the circumstances in which federal officers can carry out their functions. And it is abundantly clear that the purpose and effect of the Challenged Laws is precisely to engage in that form of impermissible regulation. *See King Cnty.*, 122 F.4th at 756. "Because this impermissibly 'override[s] the federal government's decision, pursuant to discretion conferred by Congress,'" as to how to detain and remove aliens, the Challenged Laws constitute an unlawful regulation of federal immigration officials and are therefore invalid under the intergovernmental immunity doctrine. *See id.* at 756–57. Thus, on their face, the information and access restrictions "place[] . . . prohibition[s] on the Federal Government." *Hancock*, 426 U.S. at 180 (quotation marks omitted). And they purport to define "whether, how, and when" federal officers can obtain information regarding immigration status and access to aliens in custody. *California*, No. 26-926, 2026 WL 1088674 at *5. These requirements directly regulate the Federal.

Contrary to Defendants' assertions, the Challenged Laws do not impose mere incidental obstacles to the enforcement of federal immigration law. They fundamentally alter the way that federal officials can access information and aliens under Congress's scheme. That is a direct—not incidental—impact on federal functions. By looking to the degree to which state law interfered with the activities of the United States, Defendants focus on the regulation standard applicable to contractors and third-party employers, not the Federal Government itself. *See California*, No. 26-926, 2026 WL 1088674 at *5. Moreover, the Challenged Laws reflect an effort to impose mandates and prohibitions on the Federal Government, not merely decisions not to volunteer resources or not to participate in immigration enforcement. Intergovernmental immunity principles apply with full force to the Federal Government's immigration-enforcement functions. Several courts of appeals have held that state bans on private detention facilities unlawfully regulated the Federal Government because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325; *GEO Grp.*, 50 F.4th at 757 (explaining that a state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"); *Mayo*, 319 U.S. at 447 ("the federal function must be left free"). In short, the bar on state regulation of federal activities permits "[n]o other adjustment of competing enactments or legal principles." *Id.* at 445.

Defendants rely on *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022), but that case involved a lease of property to the Federal Government; here, the United States does not compel Defendants to lease property to anyone, but seeks temporary access to interview aliens, as well as access to information and the aliens themselves that is expressly contemplated in the INA. And insofar as the court in *McHenry County* did not apply "the functional approach that

34

intergovernmental immunity demands," *CoreCivic*'s use of that approach makes it the more compelling case. *CoreCivic*, 145F.4th at 325.

Further, the anti-commandeering doctrine is inapplicable here as it protects states from being conscripted to administer federal programs. *Printz v. United States*, 521 U.S. 898, 933 (1997); *see infra* Argument § III. Here, the United States is not seeking to force Defendants to implement a federal scheme; it is enforcing federal law through Congressionally authorized means and upholding the cooperative scheme Congress enacted.

The Challenged Laws impermissibly regulate the Federal Government by imposing mandates on the Federal Government to obtain judicial approval and prohibiting the Federal Government from accessing information and aliens necessary to enforce federal immigration law.

## III.    Invalidating the Challenged Laws Would Not Implicate the Tenth Amendment.

The Tenth Amendment bars Congress from "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (alteration and quotation marks omitted) (invalidating a federal statute that made it unlawful for state governmental entity to authorize sports gambling); *New York v. United States*, 505 U.S. 144, 161 (1992). It also prohibits Congress from "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz*, 521 U.S. at 933–35 (invalidating federal statute that required state officials to conduct federal background checks for firearms purchasers). Invalidating the Challenged Laws would do neither.

Invalidating the Challenged Laws concerning compliance with administrative warrants, detainers, and subpoenas, as well as those requiring notice to and consent from aliens to communicate regarding certain information plainly would not require the state to regulate in a particular area by enacting or repealing a particular law, as in *New York* and *Murphy.* The modest

measures of cooperation sought here are far different from requiring state and local officials "to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. The United States is *not* arguing that state or local law enforcement must arrest aliens. Instead, states and localities who elect to assume custody of criminal aliens must do so on the terms contemplated by Congress and then refrain from interfering with an orderly transfer to statutorily required federal detention thereafter.

Moreover, invalidation of the information sharing and access restrictions would merely preclude Connecticut and New Haven from obstructing the Federal Government's enforcement of the federal immigration laws. The Tenth Amendment does not give the states the right to "frustrate[] federal programs" in this way. *City of New York*, 179 F.3d at 35 (rejecting Tenth Amendment challenge to Section 1373's bar on state policies prohibiting information sharing with federal immigration authorities); *see also Dep't of Just.*, 951 F.3d at 112–14.

Additionally, barring state and local officials from undermining Congress's goals by thwarting federal agents from taking custody of criminal aliens is not "invalid" under the Tenth Amendment, any more than it would be if Congress had made state incarceration of criminal aliens *expressly subject to* a provision mandating the transfer of criminal aliens to federal custody after their sentences were served. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981); *City of N.Y.*, 179 F.3d at 35. Indeed, the United States could have prescribed the procedures state and local officials would have to use to decide whether to accept that scheme. *See FERC v. Mississippi*, 456 U.S. 742, 771 (1982). The more modest request here, that states and localities do not categorically bar all cooperation with federal immigration officials, is not the type of "federal command to the States" the Tenth Amendment bars. *Id.* at 762.

36

Defendants fret about sharing information about criminal aliens in their custody with federal immigration authorities and bearing the cost of enforcing the federal immigration scheme and removing their authority to determine the proper allocation of state resources. But this mischaracterizes what 8 U.S.C. § 1373 does. All that provision of the INA says is that state and local laws may not prohibit information sharing with immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). It is not a positive command to States and localities to allocate resources. And while "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering[,] . . . the conclusion that § 1373, on its face, violates the Tenth Amendment does not follow." *Dep't of Just.*, 951 F.3d 84, 113 (2d Cir. 2020). And even if 8 U.S.C. §§ 1373(a) and 1644 regulated states, they are still valid because they require only the "provision of information," and "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. Thus, the Second Circuit has correctly held that 8 U.S.C. §§ 1373(a) and 1644 do not compel "state and local governments to enact or administer any federal regulatory program." *City of New York*, 179 F.3d at 35. The Supreme Court has also rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King Cnty.*, 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."). This Court should as well.

37

## IV.    The United States Has Standing.

The United States's standing to enforce the Supremacy Clause and other federal laws is well established. Constitutional standing is an indispensable component of the case-or-controversy requirement of Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The United States suffers a sovereign injury when a state legislates in violation of federal law and the Supremacy Clause. *See Vt. Ag'y of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). It is obvious that "[t]he United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984–85 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025) (citing *United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996)). The Federal Government has cognizable "sovereign interests" not only in its "power to create and enforce a legal code, both civil and criminal[,]" but also in "recognition [of that code] from other sovereigns[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).

Here, the United States has suffered an injury because Connecticut and New Haven passed laws that both violate and undermine federal law. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026). The Supreme Court has recognized that "[i]t is beyond doubt that [a] complaint asserts an injury to the United States" where it alleges an "injury to its sovereignty arising from violation of its laws." *Vt. Ag'y of Nat. Res.*, 529 U.S. at 771. The Challenged Laws threaten and harm the United States' sovereign interest in the supremacy and enforcement of federal law, specifically the INA.

The Challenged Laws also undermine and conflict with federal immigration enforcement policy and impose financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Connecticut and New Haven. The Challenged Laws also pose an obstacle to the Federal Government's enforcement of immigration laws, increasing burdens on

38

costs on federal agencies charged with that responsibility. Compl. ¶ 69. The Challenged Laws thus act as an impediment to federal immigration enforcement, and without them, federal immigration agents will receive less support and cooperation of local law enforcement. As the Second Circuit explained, "[a]bsent any cooperation at all from local officials, some federal programs," such as the immigration system, "may fail or fall short of their goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). This obstruction also increases risks to federal officers who must attempt to re-apprehend potentially dangerous criminals out in the community, rather than within the safe confines of state or local detention facilities. Compl. ¶¶ 58–59, 63. These harms are directly traceable to the Challenged Laws. As alleged in the Complaint, since 2020, ICE has issued 3,070 civil immigration detainers in Connecticut. Connecticut has honored less than 20% of these detainers. Localities fare no better. As of the filing of the Complaint, the Enforcement and Removal Operations Office in Hartford reported that there were 403 active ICE detainers dating back to 2020 being tracked. But since 2020, that office has been permitted to securely pick up only 181 inmates for transport. Compl. ¶¶ 60–61. Enjoining the Challenged Laws would cure these harms.

The traceability and redressability shortfalls perceived by the district court in *United States v. City of Boston*, No. 1:25-cv-12456-LTS, 2026 WL 1493706 (D. Mass. May 28, 2026), are not present here. In *City of Boston*, the Court's holding was primarily based on Massachusetts Supreme Court precedent that stated there was no authority for Massachusetts officers to arrest and hold an individual based on a federal civil immigration detainer. *Id.* at *7 (citing *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1160 (2017)). Unlike *City of Boston*, there is no independent bar on cooperation between federal authorities and Connecticut or New Haven authorities. An order enjoining the Challenged Laws' prohibitions on cooperation with civil immigration detainers and administrative warrants and subpoenas would, indeed, alter the status quo, because it would give state and local

39

police the option to cooperate with immigration detainers and administrative warrants and subpoenas. Thus, an order enjoining the Challenged Laws would at the very least partially redress the United States' injuries, which suffices to demonstrate standing. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))). Further, an order enjoining the Challenged Laws would redress some or all of the injuries by removing these sovereign injuries and barriers to cooperation with federal immigration authorities. *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026).

The harm suffered by the United States is fairly traceable to the information sharing restrictions of the Challenged Laws because "without them, [] local law enforcement would be free to cooperate with federal immigration authorities." *United States v. Illinois*, 796 F. Supp. 3d 494, 510 (N.D. Ill. 2025). An order enjoining the information sharing restrictions in the Challenged Laws would provide the United States with the relief it seeks. *See id.* ("Enjoining the Policies would redress the alleged harm by removing definitive impediments to federal immigration policy. This would provide tangible relief[.]"); *see also Missouri*, 114 F.4th at 985. In sum, it is beyond doubt that the United States has standing to seek relief from the Challenged Laws.

## CONCLUSION

For the foregoing reasons, this Court should deny the motions to dismiss and grant the United States summary judgment against Defendants'[3] on all claims.

---

[3] The Connecticut Attorney General and Governor, and New Haven Mayor are proper defendants because they bear enforcement responsibilities under the Challenged Laws themselves and under Connecticut and New Haven law. *See* SOF at ¶¶ 9–11, 20, 21; Conn. Gen. Stat. §§ 3-1, 3-5, Conn. Const. art. IV, §§ 5, 12; *see also Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 829 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 113 (2025). To the extent that Defendants concede that relief is available against them, the United States does not oppose dropping the governor as a defendant.

Dated: July 27, 2026

Respectfully Submitted,

| | |
|---|---|
| BRETT A. SHUMATE<br>Assistant Attorney General<br>Civil Division | /s/ Jackson M. Story<br>JACKSON M. STORY<br>Trial Attorney (FL Bar No. 1032001)<br>U.S. Department of Justice |
| CHARLES E.T. ROBERTS<br>Senior Counsel to the Assistant Attorney General | Civil Division<br>Enforcement & Affirmative Litigation Branch<br>P.O. Box 386 |
| | Washington, D.C. 20044 |
| JACQUELINE COLEMAN SNEAD<br>Deputy Director<br>Enforcement & Affirmative Litigation Branch | (202) 451-7304<br>jackson.m.story@usdoj.gov |

*Attorneys for the United States of America*